UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

      Plaintiffs,

v.

XL INSURANCE AMERICA, INC., formerly
known as WINTERTHUR INTERNATIONAL
AMERICA INSURANCE COMPANY,

      Defendant.

Case No.

HON.

---

## COMPLAINT

Plaintiffs, Stryker Corporation and Howmedica Osteonics Corp. (collectively, "Stryker"), state:

### Nature of the Action

1. This is an action for bad faith settlement by an insurer. When Stryker faced products liability claims, XL refused to defend or indemnify Stryker. After this Court held that XL had breached its policy by denying coverage (a decision later affirmed by the Sixth Circuit), XL then settled part of the underlying liability. But XL did so in a way that put its own interests ahead of Stryker's. XL unilaterally, and over Stryker's objection, chose to pay the underlying claims in a way that minimized XL's liability and negated Stryker's excess insurance coverage. In doing so, XL breached its duty of good faith to Stryker and reneged on its oral and written promise to "fully protect" Stryker's interests, including Stryker's interests in obtaining

coverage through its excess insurance policy. Because of XL's actions, Stryker has incurred damages exceeding $6.2 million.

## The Parties

2. Plaintiff Stryker Corporation is a Michigan corporation, whose principal place of business is in Michigan. Stryker manufactures medical supplies and medical devices.

3. Plaintiff Howmedica Osteonics Corp. is a New Jersey corporation, whose principal place of business is in New Jersey. Howmedica Osteonics manufactures medical devices.

4. Defendant, XL Insurance America, Inc. ("XL"), is a Delaware corporation, whose principal place of business is in Connecticut. XL is the successor to Winterthur International America Insurance Company's obligations under the policy attached as **Exhibit A**. XL is in the insurance business. XL does business in Michigan.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6. Venue is proper in this district under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this action occurred in this district and because Defendant has conducted and continues to conduct business in Michigan.

7. This case is related to two lawsuits previously filed in this Court: Case No. 4:01-cv-157 ("*Stryker I*") and Case No. 1:05-cv-51 ("*Stryker II*"). Both were assigned to Judge Robert Holmes Bell.

## Factual Background

**Plaintiffs' Insurance Policies**

8. In order to protect itself from potential products liability suits, Stryker purchased insurance.

9. For the year 2000, Stryker's primary insurer was XL, and its first-layer excess insurer was non-party TIG Insurance Company ("TIG").

10. XL sold to Plaintiffs a commercial general liability policy for the period of January 1, 2000 to January 1, 2001. XL's policy covers tort claims arising out of defective medical products. The policy had a "per occurrence" limit of $15 million. A copy of the XL policy is attached as **Exhibit A**.

11. The XL policy contains a "batch" clause, which groups together medical products with the same defect. That is, if a common product defect resulted in multiple products liability claims over several years, the claims would be "batched" together, treated as one "occurrence," and covered under one policy year.

12. TIG sold to Plaintiffs a first-layer excess liability policy for the period of January 1, 2000 to January 1, 2001. The TIG policy "follows the form" of the XL policy and has limits of $25 million. A copy of the TIG policy is attached as **Exhibit B**.

13. These policies are designed to provide Stryker with "seamless" coverage for products liability claims. For one occurrence, like a batch, Stryker would pay the first $2 million of the loss, per the self-insured retention. XL would then be liable for the next $15 million. TIG would then be liable for any portion of the loss that exceeds XL's policy limits, up to $25 million.

3

**Stryker purchases Uni-Knees from Pfizer.**

14. The Uni-Knee was a line of artificial knees manufactured in 1993 by Howmedica Inc., a subsidiary of Pfizer Inc.

15. In 1998, Stryker purchased from Pfizer the assets of Howmedica, including its inventory of Uni-Knees. In essence, Pfizer sold its orthopedic business to Stryker. This transaction was accomplished through an Asset Purchase Agreement (the "Pfizer-Stryker Asset Purchase Agreement").

16. Stryker placed the purchased assets, including the Uni-Knees, into a new subsidiary, Howmedica Osteonics.

**The Uni-Knee Claims**

17. From 2000 until 2006, Plaintiffs received products liability claims and lawsuits arising out of defective Uni-Knees (the "Uni-Knee Claims"). The Uni-Knee Claims alleged that some of the Uni-Knees were defective because they contained expired polyethylene.

18. Because the Uni-Knee Claims arose from a common defect, they were a "batch" under the XL and TIG policies. As a result, all of the claims were a single "occurrence" under those policies.

