UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION &
HOWMEDICA OSTEONICS CORP.,

      Plaintiffs,

                            Case No. 1:17-CV-66

v.

                            HON. PAUL L. MALONEY

XL INSURANCE AMERICA, INC.,

      Defendant.

_____/

## OPINION

Plaintiffs Stryker Corporation and Howmedica Osteonics Corp. (collectively, "Stryker") bring this action against their liability insurer, XL Insurance America, Inc. ("XL"), alleging that XL breached a duty of good faith when settling a claim. Before the Court is XL's motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (ECF No. 19). For the reasons discussed herein, XL's motion will be denied.

## I. Background

This case is the third in which Stryker seeks to recover from XL for damages stemming from the sale of a batch of expired artificial knee joints known as Duracon Unicompartmental Knees ("Uni-Knees"). Howmedica sold the Uni-Knees in 1997 and 1998 while it was a subsidiary of Pfizer, Inc. Stryker purchased the assets of Howmedica in 1998 under the terms of an Asset Purchase Agreement ("APA") with Pfizer. Patients who received the Uni-Knees as implants began suing Stryker and Pfizer in 2000, after the implants failed.

*Stryker sues XL to obtain coverage for the Uni-Knee claims against Stryker (Stryker I).*

Stryker's primary liability insurer for the relevant time period was XL. XL's policy provided $15 million in coverage, after a $2 million self-insured retention. Stryker also had coverage from TIG Insurance Company ("TIG"), which provided $25 million in excess coverage under a policy that followed the form of XL's policy. After XL and TIG refused to defend or indemnify Stryker for the Uni-Knee claims, Stryker settled with the individual claimants for a total of $7.6 million ("Uni-Knee Settlements"). Stryker then brought suit against XL to recover its costs of settlement and defense. *See Stryker Corp. v. XL Ins. Am.*, No. 4:01-cv-157 (W.D. Mich.) ("*Stryker I*"). In April 2007, the Court held that XL had a contractual obligation to defend and indemnify the Uni-Knee claims. (*Stryker I*, 4/3/2007 Op., ECF No. 916.) In December 2008, the Court entered a partial judgment against XL for approximately $12 million, not including pre-judgment interest.[1] (*Stryker I*, 12/15/2008 Order, ECF No. 1056.) This amount included the $7.6 million in Uni-Knee Settlements, as well as some of Stryker's costs for defending the Uni-Knee claims. Only the $7.6 million applied toward XL's policy limit.

*Stryker sues XL and TIG to obtain coverage for the claims against Pfizer (Stryker II).*

Many of the patients with failed implants also sued Pfizer, and Pfizer sought coverage from Stryker, arguing that the APA required Stryker to defend and indemnify Pfizer for these

---

[1] When the Court entered a final judgment in September 2010, the total amount of damages, including pre-judgment interest, was $27 million. (*Stryker I*, ECF No. 1133.)

claims. Stryker refused to provide coverage, and Pfizer sued Stryker in the Southern District of New York. In 2004, the district court in New York ruled in Pfizer's favor, holding that the APA required Stryker to defend and indemnify Pfizer.

The policies issued by XL and TIG also covered Stryker's liability to Pfizer, and Stryker filed a new lawsuit against XL and TIG in 2005 to obtain coverage for the Pfizer claim. *See Stryker v. XL Ins. Am.*, No. 1:05-cv-51 (W.D. Mich.) ("*Stryker II*"). After the district court in New York entered an interlocutory judgment in Pfizer's favor for $17.7 million, Stryker tendered this judgment to XL and TIG, but they refused to pay. On January 8, 2009, this Court held that XL was obligated to defend and indemnify the claims by Pfizer, and that TIG was liable for any excess above the limits of XL's policy. (*Stryker II*, 1/8/2009 Am. Op., ECF No. 161, PageID.3117.)

