UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

       Plaintiffs,

v.

XL INSURANCE AMERICA, INC., formerly
known as WINTERTHUR INTERNATIONAL
AMERICA INSURANCE COMPANY,

       Defendant.

Case No. 1:17-cv-00066

Hon. Paul L. Maloney

---

# Plaintiffs' Trial Brief

Table of Contents

Page

Introduction ................................................................................................................ 1

Expected Proofs.......................................................................................................... 1

I.   XL denied coverage for the Uni-Knee lawsuits, forcing Stryker to
     settle those claims on its own. ................................................................................ 1

II.  At a settlement conference in January 2009, XL unilaterally
     settles with Pfizer in an attempt to exhaust its policy limits and
     avoid paying part of the *Stryker I* judgment........................................................ 3

III. When settling with Pfizer, XL intentionally exposed Stryker to a
     coverage dispute with TIG, exposing Stryker to the risk that
     Stryker would lose its excess coverage................................................................ 5

IV.  Because of XL's bad-faith conduct, Stryker lost its excess
     coverage from TIG.............................................................................................. 7

XL's Bad Faith ........................................................................................................... 8

Stryker's Damages................................................................................................... 13

Anticipated Evidentiary Issues................................................................................ 14

Other         ................................................................................................................... 14

Certificate of Compliance ....................................................................................... 17

## Introduction

This is an action for insurance bad faith. Because of XL's unilateral actions, Stryker lost excess insurance coverage for about $6.2 million in settlements that Stryker paid to settle personal injury lawsuits. Stryker lost its excess coverage because XL was motivated by a selfish purpose: it was more concerned about saving money than protecting its insured.

## Expected Proofs

Stryker expects that the evidence will show as follows:

**I. XL denied coverage for the Uni-Knee lawsuits, forcing Stryker to settle those claims on its own.**

Starting in 2000, Stryker received claims and lawsuits for personal injuries arising out of defective Duracon Uni-Knee implants. The polyurethane components in these implants failed prematurely, causing injury. Stryker tendered these claims and lawsuits to XL for defense and indemnification, and XL denied coverage.

Stryker then sued XL for wrongfully denying coverage, and Stryker won. Judge Robert Holmes Bell ruled against XL on the issue of coverage and, after trial, entered a judgment against XL for the $7.6 million that Stryker had paid in settlements, plus $6.3 million in defense costs. Judge Bell also awarded Stryker $12.7 million in penalty interest, based on XL's failure to timely pay insurance benefits, as allowed by Mich. Comp. Laws 500.2006. (*Stryker I*, Case No. 4:01-cv-00157, DE 1055, PageID.10162).

The Uni-Knees created liability for Stryker, and they created liability for Pfizer, Inc., as well. Pfizer's subsidiary, Howmedica, Inc., had manufactured the Uni-Knees. Stryker purchased Howmedica's assets, including the inventory of Uni-Knees in 1998. Many recipients of the defective Uni-Knees sued both Stryker and Pfizer.

Pfizer tendered many of its Uni-Knee claims to Stryker for defense and indemnification, which Stryker refused. Pfizer then sued Stryker in the Southern District of New York, alleging that Stryker breached the indemnification provisions of the Pfizer-Stryker asset purchase agreement. Pfizer won. In 2005, Pfizer obtained an interlocutory judgment against Stryker for about $17.7 million.

In a separate lawsuit, called *Stryker II*, Stryker sued XL and its excess carrier, TIG, seeking coverage for the *Pfizer* judgment. This judgment was covered under the "insured contract" provisions of the insurance policies. Stryker won this suit as well. Judge Bell declared that XL had to pay part of the *Pfizer* judgment and that TIG was liable for any portion of the *Pfizer* judgment that exceeded XL's $15 million limits. (*Stryker II*, Case No. 1:05-cv-00051, DE 162, PageID.3119).