19. Plaintiffs timely notified their insurers, including XL and TIG, both of the "batch" of Uni-Knee Claims and of each Uni-Knee Claim.

20. In an October 11, 2001 letter, XL denied coverage for the Uni-Knee Claims. XL incorrectly asserted that the "known or suspected" policy exclusion barred coverage because, according to XL, Stryker knew of, or suspected, the defect before XL's policy period began.

4

21. TIG closed its files on each of the Uni-Knee Claims, incorrectly treating each claim as a separate occurrence and concluding that no claim would reach TIG's coverage layer.

**Stryker settles the Uni-Knee Claims.**

22. Because their insurers denied coverage and XL refused to defend Plaintiffs, Plaintiffs were forced to protect themselves.

23. Spending their own money, Plaintiffs defended themselves and settled each Uni-Knee Claim.

24. When Plaintiffs settled the last Uni-Knee Claim in 2006, these settlements totaled approximately $7.6 million, excluding defense costs and interest (the "Uni-Knee Settlements").

25. The Uni-Knee Settlements were reasonable, as both XL and TIG have acknowledged.

26. Plaintiffs did not seek written consent from either XL or TIG before entering into the Uni-Knee Settlements.

27. Plaintiffs did not need XL's consent for the Uni-Knee Settlements, because XL had denied coverage and refused to defend Plaintiffs.

28. Plaintiffs did not seek or need TIG's consent to the Uni-Knee Settlements, because the settlements, when made, were within the self-insured retention or XL's policy limit.

**The *Stryker I* Lawsuit: XL is liable for the Uni-Knee Claims.**

29. Plaintiffs sued XL for breach of contract based on XL's failure to defend and indemnify Plaintiffs in the Uni-Knee Claims. This suit was *Stryker I*.

5

30. After a bench trial on liability in 2007, the Court in *Stryker I* ruled that XL had breached its duty to defend and indemnify Plaintiffs for the Uni-Knee Claims. (*Stryker I*, Case No. 4:01-cv-157, Doc. #915, 916, PageID #9370-9406.)

31. On September 16, 2010, after all issues regarding damages were resolved, the Court entered judgment in *Stryker I* for $27,120,608.10 in favor of Plaintiffs and against XL. (*Stryker I*, Case No. 4:01-cv-157, Doc. #1133, PageID #11027-11029.) This judgment represented the amounts that Plaintiffs had paid to settle and defend the Uni-Knee Claims, as well as interest on those amounts:

|  |  |
|---:|---:|
| Damages: | $13,903,606 |
| Prejudgment Interest: | $13,132,493 |
| Costs: | $84,509.10 |
| **TOTAL:** | **$27,120,608.10** |

32. XL appealed. The Sixth Circuit affirmed the district court's ruling that the XL policy covers the Uni-Knee Claims. The Sixth Circuit further ruled that when an insurer breaches the duty to defend and indemnify, as XL did here, the insurer is liable for the insured's "expectation interest," including consequential damages. (*Stryker I*, 735 F.3d 349, 357.)

**The *Pfizer v. Stryker* Lawsuit: Stryker is also liable for Uni-Knee Claims against Pfizer.**

33. The Uni-Knees created liability not only for Plaintiffs but also for Pfizer Inc., because Pfizer manufactured the product.

34. Pfizer tendered to Stryker some of the claims brought against it, for defense and indemnification under the Pfizer-Stryker Asset Purchase Agreement.

35. Stryker initially refused to indemnify Pfizer for Pfizer's Uni-Knee liability, alleging that Pfizer had breached warranties in the Pfizer-Stryker Asset Purchase Agreement.

36. Pfizer sued Stryker in the United States District Court for the Southern District of New York, Case No. 02-cv-8613. In that lawsuit, Pfizer claimed, among other things, that, under the Pfizer-Stryker Asset Purchase Agreement, Stryker had assumed Pfizer's tort liability to third-parties for bodily injury allegedly caused by any Uni-Knee sold after December 4, 1998.

37. Plaintiffs timely notified XL and TIG about the *Pfizer v. Stryker* lawsuit.

38. Pfizer won the *Pfizer v. Stryker* lawsuit. The District Court for the Southern District of New York granted summary judgment to Pfizer, ruling that Stryker must indemnify Pfizer for some Uni-Knee claims brought against Pfizer. A copy of the corrected opinion, dated December 2, 2004, is attached as **Exhibit C**.