*XL settles with Pfizer.*

About a week later, Stryker, XL, TIG, and Pfizer gathered at the Court for a two-day settlement conference. TIG maintained its position that its policy offered no coverage and it decided not to participate in the second day of the conference. However, XL agreed to settle the *Pfizer* judgment for $26 million ("Pfizer Settlement"). Curiously, the settlement allocated exactly $17 million to costs that would apply to XL's policy limit.[2] The rest of the settlement was allocated to costs that likely did not apply to the policy limit, including pre-judgment interest and $500,000 of "miscellaneous" expenses. (*Stryker II*, ECF No. 499-

---

[2] At the time, it was believed that the limit of XL's policy was effectively $17 million, because the Court had held that XL was not entitled to enforce the $2 million self-insured retention clause in the policy. The Sixth Circuit later held that XL could enforce that clause.

15, PageID.8704.)

Stryker alleges in its complaint that it was not involved in the discussions between XL and Pfizer and did not consent to the settlement. Nor was it informed of the terms of the settlement before XL agreed to it.

*Stryker argues that XL acted in bad faith.*

XL subsequently sought a declaration from the Court that the Pfizer Settlement exhausted the limit of its policy. Stryker objected, contending that XL acted in bad faith by settling with Pfizer before paying the Uni-Knee claims at issue in *Stryker I.* (*Stryker II*, Pl.'s Br. in Opp'n, ECF No. 183, PageID.3367.) At a hearing on XL's motion, the Court expressed concern that the settlement had been "structured" in a manner intentionally designed to exhaust XL's policy at the expense of other parties. (*Stryker II*, 9/21/2009 Mot. Hr'g Tr., ECF No. 198, PageID.3534.) XL's attorney responded that the settlement would not harm Stryker, because Stryker could recover any remaining damages related to the Uni-Knee claims from TIG. (*Id.*, PageID.3534-3536.) Of course, TIG's attorney disagreed.

*The Court finds XL liable for the Uni-Knee Settlements, notwithstanding XL's policy limit.*

After the motion hearing, the Court held that the Pfizer Settlement did not fully exhaust the limits of XL's policy, and that XL was liable for the Uni-Knee Settlements as consequential damages for XL's refusal to defend the Uni-Knee claims. (*Stryker I*, 10/7/2009 Op., ECF No. 1092, PageID.10401.) XL appealed that decision.

*Stryker again argues that XL acted in bad faith, but the Court of Appeals holds that the Pfizer Settlement can apply to XL's policy limit.*

On appeal, Stryker again raised the issue of bad faith. It argued that the Pfizer Settlement did not exhaust XL's policy limit, in part, because XL should have paid the Uni-Knee Settlements first. Stryker argued that XL tried to "game the system" by avoiding liability for penalty interest under Mich. Comp. Laws § 500.2006 for the Uni-Knee Settlements, which were tendered to XL long before the *Pfizer* judgment. (Stryker Br. on App. 43, Case No. 10-2383 (6th Cir.), ECF No. 30; *see Stryker II*, 4/18/2013 Joint Status Rep., ECF No. 312, PageID.4607.) The Court of Appeals rejected these arguments, holding that "exhaustion turns on the actual payment of money on behalf of the insured," and that "[a]s it is clear that XL entered into the Pfizer settlement before it paid any claims under *Stryker I*, the Pfizer settlement can be used to exhaust the XL policy[.]" *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 357 (6th Cir. 2012). The Court of Appeals also noted that "Stryker cites no Michigan case law stating that an insurer has an obligation to pay claims in a particular order. Case law in other jurisdictions, however, makes clear that the general rule is that an insurer may pay claims in any order it chooses." *Id.* at 357 n.3. The Court of Appeals overturned this Court's decision that XL would be liable for the Uni-Knee Settlements as consequential damages, and remanded the matter to this Court to determine precisely how much of the Pfizer Settlement exhausted XL's policy. *Id.* at 359.

On remand, this Court held that the Pfizer Settlement fully exhausted the limit of XL's policy. (*Stryker I*, 2/8/2013 Op., ECF No. 1198.)