Thus, as of January 2009, Stryker had won complete coverage for its Uni-Knee liability. In *Stryker I*, the Court had ruled that XL was required to indemnify Stryker for the $7.6 million in Uni-Knee settlements (plus defense costs and penalty interest). In *Stryker II*, the Court had ruled that XL had to pay a portion of the *Pfizer* judgment, up to XL's policy limits, while TIG was required to pay the remainder of the *Pfizer* judgment.

2

But in January 2009, XL took Stryker's victory away, by compromising Stryker's excess insurance coverage.

## II. At a settlement conference in January 2009, XL unilaterally settles with Pfizer in an attempt to exhaust its policy limits and avoid paying part of the *Stryker I* judgment.

In late 2008, Stryker and XL jointly requested that the Court schedule a settlement conference, and they suggested that Pfizer and TIG be invited to attend, in the hope of a global resolution. Magistrate Judge Scoville presided over the settlement conference on January 12 and 14, 2009.

At the outset of the conference, Stryker's representative, Michael Cartier, advised the other parties that Stryker wanted a global resolution of all claims and the insurers should pay. Other than that, Stryker had no substantive discussions with XL during the entire settlement conference.  Stryker's position was that it had won coverage, and all that needed to be negotiated was the division of the loss between XL and TIG.

On the second day of the settlement conference, counsel for TIG told the other parties that TIG would not pay anything. TIG's counsel did not attend the second day of the settlement conference in person. XL knew full well that TIG was doing everything in its power to avoid paying anything to Stryker.

Stryker was present on the second day of the settlement conference, but it was kept in the dark about the negotiations between Pfizer and XL. At the conclusion of the second day of the settlement conference, XL and Pfizer announced that they had reached a settlement in principle. Even though XL was ostensibly

3

entering into a settlement with Pfizer on Stryker's behalf, XL never discussed the settlement with Stryker, never sought Stryker's consent to it, did not disclose the details of the settlement to Stryker, and did not disclose that it would refuse to pay part of the judgment in *Stryker I*.

Upon learning that XL had entered into a settlement with Pfizer, Stryker repeatedly objected in writing to XL's decision to enter into the settlement without Stryker's participation or consent. Stryker demanded that XL provide details on the secret settlement that XL had entered "on Stryker's behalf," but XL refused. Stryker specifically warned XL that XL had an obligation to act in good faith *vis-à-vis* Stryker and that Stryker did not consent to any settlement that would impair any of Stryker's interests.

XL did not heed that warning. Instead, XL secretly struck a deal that benefited XL at the expense of Stryker. Even though Judge Bell, after trial, had entered a judgment, in *Stryker I*, requiring XL to indemnify Stryker for the $7.6 million in settlements that Stryker paid, XL chose to pay the entire *Pfizer* judgment and not pay the *Stryker I* judgment. XL did not disclose this plan to Stryker until after the agreement was signed.

XL did this in an attempt to exhaust its policy limits and to avoid paying over $6 million in penalty interest awarded in *Stryker I* under Mich. Comp. Laws § 500.2006.

4

**III. When settling with Pfizer, XL intentionally exposed Stryker to a coverage dispute with TIG, exposing Stryker to the risk that Stryker would lose its excess coverage.**

Stryker learned of the terms of the settlement only after the settlement agreement had been signed by XL and Pfizer. As Pfizer's attorney will testify, XL did not negotiate the amount of the settlement with Pfizer at all; it simply paid Pfizer's entire $26 million demand. XL did so because XL was not at all motivated by trying to maximize Stryker's overall insurance coverage; instead, it paid any price it thought it needed to in order to exhaust its policy limits and extricate itself from the disastrous coverage litigation. XL was not looking out for Stryker at all; it was simply trying to get out of the coverage litigation and to avoid paying millions of dollars of penalty interest. In 2014, XL was ultimately ordered by the Sixth Circuit to pay the penalty interest, but at the time XL believed that it could avoid it.