39. After a trial on damages, the District Court for the Southern District of New York entered an Order and Interlocutory Judgment against Stryker in the amount of $17,710,428.34 (the "*Pfizer v. Stryker* Judgment"). A copy of the *Pfizer v. Stryker* Judgment is attached as **Exhibit D**.

40. Plaintiffs tendered the *Pfizer v. Stryker* Judgment to XL and TIG for coverage because their policies cover tort liability that Plaintiffs contractually assumed.

41. The claims brought against Pfizer were part of the same "batch" as the claims brought against Stryker. Thus, the *Pfizer v. Stryker* Judgment arose out of the same occurrence as the claims asserted directly against Stryker.

42. Nevertheless, both XL and TIG refused to indemnify Plaintiffs for the *Pfizer v. Stryker* Judgment.

**The *Stryker II* Lawsuit: TIG and XL are liable for the *Pfizer v Stryker* Judgment.**

43. Because both XL and TIG refused to cover the *Pfizer v. Stryker* Judgment, Stryker brought a second lawsuit, *Stryker II*.

44. In *Stryker II*, Plaintiffs sought summary judgment against XL and TIG regarding their liability for the *Pfizer v. Stryker* Judgment.

45. This Court granted Plaintiffs' motion. (*Stryker II*, Case No. 1:05-cv-51, Doc. #161-162, PageID #3093-3119.) The Court ruled that XL had breached its obligation to defend Stryker in *Pfizer v. Stryker* and that XL was obligated to indemnify Stryker, up to its limits, for the final judgment entered in *Pfizer v. Stryker* and for the attorneys' fees and costs incurred by Stryker in the defense of *Pfizer v. Stryker*.

46. This Court further ruled that TIG was obligated under its policy to cover any loss in excess of the XL policy. (*Id.*)

**The Settlement Conference: XL chooses to settle with Pfizer instead of paying Stryker's settlements of the Uni-Knee Claims.**

47. On January 12 and 14, 2009, this Court conducted a two-day settlement conference, which encompassed *Stryker I*, *Stryker II*, and *Pfizer v. Stryker*. Magistrate Judge Joseph G. Scoville presided, and counsel for Pfizer also participated. (*Stryker II*, Case No. 1:05-cv-51, Doc. #164, 165, PageID #3128-3129.)

48. At the time of the conference, this Court had entered partial judgments in both *Stryker I* and *Stryker II*.

49. In *Stryker I*, the Court had entered partial judgment for Stryker and against XL in the principal amount of $12,126,881. This amount consisted of the amounts that Plaintiffs

8

had paid for the Uni-Knee Settlements (approximately $7.6 million), plus some of Plaintiffs' defense costs (approximately $4.5 million). The Court further ruled that Plaintiffs were entitled to 12% prejudgment penalty interest under Michigan law. (*Stryker I*, Case No. 4:01-cv-157, Doc. #1055, 1056, PageID #10160-10175.)

50. In *Stryker II*, the Court had entered an amended partial judgment for Plaintiffs and against XL, declaring that XL was liable to indemnify Plaintiffs for the amount of the *Pfizer v. Stryker* Judgment up to XL's policy limits, plus Stryker's attorneys' fees and costs in that case. The Court further declared that TIG was liable to cover any loss in excess of XL's policy limits. (*Stryker II*, Case No. 1:05-cv-51, Doc. #162, PageID #3118-3119.)

51. TIG's counsel left after the first day of the settlement conference; TIG did not participate in the second day of the conference. TIG stated that its policy did not provide coverage for the loss.

52. XL then proceeded to negotiate directly with Pfizer. In so doing, XL did not attempt to negotiate the best deal possible. Instead, XL negotiated a settlement that allowed it to exhaust its policy limits.

53. At the end of the second day of the conference, XL announced that it had reached a settlement agreement in principle with Pfizer.

54. Initially, XL did not disclose to Plaintiffs the terms of the settlement.

55. Later, XL disclosed that, under this agreement, XL would pay $26 million to Pfizer, satisfying the *Pfizer v. Stryker* Judgment, but XL would not pay anything to Plaintiffs for the Uni-Knee Settlements.

56. XL's primary purpose in settling with Pfizer was to exhaust its policy limits; XL did not negotiate a settlement that would have maximized Stryker's insurance coverage.

57. Plaintiffs did not, and were not asked to, consent to XL's settlement with Pfizer.

58. Plaintiffs did not participate in the settlement discussions between XL and Pfizer in any way.

59. Plaintiffs expressed surprise and concern at XL's unilateral decision to settle the *Pfizer v. Stryker* Judgment but not the Uni-Knee Settlements, particularly because the district court had entered a partial judgment against XL for the amount of the Uni-Knee settlements.