*Stryker attempts to assert a contingent claim of bad faith against XL.*

With XL's policy fully exhausted, Stryker turned its attention to TIG. After Stryker filed a motion for summary judgment against TIG, TIG objected to coverage of the Uni-Knee Settlements on the basis that Stryker failed to provide adequate notice of the Uni-Knee claims, and failed to obtain TIG's consent for the settlements as required by TIG's policy. Stryker also sought to add a "contingent" claim of bad faith against XL in *Stryker I*. (*Stryker I*, 4/18/2013 Joint Status Report, ECF No. 1206.) Stryker maintained that it did not need TIG's consent for the Uni-Knee Settlements, but if the Court held otherwise, then Stryker wanted to pursue a claim that XL settled with Pfizer in bad faith. (*Id.*, PageID.11659.) The magistrate judge recommended that the Court deny Stryker's request to add a new claim of bad faith because the claim likely accrued as early as January 2009, when XL settled with Pfizer, yet Stryker never attempted to supplement its complaint with this claim before the Court entered a final judgment in *Stryker I* later that year. (*Stryker I*, 4/22/2013 R&R, ECF No. 1210, PageID.11692-11693.) In addition, the magistrate judge noted that, according to Stryker, Stryker's claim was not ripe. (*Id.*) Stryker did not object to the magistrate judge's report and recommendation, so the Court adopted it. (*Stryker I*, 5/16/2013 Order Approving & Adopting R&R, ECF No. 1212.)

Stryker also attempted to supplement its complaint in *Stryker II* to assert a "contingent" claim of bad faith against XL for satisfying the *Pfizer* judgment before paying the Uni-Knee Settlements. The Court denied Stryker's motion because its new cause of action was not related to any claims originally asserted in that case. (*Stryker II*, 10/7/2013

Op., ECF No. 360, PageID.5107.) *Stryker II* concerned XL's liability for the *Pfizer* judgment, not XL's liability for the Uni-Knee Settlements. Also, a judgment had already been entered against XL in *Stryker II* for the claims in the non-supplemented complaint. It made no sense to further "prolong" the case against XL. (*Id.*, PageID.5113.)

*The Court finds that TIG is liable for the Uni-Knee Settlements.*

This Court subsequently held that Stryker provided adequate notice to TIG and that Stryker did not need to obtain TIG's consent for the Uni-Knee Settlements because the language of TIG's policy regarding consent[3] contained a latent ambiguity. Stryker argued, and this Court agreed, that the consent requirement only applied to claims within TIG's coverage layer. Even TIG's claims adjusters testified that they were not concerned about any claims that were below TIG's coverage layer. (*Stryker II*, 10/30/2014 Op., ECF No. 546, PageID.10264-10266.) Moreover, requesting consent would have been meaningless because TIG had already denied coverage for the Uni-Knee claims. (*Id.*, PageID.10266-10269.)

*The Court of Appeals holds that TIG is not liable for the Uni-Knee Settlements.*

The Court of Appeals overturned this Court's decision regarding the need for consent, finding that the plain language of TIG's policy required TIG's consent for any settlements. *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422,

---

[3] The TIG policy provided coverage for "Ultimate Net Loss," and Ultimate Net Less was defined as "the amount of the principal sum . . . actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable . . . by . . . compromise *with the written consent of [TIG]*." (*Stryker II*, ECF No. 70-8, PageID.1486 (emphasis added).)

428 (6th Cir. 2016). Consequently, because TIG did not consent to the Uni-Knee Settlements, it was not required to reimburse Stryker for them. *Id.* at 430.

*Stryker files the instant action, claiming XL acted in bad faith.*

In this action, Stryker again argues that XL should have paid the Uni-Knee Settlements before settling with Pfizer. Stryker asserts that it has been harmed by XL's decision because Stryker is unable to recover the Uni-Knee Settlements from TIG. If XL had paid the Uni-Knee Settlements, then presumably Stryker could have recovered the amount due under the *Pfizer* judgment from TIG because TIG's policy does not require consent for judgments.

Stryker claims that XL breached its duty of good faith to Stryker in the following ways: (1) settling with Pfizer in order to minimize XL's liability for penalty interest while compromising Stryker's ability to obtain excess coverage from TIG; (2) failing to investigate the impact of the Pfizer Settlement on Stryker's ability to obtain excess coverage; and (3) failing to effectively negotiate with Pfizer to "negotiate the best possible deal with Pfizer." (Compl., ECF No. 1, PageID.18.)