In doing so, XL intentionally exposed Stryker to litigation risk. One of XL's attorneys, Mike Betz, is expected to testify that XL considered several options during the settlement conference, including: (1) pay the entire amount of the Uni-Knee Settlements as well as the Pfizer judgment and then pursue TIG under an equitable subrogation theory; (2) interplead the policy limits with the Court; or (3) settle with Pfizer alone.

Mr. Betz is expected to testify that option (1) did not appeal to XL because it involved a risk that TIG might end up not providing coverage. That is the same risk that XL decided to impose upon Stryker, instead. Option (2) did not appeal to XL because it involved a risk that penalty interest would continue to accrue. XL's

5

rejection of that option was solely due to serve its own interests, because only XL—not Stryker—would be harmed by the continued accrual of penalty interest. Thus, XL rejected the options that would create risk for XL and chose the only option that created risk for Stryker.

XL's representative at the settlement conference, Michael Daly, is expected to testify that XL had several options at the settlement conference other than the one it chose. XL knew exactly what it was doing when it decided to make Stryker shoulder these risks instead of taking the risks upon itself.

Stryker—which did not know any of the material terms of the settlement between XL and Pfizer—asked XL to explain the terms of the settlement, but XL refused. In fact, one of XL's attorneys, Mike Betz, stated in an email to Pfizer's attorneys that, "It is not our intention, until there has been agreement on a final document, to supply detailed information concerning the proposed settlement or the settlement document to Stryker's counsel for their information (or, heaven forbid, their additional input)." Remarkably, Mr. Betz indicated in the same email that XL was entering the settlement with Pfizer "on Stryker's behalf . . .". Mr. Daly is expected to testify that he did not think he had to tell Stryker about the details of the settlement because the policy did not require him to do so, even though he was settling "on Stryker's behalf."

Of course, XL should not have been settling claims "on Stryker's behalf" without Stryker's consent in the first place. XL's attorneys could not represent Stryker's interests with respect to the settlement, because there was a giant conflict

6

of interest between XL and Stryker. XL had been adverse to Stryker for seven years prior to the settlement conference and remained adverse to Stryker for five more years after the settlement conference, when it continued to dispute coverage on appeal.

**IV.   Because of XL's bad-faith conduct, Stryker lost its excess coverage from TIG.**

Because XL paid the *Pfizer* judgment first, the $7.6 million of Stryker's Uni-Knee settlements were suddenly "pushed" into TIG's layer of excess coverage. This created a coverage defense for TIG (which was not a party to *Stryker I* and therefore wasn't bound by the judgment in *Stryker I*), because TIG had not consented to Stryker's settlements. TIG would not have had this defense to payment of the *Pfizer* judgment, because the policy does not require an insurer's consent to an adjudicated liability, and because Judge Bell had already declared that TIG was liable for any portion of the *Pfizer* judgment that exceeded XL's policy limits.

Ultimately, as a direct result of XL's actions taken over Stryker's objections, TIG was able to avoid coverage under its excess policy—solely because XL's conduct had given TIG a new defense to coverage that TIG would not have possessed had XL satisfied the Court's judgments.

When XL entered into the settlement in January and February 2009, Stryker had already won coverage—after trial and almost seven years of litigation—for the Uni-Knee settlements. Stryker had a judgment against XL for those settlements. But then XL took Stryker's hard-fought victory away, ignoring the judgment that Stryker had already obtained and forcing Stryker to litigate coverage

7

for the Uni-Knee settlements all over—this time against a new coverage defense that XL's conduct had provided to TIG.

All of this occurred solely because XL wanted to exhaust its limits and try to save itself from paying millions of dollars in penalty interest. If XL had simply honored the judgments by paying Stryker's settlements and tendering the balance of its limits towards the *Pfizer* liability, then there would have been no coverage problem.