60. Plaintiffs told XL that Plaintiffs did not consent to XL's unilateral settlement and that XL could not take any action that would harm Plaintiffs.  (**Exhibit E**.)

61. In response, XL assured Plaintiffs in writing that Plaintiffs would not be prejudiced by XL's settlement with Pfizer, and that XL's agreement with Pfizer would "fully protect" Plaintiffs' interests.  (**Exhibit F**.)

62. On February 2, 2009, XL consummated its settlement agreement with Pfizer, again without Plaintiffs' consent.

63. XL settled with Pfizer, instead of paying the Uni-Knee Settlements, in order to exhaust its policy limits and limit its liability for penalty interest under Mich. Comp. Laws §500.2006.

64. Instead of satisfying only the *Pfizer v. Stryker* Judgment, XL could have—consistent with the partial judgments that had been entered—paid both the *Stryker I* judgment

(which included the Uni-Knee Settlements and some defense costs in the Uni-Knee Claims) ***and*** a portion of the *Stryker II* judgment (which included the *Pfizer v. Stryker* Judgment) up to XL's limits. TIG would then have been liable for the remainder of the *Pfizer v. Stryker* Judgment.

65. But XL did not do this because XL believed that this course of action would have required it to pay more penalty interest.

66. XL knew, or should have known, that its decision to settle with Pfizer put Plaintiffs at risk for losing their excess coverage under the TIG policy.

67. Upon information and belief, XL did not reasonably investigate whether its decision to settle with Pfizer would jeopardize Stryker's excess coverage under the TIG policy.

68. In other words, when XL unilaterally settled with Pfizer, XL put its own interests ahead of Plaintiffs' interests. After it wrongfully denied coverage for millions of dollars in claims and lost two lawsuits, XL then tried to minimize penalty interest without any regard for Plaintiffs' excess coverage.

**XL represents to Plaintiffs and the Court that the Pfizer settlement will not harm Plaintiffs.**

69. On February 4, 2009, XL filed a motion for partial summary judgment and declaratory relief seeking a ruling that its unilateral settlement with Pfizer exhausted its policy limits.

70. In its initial brief supporting that motion, XL represented to the Court and Plaintiffs that XL's settlement with Pfizer would not harm Plaintiffs because Plaintiffs could obtain, from TIG, coverage for the Uni-Knee Settlements.

      a.    For example, XL stated that "the TIG policy would provide 'seamless' coverage". (*Stryker I*, Case No. 4:01-cv-157, Doc. #1072, at 9 (PageID unavailable).)

      b.    XL continued: "And because the XLIA policy has now, in fact, been exhausted . . . it follows that [the] TIG excess policy has been triggered, providing Stryker with coverage for the $7,620,731.07 incurred by Stryker in settling the underlying [Uni-Knee] tort claims brought against it." (*Stryker I*, Case No. 4:01-cv-157, Doc. #1072, at 10.)

      c.    XL further stated: "[G]iven the coverage provided by TIG for amounts exceeding XLIA's policy limits, XLIA's breach did not and could not cause Stryker to suffer any loss in excess of those limits. At all relevant times, Stryker has had excess coverage from TIG . . . for such settlements. . . . In other words, Stryker did not face any risk of, and did not actually suffer, any loss exceeding policy limits as a consequence of XLIA's breach – the TIG coverage was always available to cover that excess loss." (*Stryker I*, Case No. 4:01-cv-157, Doc. # 1072, at 13.)

71.    In their response to XL's motion, Plaintiffs raised the specter of a bad faith settlement by XL. They explained that, to the extent that XL's unilateral settlement with Pfizer "reduce[s] Stryker's overall recovery in this case, XLIA has breached its obligation to Stryker to act in good faith in settling claims against an insured." (*Stryker I*, Case No. 4:01-cv-157, Doc. #1083, PageID #10312-10313.)

72.    In its reply brief, XL responded to Stryker's concerns about bad faith. XL assured the Court and Plaintiffs that XL's settlement with Pfizer would not harm Plaintiffs.