XL argues that Stryker's claim is meritless and barred by the doctrines of res judicata, collateral estoppel, and the prohibition against splitting causes of action. The Court disagrees.

## II. Standard

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may

be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim." *HDC, LLC*, 675 F.3d at 611. Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F. 3d 623, 640 (6th Cir. 2016).

## III. Analysis

### A. Preclusion (Res Judicata and Collateral Estoppel)

XL asserts that Stryker's claims are barred by decisions and judgments in *Stryker I* and *Stryker II*. "'As this case involves successive diversity actions, federal res judicata principles apply.'" *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 708 (6th Cir. 2015) (quoting *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006)). "'A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.'" *Rawe*, 462 F.3d at 528 (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). "'[R]es judicata[, i.e. claim preclusion,] has four elements: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.'" *Id.* (quoting *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995)).

Stryker's claim of bad faith does not satisfy the third element of res judicata. First, the claim was not actually litigated in *Stryker I* or *Stryker II*. Although the Court of Appeals considered Stryker's assertion of bad faith, it did so only in the context of deciding whether the Pfizer Settlement exhausted XL's policy. Exhaustion is determined by the terms of the insurance policy and general principles regarding the payment of insurance claims. In contrast, bad faith considers whether the insurer protected the interests of the insured and whether the insured was harmed by the insurer's actions. The Court of Appeals did not

consider XL's motives or the impact of its decision on Stryker's ability to recover from TIG. Thus, it did not decide the issue of bad faith. Moreover, when this Court adopted the magistrate judge's recommendation to deny Stryker's request to add a contingent claim of bad faith in *Stryker I*, and refused to allow Stryker to supplement its complaint in *Stryker II*, the Court's decisions did not bar Stryker from ever bringing such a claim in a separate action. Instead, the Court merely determined that Stryker could not add the claim to those actions.

In addition, Stryker's claim is not one that "should have been" litigated in *Stryker I* or *Stryker II*. XL did not settle with Pfizer until long after those actions were filed. "'[A]n action need include only the portions of the claim *due at the time of commencing that action*,' because 'the opportunity to file a supplemental complaint is not an obligation.'" *Rawe*, 462 F.3d at 530 (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4409 (2d ed. 2002)) (emphasis added). Stryker's claim of bad faith was not "due" when Stryker commenced its prior actions, because XL's allegedly improper conduct had not yet occurred. *See id.* at 529-30 (holding that claims based on conduct occurring after the filing of the previous complaint are not barred by res judicata). Thus, Stryker's claim is not barred by res judicata (claim preclusion).

For similar reasons, the issues in Stryker's case are not barred by collateral estoppel (issue preclusion). Issue preclusion applies when:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 819, 825 (6th Cir. 2012) (quoting *Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 601 (6th Cir. 2012)).

As indicated above, Stryker did not actually litigate the issue of bad faith in *Stryker I* or *Stryker II*, and no court has made a determination of the issue. Stryker attempted to add a claim of bad faith to *Stryker I* and *Stryker II*, but this Court denied Stryker's requests for procedural reasons. Moreover, the Court noted that Stryker's "contingent" claim of bad faith was not yet ripe because Stryker had not suffered any harm from XL's decision. At the time, the Court of Appeals had not yet ruled that Stryker could not recover the Uni-Knee Settlements from TIG.

In addition, when Stryker raised the issue on appeal, the Court of Appeals sidestepped around the issue because it was not pertinent to the question of exhaustion. Thus, Stryker's new claim is not barred by any decisions or judgments in *Stryker I* or *Stryker II*.