### **XL's Bad Faith**

Under Michigan law, an insurer acts in bad faith if its conduct is "arbitrary, reckless, indifferent, or [in] intentional disregard of the interest of [the insured]." *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161, 164 (Mich. 1986). "Good or bad faith is a state of mind." *Id.* at 164 n. 6 (*quoting Wakefield v. Globe Ins. Co.*, 225 N.W. 643 (Mich. 1929)). "If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent." *Commercial Union*, 393 N.W.2d at 164.

The jury will have to assess XL's conduct and determine if it was arbitrary, reckless, indifferent, or in intentional disregard of the interest of Stryker. The jury will have to evaluate XL's state of mind and determine if XL was motivated by selfish purpose in paying the *Pfizer* judgment. The evidence that Plaintiffs will present on XL's bad faith includes the following:

1. <u>XL admitted that it was trying to avoid penalty interest.</u> XL admitted in its filings, including in a brief filed with the Sixth Circuit, that it was

8

    motivated by selfish purpose in settling with Pfizer. Namely, XL paid Pfizer first because it want to exhaust its policy and avoid the paying over $6 million in penalty interest on Stryker's settlements. XL's Sixth Circuit brief states, "[o]f course XL wanted to avoid penalty interest" when explaining XL's motivation for entering into the settlement with Pfizer. (XL 3rd Brief, Sixth Cir. Case No. 09-2332, RE 70, PageID.12,).

2. <u>XL ignored options that would have protected its insured</u>. XL had several options at its disposal other than settling the Pfizer Judgment over Stryker's objection. XL also could have: paid the *Stryker I* judgment and interpleaded with the Court, in *Stryker II*, the remaining limits on XL's policy; made its settlement with Pfizer contingent on a final resolution of *Stryker I* and *II* to make sure that Stryker received full payment under its policies; or paid the full amount of the judgments in *Stryker I* and *II* and then brought a subrogation action against TIG. Instead of choosing one of these other options and protecting Stryker's interests, XL looked out for its own interests while jeopardizing Stryker's ability to obtain payment for the Uni-Knee Settlements.

3. <u>XL was motivated by spite at the settlement conference.</u> At the time of the settlement conference, XL had spent about $5.7 million trying to defeat Stryker's coverage claim. XL paid almost as much fighting Stryker as it would have paid to defend its insured. XL incurred these fees through seven years of scorched-earth litigation. The amount that XL spent shows that XL was motivated by spite at the settlement conference. XL had spent a lot in legal fees and had lost—badly.

4. <u>XL ignored its conflict of interest</u>. At the time of the settlement conference, XL had denied coverage to Stryker and therefore had a conflict of interest with Stryker, as a matter of law. In fact, XL continued to be adverse to Stryker for years after the settlement agreement, as well. XL continued to contend, including on appeal, that there was no coverage under the policy. Before, during, and after the settlement conference, XL was adverse to Stryker and was not looking out for Stryker's interests. Yet, XL purported to settle the *Pfizer* judgment "on Stryker's behalf."

5. <u>XL cut Stryker out</u>. Even though it was acting "on Stryker's behalf," XL refused to inform Stryker about the material terms of the settlement agreement until after it had been completely executed. The very first factor under *Commercial Union* indicating bad faith is if the insurer "fail[s] to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured." 393 N.W.2d at 165. Yet, Mr. Betz admitted to Pfizer's attorneys that, "It

9

is not our intention, until there has been agreement on a final document, to supply detailed information concerning the proposed settlement or the settlement document to Stryker's counsel for their information (or, heaven forbid, their additional input)." And Mr. Daly claimed that XL did not need to provide Stryker with any information or input into the settlement agreement because XL was not required to do so under the policy—a view that is directly contradicted by Michigan law on good-faith.