12

      a.    XL acknowledged that "an insurer has an 'obligation to act in good faith' in paying claims." (*Stryker I*, Case No. 4:01-cv-157, Doc. #1086, p. 7 (PageID unavailable).)

      b.    XL then represented that the settlement would not harm Plaintiffs: "XLIA's payment to Pfizer, along with its forthcoming payment of Stryker's defense costs in *Stryker I*, ensures that Stryker receives everything to which it is contractually entitled: $17 million in primary coverage . . . for settlement of the Insured Contract claims and third-party claims, as well as coverage for defense costs in addition to the liability limit up until the policy was exhausted, with all remaining settlement and defense costs covered by the TIG excess policy. ***There is no 'detriment' whatsoever to Stryker as a result of XLIA's payment***." (*Stryker I*, Case No. 4:01-cv-157, Doc. #1086, pp. 7-8)(emphasis added).

73.    At the hearing on XL's motion,[1] the Court raised the issue of XL's bad faith, and XL again represented that its settlement with Pfizer would not harm Plaintiffs.

      a.    The Court asked XL's counsel, "You're not arguing for a moment here that your client structured the payments of its final limitation in such a way as to advantage your client as opposed to disadvantage other parties?" (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3534.)

      b.    XL's counsel responded: "There is absolutely not one moment where we would have disadvantaged the insured, and that's what matters. ***There is no way that . . . Stryker will be out one penny of what they're owed under the policies***. ***<u>It's not possible.</u> So there's no way that . . . what XL did is going to deny Stryker anything***

---

[1] The hearing was held as a consolidated motion hearing in both *Stryker I* and *Stryker II*. The transcript appears in the *Stryker II* record.

13

*to which it's entitled as a matter of law or as a matter of contract*." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3534)(emphasis added).

        c.        The Court continued to express concern about XL's unilateral settlement decision, stating, "Something doesn't smell quite right." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3535.)

        d.        When pressed, XL's attorney admitted that XL had entered into the Pfizer settlement because doing so was in XL's best interest: "But the insurance company has the option to settle claims, and as a profit-making enterprise, you know, an entity is going to do what it regards [as] in its interest, and there's no limit on that under the law and policy *except for good faith*." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3535)(emphasis added).

        e.        When asked by the Court to define "good faith" in the context of the Pfizer settlement, XL's attorney responded that good faith means XL cannot settle in a way that harms Plaintiffs: "*Good faith in this kind of case is you cannot settle in such a way that undermines the financial pecuniary interests of the insured* . . . ." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3536)(emphasis added).

        f.        Further, XL admitted that it knew that TIG might avoid liability under the TIG policy based on XL's settlement with Pfizer: "I assume TIG will not be happy with it [the settlement with Pfizer] . . . and I think their arguments are incorrect as a matter of law that they can escape liability on this. *[TIG] will be subjected to liability*. . . . So it's really only TIG standing here saying there's going to be a time when we're not going to make these payments, and I think those arguments are wrong as a

matter of law and fact." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3536)(emphasis added).

        g.    Finally, XL again acknowledged its duty of good faith and again represented that the Pfizer settlement would not harm Stryker: "[T]he only limitation under the policy and law on our ability to make a payment, decide which claim to pay first, is ***the obligation of good faith***, that obligation ***is violated only if you hurt the insured***. . . . ***That's not the situation here*** . . . ." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3536-3537)(emphasis added).

74.    XL's statements to the Court and Plaintiffs could not have been clearer. XL expressly and repeatedly represented that its unilateral settlement with Pfizer would not in any way harm Plaintiffs and that TIG would cover the Uni-Knee Settlements.

**XL's Settlement with Pfizer pushes Plaintiffs' Uni-Knee Settlements into TIG's layer, allowing TIG to avoid coverage.**

75.    After the Sixth Circuit affirmed this Court's coverage ruling in *Stryker I*, (735 F.3d 349, 356), XL claimed that its settlement with Pfizer exhausted its policy limits.

76.    On June 17, 2013, this Court entered judgment after remand in *Stryker I*. This Court ruled, among other things, that XL's settlement payment to Pfizer on February 2, 2009 had exhausted XL's policy limits. (*Stryker I*, Case No. 4:01-cv-157, Doc. #1215, PageID#11722-11724.)

77.    Although this Court ruled that XL had exhausted its policy limits, no insurer has reimbursed Plaintiffs for the amounts that Plaintiffs paid for the Uni-Knee Settlements.

78.    Because XL's settlement with Pfizer exhausted XL's policy limits, the Uni-Knee Settlements were pushed into TIG's policy layer.