### B. Splitting Causes of Action

XL also asserts that Stryker's action is barred by the prohibition on splitting causes of action, which requires a party to "join all claims arising from the same set of facts in a single proceeding" and prohibits them from asserting such claims "across multiple fora." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 479 (6th Cir. 2004). This doctrine does not apply because Stryker's claim does not arise from the "same set of facts" at issue in *Stryker I* and *Stryker II*. Stryker is not challenging XL's denial of benefits under the insurance policy, as it did in those previous actions. Instead, it is challenging the manner in which XL paid those

benefits, which occurred while the previous actions were pending.   Stryker was not required to supplement its complaint in those actions to add this new claim.   Thus, its claim is not barred.

### C. Merits

#### 1.   Michigan Law re Duty of Good Faith

In Michigan, "[i]t is clear that the insurer owes the insured a duty of good faith. Thus, the insured has a direct cause of action against the insurer for a breach of this duty which exposes him to excess liability." *Commercial Union Ins. Co. v. Med. Protective Co.*, 356 N.W.2d 648, 650 (Mich. Ct. App. 1984).   In the case law, a claim of bad faith typically arises when the insurer fails to settle a claim within the limits of the insurer's policy, causing the insured or an excess carrier to be liable for a judgment in excess of the insurer's policy limits.   *See, e.g., Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161, 162 (Mich. 1986); *City of Wakefield v. Globe Indemnity Co.*, 225 N.W. 643, 644 (Mich. 1929) ("[T]he insurer is liable to the insured for an excess of judgment over the face of the policy when the insurer, having exclusive control of settlement, fraudulently or in bad faith refuses to compromise a claim for an amount within the policy limit.").   Michigan courts have also recognized that an insurer's failure to process a claim in good faith might give rise to a cause of action.   *Wendt v. Auto Owners Ins. Co.*, 401 N.W.2d 375, 379 (Mich. Ct. App. 1986).

Bad faith is defined as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty."   *Commercial Union Ins. Co.*, 393 N.W.2d at 164.

13

Good-faith denials, offers of compromise, or other honest errors of judgment are not sufficient to establish bad faith. Further, claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment. However, because bad faith is a state of mind, there can be bad faith without actual dishonesty or fraud. If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent.

*Id.*

According to *Commercial Union*, a fact-finder may consider the following factors when determining whether bad faith existed:

1) failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured,

2) failure to inform the insured of all settlement offers that do not fall within the policy limits,

3) failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances,

4) failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury,

5) rejection of a reasonable offer of settlement within the policy limits,

6) undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high,

7) an attempt by the insurer to coerce or obtain an involuntary contribution from the insured in order to settle within the policy limits,

8) failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits,

9) disregarding the advice or recommendations of an adjuster or attorney,

14

> 10) serious and recurrent negligence by the insurer,
>
> 11) refusal to settle a case within the policy limits following an excessive verdict when the chances of reversal on appeal are slight or doubtful, and
>
> 12) failure to take an appeal following a verdict in excess of the policy limits where there are reasonable grounds for such an appeal, especially where trial counsel so recommended.

*Id.* at 165-66 (footnotes omitted). These factors are not exclusive, and no single factor is decisive. *Id.* at 165.

However, bad faith is not determined by looking at the insurer's conduct with the benefit of hindsight.

> In applying any factors, it is inappropriate in reviewing the conduct of the insurer to utilize "20-20 hindsight vision." The conduct under scrutiny must be considered in light of the circumstances existing at the time. A microscopic examination, years after the fact, made with the luxury of actually knowing the outcome of the original proceeding is not appropriate. It must be remembered that if bad faith exists in a given situation, it arose upon the occurrence of the acts in question; bad faith does not arise at some later date as a result of an unsuccessful day in court.

*Id.* at 166.

> For instance,
>
> [T]he insurer does not act in bad faith if it refuses settlement in the honest belief that it has a fair chance of victory, or of keeping the verdict within the policy limit, or, upon reasonable grounds, that the compromise amount is excessive, or if it has legal defenses, as yet undetermined by a court of last resort, which fairly seem applicable . . . . On the other hand, arbitrary refusal to settle for a reasonable amount, where it is apparent that suit would result in a judgment in excess of the policy limit, indifference to the effect of refusal on the insured, failure to fairly consider a compromise and facts

> presented and pass honest judgment thereon, or refusal upon grounds
> which depart from the contract and the purpose of the grant of power,
> would tend to show bad faith.