6. <u>XL ignored Stryker's objections</u>. XL entered into the settlement with Pfizer over Stryker's objection. Stryker's attorneys objected in a January 23, 2009 letter to XL's attorneys that "We have asked you to provide us with details. . . but you have refused to do so." Stryker's attorneys reiterated the point in a January 30, 2009 letter to XL's attorneys, noting that "Stryker is entitled, as XLIA's insured, to know . . ." and warning XL that XL needed to act in good faith vis-à-vis Stryker when conducting the settlement. These letters to XL were sent before the settlement agreement was executed, but XL still refused to provide information to Stryker. XL admitted that it did not want Stryker to know about the details of the settlement agreement.

7. <u>XL did not try to negotiate the best deal possible for Stryker, because it was more interested in exhausting its limits than maximizing coverage</u>. XL did not negotiate the amount of the settlement at all, but simply paid Pfizer's full demand so that XL could exhaust its limits and extricate itself from the coverage litigation, heedless of the potential impacts upon Stryker's interests, including Stryker's excess coverage. Pfizer's attorney, Rick Barnes, will testify that no substantive communications occurred between XL and Pfizer at the settlement conference, other than that XL made a single offer to pay Pfizer's full $26 million demand, which Pfizer accepted. Michael Daly admits that he does not remember any back-and-forth negotiations taking place between XL and Pfizer. One of XL's attorneys, Michael Betz, admitted that XL paid "too much" when entering the Pfizer settlement. XL was willing to pay too much for the settlement (thereby wasting Stryker's coverage) because its sole interest was in exhausting its policy limits.

8. <u>XL allocated the settlement amounts in such a manner that XL made sure that the settlement payment would exhaust XL's policy limits</u>. The emails and documents exchanged between XL's attorneys (Bloss Betz) and Pfizer's attorneys (Goodell DeVries) between January 16 and February 4, 2009 indicate that XL's attorneys came up with the allocation formula and that XL was insistent that exactly $17 million of the settlement payment be allocated to amounts that would exhaust

10

    XL's policy limits. Essentially, XL took the $26 million settlement figure, allocated the first $17 million of it to damages categories that fell within the policy limits in order to max out the within-limits amounts, and then created new damages categories to add up to the $26 million settlement amount. In the process of allocating the damages amounts, XL needed to deduct approximately $500,000 from the within-limits damages categories so that the within-limits damages amounted to exactly $17 million. XL then allocated that $500,000 to a new category of damages, which XL referred to as "Compensation to Pfizer for its having to deal with" Stryker's continued counter-claim asserted against Pfizer in the Southern District of New York. In other words, XL was paying Pfizer $500,000 to continue to litigate against XL's own insured, Stryker. As XL later realized, XL's decision to fund Pfizer's litigation against XL's insured was indicative of bad faith. But instead of substantively amending the settlement agreement, XL simply relabeled the damages category to state that the $500,000 was for "Miscellaneous" expenses incurred by Pfizer. The substance of this category remained the same, and Pfizer was never required to substantiate that it had or would suffer $500,000 in miscellaneous expenses. XL overpaid Pfizer in order for XL to get itself out of the coverage litigation—and in doing so, XL paid Pfizer's expenses for litigating against XL's own insured.

9. <u>While it was negotiating "on Stryker's behalf," XL was scheming to get out of the judgment that had been entered against it.</u>  Right after XL finally presented Stryker with the settlement agreement as a *fait accompli*, XL filed a dispositive motion with the Court, asking for a declaration that the settlement had exhausted XL's policy limits. In filing this motion, XL was focused on extricating itself from the coverage litigation, regardless of any effects that its conduct might have on Stryker and Stryker's excess coverage. For example, XL stated on March 23, 2009, in a reply brief that XL filed in the Western District of Michigan in support of XL's Motions for Partial Summary Judgment and for Declaratory Relief, that whether Stryker was entitled to excess coverage from TIG was "irrelevant to XLIA's motion, which focuses mainly on XLIA's continuing liability as primary carrier, not on the extent of TIG's liability as excess carrier." (Case No. 1:05-cv-51-RHB, RE 235, PageID.3475). In other words, XL was focused solely on extricating itself from the coverage litigation; it did not know or care about the effect that its conduct would have on Stryker's excess coverage.