15

79. But TIG refused to reimburse Plaintiffs for the Uni-Knee Settlements because it did not consent to them in writing.

80. Because XL's unilateral settlement with Pfizer allowed TIG to raise this "lack of consent" defense, Plaintiffs moved to supplement their complaint in *Stryker II* to plead a bad faith and consequential damages claim against XL. But the Court denied that motion, directing Plaintiffs to instead file a new lawsuit against XL if TIG prevailed on the defense. (*Stryker II*, Case No. 1:05-cv-51, Doc. #316, PageID #4634.)

81. Plaintiffs then obtained from XL a tolling agreement, which tolled the statute of limitations on the claims asserted in this lawsuit. (**Exhibit G**.) Plaintiffs have filed this lawsuit within the time allowed by the tolling agreement.

82. The Sixth Circuit agreed that TIG was not liable for the Uni-Knee Settlements. (*Stryker II*, 842 F3d 422.) It directed judgment for TIG in *Stryker II*. This Court entered judgment for TIG on January 19, 2017.

83. TIG was able to assert and prevail on its "lack of consent" defense only because of XL's unilateral decision to satisfy the *Pfizer v. Stryker* Judgment in *Stryker II* instead of paying the Uni-Knee Settlements, which were encompassed by the judgment against XL in *Stryker I*.

84. If XL had satisfied the judgment in *Stryker I*, as both the judgment and XL's duty of good faith required, then a portion of the *Pfizer v. Stryker* Judgment would have fallen in TIG's coverage layer.

85. TIG could not have refused to indemnify Plaintiffs for that portion of the *Pfizer v. Stryker* Judgment based on a lack of consent defense. This is because TIG's policy does not require TIG's consent for payment of judgments entered against its insured.

86. XL's decision to look out for its own interests instead of Plaintiffs' interests cost Plaintiffs their excess coverage. Accordingly, Plaintiffs bring this lawsuit against XL to recover the amounts that they paid for the Uni-Knee Settlements.

**Count I – Breach of Contract / Bad Faith Settlement**

87. Plaintiffs incorporate by reference the foregoing paragraphs.

88. Under Michigan law, XL owes to Plaintiffs a duty of good faith when it exercises its power to settle claims brought against its insured.

89. In order to fulfill its duty of good faith, XL must exercise its contractual power to pay judgments and settle claims in a manner that is not arbitrary, reckless, indifferent, or intentionally in disregard of the interests of its insured. An insurer breaches this duty when it acts to protect its own interest at the expense of its insured's interests.

90. XL breached its duty of good faith by settling with Pfizer in a manner that minimized XL's liability for penalty interest but compromised Plaintiffs' excess coverage.

91. When XL settled with Pfizer, it either intentionally disregarded or was indifferent to the possibility that the settlement would jeopardize Plaintiffs' excess coverage.

92. XL also breached its duty of good faith by failing to reasonably investigate how its settlement with Pfizer would impact Plaintiffs' excess coverage under the TIG policy.

93. XL further breached its duty of good faith by failing to effectively negotiate with Pfizer. XL made little effort to negotiate the best possible deal with Pfizer. XL's primary motivation in negotiating with Pfizer was to reach a settlement figure that would exhaust its policy limits and terminate liability for penalty interest under Mich. Comp. Laws §500.2006.

94. XL could have negotiated a deal that would have left Plaintiffs with additional coverage under the XL policy, but XL had no interest in such a deal. In reaching a settlement agreement that exhausted its policy instead of maximizing coverage, XL placed its own interests ahead of its insureds' interests.

95.     Because of XL's breach, XL is liable to Plaintiffs for the amount of the Uni-Knee Settlements in excess of the self-insured retention, approximately $6.2 million, plus all consequential damages caused by XL's breach of the duty of good faith.  XL is also liable for interest on this amount, under Mich. Comp. Laws §500.2006 and Mich. Comp. Laws §600.6013(8).

## Prayer for Relief

Plaintiffs seek judgment against XL in the amount of the Uni-Knee Settlements in excess of the self-insured retention, approximately $6.2 million, plus all consequential damages caused by XL's breach of the duty of good faith.  Plaintiffs also seek interest on this amount, under Mich. Comp. Laws §500.2006 and Mich. Comp. Laws §600.6013(8).

MILLER JOHNSON
Attorneys for Plaintiffs

Dated: January 20, 2017        By    /s/ David J. Gass
                                       David J. Gass (P34582)

                                By    /s/ D. Andrew Portinga
                                       D. Andrew Portinga (P55804)

                                Business Address:
                                       45 Ottawa Avenue, S.W., Suite 1100
                                       Grand Rapids, Michigan  49503
                                Telephone:  (616) 831-1700