*City of Wakefield*, 225 N.W. at 652-53.

The foregoing cases stand for a simple principle: where the insurer exercises control over the settlement of a claim on behalf of the insured, the insurer has a duty to act in such a way that advances the interests of the insured. If an insurer unreasonably or arbitrarily refuses to settle a claim within the policy limits because it is motivated by its own interests rather than the interests of the insured, then the insurer may have acted in bad faith, and may be liable for an amount greater than its policy limit.

XL notes that this case is not like *Commercial Union* or any of the Michigan cases cited by Stryker. It does not involve an insurer's failure to process or settle a claim. Instead, Stryker claims that XL exercised bad faith when deciding that it would settle the *Pfizer* judgment before paying the Uni-Knee Settlements.

There is no Michigan case law expressly holding that an insurer has a duty to act in good faith when deciding which claim to pay first, but recognizing such a duty is consistent with longstanding Michigan precedent that a duty of good faith is implied in most contracts. Indeed, in *Wakefield*, the Michigan Supreme Court held that an insurer has a duty to settle in good faith because the "[p]rohibition against fraud or bad faith is imposed by law upon *every legal relationship*, is a part of every lawful grant of power, and it is not necessary to contract for it." *City of Wakefield*, 225 N.W. at 644 (emphasis added). This principle has been restated many times since *Wakefield*. *See, e.g., Hammond v. United of Oakland,*

*Inc.*, 483 N.W.2d 652, 655 (Mich. Ct. App. 1992) ("It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (quoting *Fortune v. National Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977)); *PTN-NRS, LLC v. Cty. of Wayne*, No. 332135, 2017 WL 4447016, at *3 (Mich. Ct. App. Oct. 5, 2017) ("[A]n implied covenant of good faith and fair dealing generally exists in all contracts[.]"); *Liggett Rest. Grp., Inc. v. City of Pontiac*, No. 256571, 2005 WL 3179679, at *1 (Mich. Ct. App. Nov. 29, 2005); *see also* Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

Generally, the duty of good faith arises when the contract leaves the manner of performance by a party to their discretion. *Ferrell v. Vic Tanny Int'l, Inc.*, 357 N.W.2d 669, 672 (Mich. Ct. App. 1984) ("Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.") (quoting *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975)); *accord Jacobson v. BH Assocs. Ltd. P'ship*, No. 222945, 2001 WL 738408, at *2 (Mich. Ct. App. June 29, 2001).

> Discretion arises when the parties have agreed to defer decision on a particular term of the contract.
>
> "Discretion also may arise . . . from a lack of clarity or from an omission in the express contract. In either case, the dependent party must rely on the good faith of the party in control. Only in such cases do the courts raise explicitly the implied covenant of good faith and fair dealing, or interpret a contract in light of good faith performance."

*Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2013) (quoting *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 877 n.2 (5th Cir. 1989) (applying Michigan law)). Thus, there is nothing unusual about extending the duty of good faith to this case, where an insurance contract implicitly gives the insurer discretion to choose the order in which to pay the claims against its insured.

Moreover, courts in other states that have discussed an insurer's discretion in this area have indicated that it is bounded by good faith. *See In re Sept. 11 Property Damage Litig.*, 650 F.3d 145, 153 (2d Cir. 2011) ("Under New York law, an insurer 'has no duty to pay out claims ratably and/or consolidate them,' *so long as it does not act in bad faith.*" (emphasis added)); *Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F. Supp. 2d 483, 499 (N.D. Ohio 2006) ("It is clear that an insurer can settle or pay claims *in good faith* to one insured, even if this results in actual exhaustion of the policy limits to the detriment of another insured." (emphasis added)). This Court is confident that, if presented with the issue, Michigan courts would reach the same conclusion.