10. <u>XL knew that TIG was not going to pay, but it pushed Stryker's settlements into TIG's layer anyway.</u> XL knew that it was exposing Stryker to litigation risk over its excess coverage, because when XL settled the case, TIG was vigorously contesting coverage. TIG filed

11

numerous filings between 2007 and 2009 denying coverage and asserting affirmative defenses. For example, on September 15, 2008, TIG filed in the Western District of Michigan a motion for reconsideration of the Court's order granting Stryker's motion for summary judgment, in which TIG stated that TIG was not bound by the Court's rulings in *Stryker I* "because TIG was not a party to Stryker I." (1:05-cv-51, Doc. 154, PageID.3074). XL had knowledge of all of these filings and knew that TIG contended that TIG did not owe any coverage to Stryker. In fact, on November 5, 2012, XL filed a brief in the Western District of Michigan in support of XL's Joinder in Stryker's Summary Judgment Motion Against TIG, in which XL stated, "Furthermore, at the very time that XL settled the Pfizer claims, TIG had been flatly denying any coverage for any Uni-Knee claims (including the Pfizer claims) for years . . ." (Case No. 1:05-cv-51, RE 280, PageID.4200).

11. <u>XL promised Judge Bell that Stryker woudn't be harmed by the *Pfizer* payment.</u> At a hearing before Judge Bell, shortly after XL settled with Pfizer, XL admitted that it would have acted in bad faith if XL's actions cause pecuniary harm to Stryker. The Court asked XL's counsel, "You're not arguing for a moment here that your client structured the payments of its final limitation in such a way as to advantage your client as opposed to disadvantage other parties?" (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3534.) XL's counsel responded: "There is absolutely not one moment where we would have disadvantaged the insured, and that's what matters. *There is no way that . . . Stryker will be out one penny of what they're owed under the policies.* ***It's not possible***. So there's no way that . . . what XL did is going to deny Stryker anything to which it's entitled as a matter of law or as a matter of contract." (*Stryker II*, Case No. 1:05-cv-51, Doc. #198, PageID #3534)(emphasis added). Of course, this is exactly what happened. XL's unilateral, secret actions cost Stryker its insurance coverage.

12. <u>Mr. Daly's testimony will contradict XL's own lawyer's and will be contradicted by his own, prior testimony</u>. Mr. Daly is expected to testify that he did not think that he owed Stryker a duty of good faith, and that he only had to do what the policy said. His testimony contradicts that of Mr. Hacker, who acknowledged to the Court that XL owed Stryker a duty of good faith. It will also be contradicted by Mr. Daly's own testimony in a prior case, in which he was an expert witness. There, he opined that an insurer does owe a duty of good faith in settling claims on behalf of an insured, and that an insurer can breach this duty even if it settles a claim within policy limits. As an expert, he testified that signs of bad faith include failure to communicate with the insured,

12

failure to segregate coverage litigation from settlement activity, and insufficient investigation. (RE 365)

XL has no valid response to any of this evidence. In fact, its position appears to be that Michael Cartier gave XL blanket authority at the outset of the settlement conference to settle the case in any manner that XL wanted. But this makes no sense, and Mr. Betz and other witness will testify that Mr. Cartier wanted a global settlement, not a piecemeal settlement, and that Stryker expected that XL would pay the *Stryker I* judgment in full. XL also blames Stryker's for not getting consent from TIG for its settlements. But Stryker would not have needed TIG's consent had it not been for XL's actions, and XL repeatedly represented to this Court that Stryker didn't need TIG's consent.

## **Stryker's Damages**

Damages are straightforward. Stryker paid about $7.6 million to settle the Duracon Uni-Knee claims. Of this amount, about $1.4 million falls within Stryker's self-insured retention. The amount of Stryker's settlements that should have been covered is **$6,194,258**. This is the principal amount of Stryker's damages.