XL argues that "Michigan law does not recognize an implied contractual duty of good faith," quoting *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F. Supp. 1101, 1111 (E.D. Mich. 1995). This statement of the law is overly broad. In *Dow Chemical*, the court cited another Eastern District case and *Dahlman v. Oakland University*, 432 N.W.2d 304, 306 (Mich. Ct. App. 1982). *Dow Chemical* is not persuasive because *Dahlman* involved an employment relationship; Michigan courts have refused to recognize an action for breach of an implied covenant of good faith and fair dealing in employment relationships.

*Hammond*, 483. N.W.2d at 655 (citing *Dahlman*). This case does not involve an employment relationship. Thus, *Dahlman* does not apply.

Other Michigan cases, including *Bell Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279 (Mich. Ct. App. 2003), make similarly broad statements, but those statements can be traced to *Kewin v. Massachusetts Mutual Life Insurance Co.*, 295 N.W.2d 50 (Mich. 1980),[4] which held that Michigan does not recognize an independent *tort* action for breach of the duty of good faith. *See id.* at 56 ("We decline to . . . declare the mere bad-faith breach of an insurance indemnity contract an independent and separately actionable tort and to thereby open the door to recovery for mental pain and suffering caused by breach of a commercial contract."). This is not such an action. It is an action based on breach of an implied covenant of good faith in the performance of an insurance contract. *See Harp v. Equilon Enters., LLC*, No. 302084, 2012 WL 975050, at *6 (Mich. Ct. App. Mar. 22, 2012) ("Michigan does not recognize an independent tort-like action for the breach of this implied covenant. . . . But Harp is actually asserting a direct breach of Equilon's use of its sole discretion by acting in bad faith. That claim is recognized under Michigan law."); *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 334 n.23 (3d Cir. 2001) (distinguishing breach of contract based on bad faith in performance from independent tort action for breach of implied covenant of good faith under Michigan contract law). Thus, *Kewin* and the cases relying upon it do not apply.

---

[4] *Bell Isle* cited *Ulrich v. Federal Land Bank of St. Paul*, 480 N.W.2d 910 (Mich. Ct. App. 1991), which cited *Kewin* and *Dahlman.*

### 2.  Terms of the Insurance Contract.

XL also argues, unconvincingly, that the duty of good faith should not apply here because its discretion about which claim to pay is covered by the terms of the contract. While it is true that an implied duty of good faith cannot override the express terms of a contract, *see Eastway & Blevins Agency v. Citizens Ins. Co. of Am.*, 520 N.W.2d 640 (Mich. Ct. App. 1994), XL does not point to any term in the insurance policy that would override Stryker's claim.   XL cites a provision that states:

> We shall have the right but not the duty to associate, at our own expense, in the defense or settlement of any claim or suit seeking damages within the Self-Insured Retention.   In the event of a claim or suit which in our reasonable judgement may result in the payments, including "defense expenses", in an amount in excess of the Self-Insured Retention, *we may assume control of the defense or settlement of such claim or suit.*   You will continue to be responsible for payment of the Self-Insured Retention.

(Compl., PageID.56 (emphasis added).)   This provision discusses XL's ability to assume control of the defense or settlement of a claim.   It does not discuss the ability to choose the *order* in which to settle or pay claims when there is more than one claim, as in this case. And it does not give XL unfettered discretion to make such a choice.   Thus, the foregoing provision in XL's policy does not preclude Stryker from asserting its claim of bad faith.

### 3.  Circumstances at the Time of XL's Decision.

Because *Commercial Union* and *Wakefield* require the trier of fact to consider the circumstances at the time of the insurer's decision, this Court asked the parties to provide supplemental briefing about XL's actions in light of the circumstances at the time of the Pfizer Settlement.   The circumstances that are part of the public record in *Stryker I* and

*Stryker II* suggest that XL's decision was a reasonable one. Shortly before the Pfizer Settlement, the Court indicated that TIG was liable for the Uni-Knee claims to the same extent as XL, because TIG's policy followed the form of XL's policy. (*Stryker II,* 1/8/2009 Op., ECF No. 161, PageID.3116.) The parties did not litigate any defenses specific to TIG's policy until several years later, and this Court subsequently decided that Stryker did not need TIG's consent for the Uni-Knee Settlements.