The jury may also award pre-filing interest to Stryker. Under Michigan law, pre-filing interest (as opposed to post-filing but pre-judgment interest) is an element of damages for the jury to consider. *Currie v. Fiting*, 134 N.W.2d 611, 616 (Mich. 1965). Stryker will seek pre-filing interest at 5% interest on the judgment, dating from the date of the Settlement Agreement (February 2, 2009) until the date that the complaint was filed in this litigation (January 20, 2017). Pre-filing interest

13

will equal at least **$2,468,369.39** (=$6,194,258 x 5% per year @ 2909 days). The total is **$8,662,627.39**.

Stryker will also seek prejudgment interest under Mich. Comp. Laws § 600.6013(8), but that interest will be determined by the Court, as a matter of law, not the jury.

### Anticipated Evidentiary Issues

The parties have filed myriad motions in limine. Motions that are currently unresolved are:

- Whether XL can present evidence on its erroneous interpretation of the Sixth Circuit's opinion. (ECF 324).

- Whether XL can present duplicative expert testimony on mediations. (ECF 370).

- Whether Plaintiffs can present evidence of XL's pre-mediation attorneys' fees incurred in the coverage litigation. (ECF 312).

- Whether Plaintiffs can present evidence of an expert opinion that Michael Daly, who was XL's representative at the settlement conference, presented in an insurance bad faith case, where the opinion and his prior testimony contradicts his expected testimony in this case. (ECF 331).

- Which parties can ask leading questions of Mr. Daly at his *de bene esse* deposition. (ECF 373, 377).

### Other

Witnesses will be sequestered, per Evidence Rule 615. Attorneys Paul Koepff and D. Andrew Portinga are listed as potential witnesses for each side. PageID.4452, 4454. They will not be representing parties at trial. PageID.4408.

Accordingly, they will be sequestered. Sequestered witnesses cannot be informed of testimony at trial until the trial is concluded.

David Gass will be trial counsel for Plaintiffs. XL has agreed that it will not move to disqualify Mr. Gass as trial counsel, even though Mr. Gass previously represented Stryker in *Stryker I* and *II* and attended the 2009 settlement conference, nor will it raise foundational objections to briefs, pleadings, or letters that Mr. Gass signed or to transcripts of court hearings that memorialize statements that he made. The Court may have to instruct the jury on Mr. Gass's role in this case.

Plaintiffs will present video depositions excerpts of Attorneys Jonathan Hacker and Richard Barnes. Mr. Portinga examined these witnesses at their depositions. XL has stipulated that the fact that Mr. Portinga was the examiner is not grounds for objecting to these video clips.

Depending on the testimony, Plaintiffs may seek limiting instructions to enforce this Court's orders in limine, including the order excluding out-of-court statements made by Magistrate Judge Scoville and the limits imposed on expert testimony.

                Respectfully Submitted,

                MILLER JOHNSON
                Attorneys for Plaintiffs

Dated: July 28, 2020        By   /s/ David J. Gass
                                     David J. Gass (P34582)
                                     James R. Peterson (P43102)
                                   Stephen J. van Stempvoort (P79828)
                                   45 Ottawa Avenue SW, Suite 1100
                                   Grand Rapids, Michigan  49503
                       Telephone:  (616) 831-1700

## Certificate of Compliance

1. This brief complies with the type-volume limitation of W.D. Mich. LCivR 7.3(b)(i) because this brief contains 4602 words, excluding the parts of the brief exempted by W.D. Mich. LCivR 7.3(b)(i).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 for Windows in 12-point Century Schoolbook font.

Dated: July 28, 2020            /s/ David J. Gass
David J. Gass (P34582)
James. R. Peterson (P43102)
Stephen J. van Stempvoort (P79828)
Miller Johnson
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1700