The Court will not dismiss Stryker claim on this basis, however, because the facts available to the Court at this stage are not exhaustive as to XL's knowledge and intent. Discovery may reveal more about XL's knowledge about the impact of its decision, and about its motive for settling with Pfizer instead of reimbursing Stryker for the Uni-Knee Settlements, and ultimately the trier of fact will have to weigh all the available evidence and the circumstances surrounding XL's decision to determine whether XL acted in bad faith. In other words, Stryker's allegations are sufficient to proceed further. They are sufficient to state a plausible claim that XL may have acted in bad faith when deciding to settle with Pfizer, even when taking into account the circumstances that are part of the public record.

4. <u>Reasonable Investigation / Effective Negotiation.</u>

As part of its claim, Stryker asserts that XL failed to conduct a reasonable investigation into the impact of the Pfizer Settlement and failed to "effectively negotiate" the Pfizer Settlement. XL does not directly address these specific allegations in its motion to dismiss. After the Court asked the parties to provide further briefing on these issues, XL responded

by relying upon its general argument that these issues are covered by the contract and are outside the scope of the claims recognized in *Commercial Union* and *Wakefield*.

For the reasons already stated, the Court rejects XL's argument that an insurer's duty of good faith is limited to the circumstances in *Commercial Union* and *Wakefield*. In addition, the Court rejects XL's assertion that the allegations concerning investigation and negotiation are covered by the contract. XL does not point to any provision in its contract that would cover investigation and negotiation, other than the provision mentioned above. If anything, that provision reinforces the application of the duty of good faith to the manner in which XL settled claims on behalf of Stryker, because the provision gives "control" over settlement to XL. (Compl., PageID.56.) That control is what triggers the duty of good faith. *See City of Wakefield*, 225 N.W. at 644.

Moreover, to the extent Stryker alleges a failure to investigate, the Court views this as another factor to consider when determining whether XL acted in bad faith. It is similar to at least one of the factors mentioned in *Commercial Union*, i.e., "failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits." *Commercial Union*, 393 N.W.2d at 165. And it is consistent with the factors that examine whether the insurer kept the insured informed about settlement offers and other developments in the case. *See id.* If an insurer has a duty to further the interests of the insured when entering into settlements, it cannot do so on a blank slate, and a failure to investigate the impact of its decision or to consult with its insured about the matter may, in

some circumstances, indicate recklessness or intentional disregard of the interests of the insured.

To the extent Stryker asserts that XL failed to "effectively negotiate" the Pfizer Settlement, the Court has reservations about the viability of this claim, but XL has not given the Court a persuasive reason to dismiss it at this stage. Accordingly, the Court will allow it to proceed.

### 5. Stryker's Failure to Obtain Consent.

Finally, XL argues Stryker's inability to recover from TIG is Stryker's fault, because Stryker did not seek consent from TIG. This argument conveniently ignores the fact that Stryker would not have needed to request TIG's consent for settlements if XL had honored its contract to defend and indemnify the Uni-Knee claims in the first instance. In other words, XL's finger pointing ignores its own role in Stryker's predicament.

More importantly, XL's argument brushes aside the circumstances *at the time of XL's decision*, when XL was obligated to act in Stryker's interests. XL's decision to settle with Pfizer allegedly gave TIG a defense that TIG would not have been able to assert otherwise. Stryker plausibly alleges that XL made this decision to further its own interests, to the detriment of Stryker. That is enough to state a claim.

This does not necessarily mean that Stryker's actions are irrelevant. They may be relevant to other issues or defenses that are not before the Court at this stage; however, they are not grounds for dismissal of Stryker's claim in a motion for judgment on the pleadings.

## IV. Conclusion

In short, accepting Stryker's well-pleaded allegations as true, Stryker states a viable claim that is not barred by res judicata, collateral estoppel, or the prohibition on splitting causes of action.   Accordingly, XL's motion to dismiss will be denied.

An order will enter consistent with this Opinion.


Date:   <u>August 17, 2018</u>                    <u>/s/ Paul L. Maloney</u>
                                                Paul L. Maloney
                                                United States District Judge