## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

                                Plaintiffs,

        vs.

XL INSURANCE AMERICA, INC., formerly
known as WINTERTHUR INTERNATIONAL
AMERICA INSURANCE COMPANY,

                                Defendant.

Case No.: 1:17-cv-00066-PLM-PJG
HON. PAUL L. MALONEY

## <u>DEFENDANT'S TRIAL BRIEF</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

I. SUMMARY .................................................................................................................... 1

    A.  There is No Possible Factual Basis for the Bad Faith Claim ................................ 1

    B.  Legal Grounds .................................................................................................... 2

II.  BACKGROUND FACTS ........................................................................................... 3

    A.  Stryker Purchases the Uni-Knee Business from Pfizer ..................................... 3

    B.  Pfizer's Demand for Indemnity ......................................................................... 4

    C.  The XL and TIG Insurance Policies .................................................................. 5

    D.  Stryker Seeks Coverage for the Uni-Knee Lawsuits From XL .......................... 6

    E.  Stryker Seeks Insurance Coverage for the Pfizer Judgment .............................. 8

    F.  Judge Bell's Coverage Rulings ......................................................................... 8

    G.  The Parties' Positions Going into the Settlement Conference .......................... 10

    H.  The Settlement Conference ............................................................................... 11

    I.  After the Settlement Conference ....................................................................... 12

    J.  The Sixth Circuit Decisions .............................................................................. 13

    K.  Stryker's Supplemental Coverage Action Against TIG and the Sixth Circuit Decision ......................................................................................................... 13

III. ARGUMENT ............................................................................................................. 15

    A.  XL Acted in Good Faith, Not Bad, in Settling the Pfizer Judgment First ......... 15

    B.  There is No Cognizable Claim for Alleged Bad Faith as Asserted by Stryker .... 18

    C.  Stryker was Aware of the Grounds for Challenging the XL-Pfizer Settlement in February 2009 Such that this Claim is Barred by the Doctrines of Law of the Case and Res Judicata ............................................................................................ 19

IV.    CONCLUSION ....................................................................................................... 22

—

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Dow Chem. Co.*,
883 F. Supp. 1101 (E.D. Mich. 1995) ................................................................... 18

*Cochran v. Trans-Gen. Life Ins. Co.*,
60 F. Supp. 2d 693 (E.D. Mich. 1999) ................................................................... 20

*Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*,
393 N.W.2d 161 (Mich. 1986) ................................................................... 1, 15, 18

*Dahlman v. Oakland University*,
432 N.W.2d 304 (Mich. App. 1988) ................................................................... 18

*Hall v. Eichenlaub*,
559 F. Supp. 2d 777 (E.D. Mich. 2008) ................................................................... 20

*Humphries v. Allstate Ins. Co.*,
No. 18-CV-11006, 2020 WL 3248896 (E.D. Mich. June 16, 2020) ....................... 18

*J & J Farmer Leasing, Inc. v. Citizens Ins. Co. of Am.*,
696 N.W.2d 681 (Mich. 2005) ................................................................... 18

*J.Z.G. Resources, Inc. v. Shelby I nsurance Co.*,
84 F.3d 211 (6th Cir. 1996) ................................................................... 20

*Red Cedars, Inc. v. Westchester Fire Ins. Co.*,
686 F. Supp. 614 (E.D. Mich. 1988) ................................................................... 18

*Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
842 F.3d 422 (6th Cir. 2016) ................................................................... 14, 19

*Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 819 (6th Cir. 2012) ...... 20

*Stryker Corp. v. XL Ins. Am.*,
576 F. App'x 496 (6th Cir. 2014) ................................................................... 13, 21

*Stryker Corp. v. XL Ins. Am.*,
735 F.3d 349 (6th Cir. 2012) ................................................................... 13, 19, 21

*Stryker Corp. v. XL Ins. Co.*,
57 F. Supp. 3d 823 (W.D. Mich. 2014) ................................................................... 14

**Miscellaneous**

*Stryker Appeal Brief*, 2011 WL 1460580 ................................................................... 19

Defendant XL Insurance America, Inc. ("XL") respectfully submits this Trial Brief pursuant to the November 15, 2018 Case Management Order. The claims of plaintiffs, Stryker Corporation and Howmedica Osteonics Corp. ("Stryker"), fail as a matter of fact and law.

## I. SUMMARY

### A.    There is No Possible Factual Basis for the Bad Faith Claim

XL maintains that Stryker has failed to plead a cognizable cause of action under Michigan law. But even applying the standard for bad faith set forth in *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161 (Mich. 1986), Stryker cannot meet its burden of proof that XL's conduct at the settlement conference and its decision to settle the Pfizer judgment first was arbitrary, reckless, indifferent or an intentional disregard of Stryker's interest because:

- Judge Bell issued two separate opinions holding that XL was obligated to cover the Pfizer judgment. Thus, in settling the Pfizer judgment, XL complied with Judge Bell's coverage rulings.

- At the same time, Judge Bell issued two separate rulings that TIG was liable to provide coverage for "any loss" in excess of the XL policy limits ($15 million per occurrence and in the aggregate). XL was entitled to rely on these rulings and believe that, when it settled the Pfizer judgment, TIG owed coverage for any loss in excess of the XL policy limits.

- The Sixth Circuit unequivocally ruled that (1) XL could, as a matter of law, settle underlying claims, including the Pfizer judgment, in any order it wished, (2) XL was entitled to settle the Pfizer judgment first, and (3) Stryker was wrong in contending that XL should have settled first the underlying Uni-Knee settlements. This is law of the case.

- The $26 million Pfizer judgment was far greater than the amount of the underlying Uni-Knee settlements and it was increasing significantly each day due to the 9% pre-judgment interest under New York law that applied to such judgment. XL's settlement required Pfizer to agree the judgment was fully satisfied and to dismiss Pfizer's indemnity claims against Stryker, and it also preserved Stryker's counterclaim against Pfizer.

1

- Before the settlement conference and at the settlement conference, Stryker itself demanded that XL settle the Pfizer judgment. In other words, in settling with Pfizer, XL was complying with Stryker's demand.

- Because TIG announced it would not participate in any settlement, that left XL alone to settle the Pfizer judgment.

- Because of its $15 million limits, XL could only settle the $26 million Pfizer judgment or the $7.6 million in underlying Uni-Knee settlements, but it could not settle both because the combined amount would exceed the XL policy limits.

- At the time XL agreed to settle the Pfizer judgment for $26 million, Stryker and XL were unaware that TIG would, years later, assert a coverage defense that Stryker had failed to obtain TIG's prior consent to the underlying Uni-Knee settlements.

Moreover, XL is not to blame for Stryker having failed to obtain TIG's prior consent to the Uni-Knee settlements. Indisputably, XL had no knowledge when it settled the Pfizer judgment that (1) Stryker had failed to obtain TIG's prior consent, and (2) TIG was contesting coverage based on Stryker's failure to obtain its consent, something which TIG only asserted years later.

Finally, Stryker would have had TIG coverage for these settlements but for Stryker itself not obtaining TIG's prior consent. XL should not be responsible for the loss of the TIG coverage for the Uni-Knee settlements when that is solely attributable to Stryker.

**B.    Legal Grounds**

For two separate and independent grounds, Stryker's bad faith claim against XL fails as a matter of law. First, Stryker has not stated a cognizable claim for bad faith under Michigan law, and XL maintains that position even though the Court has disagreed.

Second, Stryker's bad faith claim fails as a matter of law because Stryker knew everything upon which it now bases its bad faith claim against XL by February 4, 2009, but never raised any of that in opposing XL's position that it had the right to settle the Pfizer judgment first and that the settlement of the Pfizer judgment exhausted the XL limits. Thus,

2

Stryker cannot now pursue its bad faith claim when it could have and should have done so in proceedings before Judge Bell and then in the subsequent appeal to the Sixth Circuit.

This Court denied XL's motion for judgment on the pleadings. However, the Court can rule upon this defense at the end of Stryker's direct case and/or at the end of the trial, because the facts will demonstrate Stryker had every opportunity to raise its purported bad faith claim against XL in proceedings before Judge Bell and then in the appeal to the Sixth Circuit.

## II.  BACKGROUND FACTS

**A.      Stryker Purchases the Uni-Knee Business from Pfizer**

In December 1998, Stryker Corporation purchased from Pfizer, Inc. the assets of Howmedica, Inc., including its inventory of Uni-Knees, a line of artificial knees. As part of its agreement to purchase the assets of Howmedica from Pfizer, Stryker agreed to hold Pfizer harmless and indemnify it for defense costs, settlements and judgments if Pfizer was sued for liability arising out of defective Uni-Knees sold after the date Stryker purchased the assets of Howmedica.

Thereafter, Stryker began to manufacture and sell Uni-Knees. Unfortunately, the Uni-Knees were made of a kind of plastic that hardened and became brittle and cracked over time. This became a serious problem when Stryker did not recall the Uni-Knees that had been in inventory beyond the useful life of the product. Many persons had Uni-Knee replacement procedures done but with a defective Uni-Knee replacement part. As a consequence, between 2000 and 2006, many lawsuits and claims were asserted against Stryker, as well as Pfizer, arising out of defective Uni-Knees, which then had to be replaced. Ultimately, Stryker settled many Uni-Knee lawsuits for approximately $7.6 million.

There was at least a question of fact as to whether persons at Stryker were aware, prior to 2000, that the Uni-Knee products were defective and they suspected the Uni-Knees would become brittle and crack after a certain period of time, as demonstrated by the following:

- A memorandum drafted by a Howmedica employee, dated October 28, 1997, which memorialized the "many problems we have experienced in the past with this product line . . ."

- "In the summer of 1999, Wayne Irwin [Howmedica], Manager of the Product Surveillance Department at HOC, advised Ms. Staub [Howmedica] that he had seen a few complaints in which polyethylene older than five years had been implanted."

- Prior to January 1, 2000, a complaint about a defective Uni-Knee claim had been filed against Stryker.

**B.      Pfizer's Demand for Indemnity**

Many persons asserting Uni-Knee claims and bringing Uni-Knee lawsuits sued both Pfizer and Stryker. As a consequence, Pfizer incurred its own costs in defending these claims against it and paid settlements of the claims against it. However, these claims and lawsuits involved Uni-Knee products which had been manufactured and sold by Stryker after Stryker had purchased the Uni-Knee business from Pfizer. Therefore, relying on the indemnity provision in the purchase agreement, Pfizer demanded that Stryker indemnify and hold it harmless for all defense costs, settlements and judgments arising out of the Uni-Knee lawsuits. Stryker disagreed and flatly refused to indemnify Pfizer.

Pfizer then sued Stryker in the United States District Court for the Southern District of New York, Case No. 02-cv-8613 ("Pfizer action"). In 2004, the court granted summary judgment to Pfizer, ruling that Stryker must indemnify Pfizer for the defense costs and settlements which Pfizer incurred for certain Uni-Knee claims brought against Pfizer. After a trial on damages, on April 22, 2005, the U.S. District Court for the Southern District of New York entered an Order and Interlocutory Judgment in favor of Pfizer and against Stryker in the amount of

$17,710,428.34 (the "Pfizer Judgment"). Stryker never sought interlocutory appeal from the Pfizer judgment but left the Pfizer judgment uncontested for the next four years. By January 2009, the Pfizer Judgment amounted to nearly $26 million due to mandatory prejudgment interest accruing on the judgment.

**C.** **The XL and TIG Insurance Policies**

XL issued to Stryker Corporation commercial umbrella policy HFL004-28-67-00, which was in effect from January 1, 2000 to January 1, 2001 (the "XL Policy"). The XL Policy has per occurrence and aggregate limits of $15 million excess of a self-insured retention of $2 million. The XL Policy had a provision with respect to defending underlying product liability actions and provided that defense costs were in addition to limits.

The XL Policy also included a Medical Products Endorsement, which provided coverage for a "batch," defined as "all medical products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum." The Medical Products Endorsement further provided that the advisory memorandum sets the date at which the batch "occurred" for coverage purposes. Finally, the endorsement provided that "[b]atch coverage shall not apply to any loss, which arises out of a defect, or deficiency that is known or suspected prior to 1–1–[20]00."

TIG issued to Stryker excess umbrella liability policy XLX9274031, which was in effect from January 1, 2000 to January 1, 2001 (the "TIG Policy"). The TIG Policy has per occurrence and aggregate limits of $25 million in excess of the underlying limits of the XL Policy. Except as otherwise provided, the TIG Policy "follows form" to the XL Policy – namely, it has the same terms.

The TIG Policy provided coverage for Ultimate Net Loss, which is defined as:

the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages. Defense expense payments shall be included within the Ultimate Net Loss, provided that such expenses are included within the terms, conditions, and limits of insurance of any Underlying Insurance.

**D.** **Stryker Seeks Coverage for the Uni-Knee Lawsuits From XL**

In 2000, Stryker noticed the Uni-Knee Settlements to XL seeking defense and indemnification. Later that year, XL denied coverage for the Uni-Knee Settlements and relied on the Medical Products Endorsement, which precludes coverage for "any loss which arises out of a defect or deficiency that is known or suspected prior to 1–1–[20]00." Stryker took exception to XL's denial of coverage.

In 2001, Stryker sued XL for breach of contract seeking defense and indemnification for the Uni-Knee claims and lawsuits. *Stryker v XL,* Case No. 4:01-cv-157 ("Stryker I"). XL denied Stryker's allegations and contended there was no duty to defend or indemnify, because the policy excluded coverage if Stryker knew or suspected a defect in the Uni-Knee products prior to January 1, 2000, and there was evidence that Stryker knew or suspected that.

In 2003, Stryker filed a motion for summary judgment on the issue of duty to defend. *Stryker I,* ECF No. 251. The Court, however, by Order dated August 27, 2004, denied Stryker's motion. *Id.,* ECF No 604. In denying Stryker's motion for summary judgment, the Court explained that:

> there remains a genuine issue of material fact as to whether Stryker's claims fall within XLIA's batch coverage. Because this issue precludes a determination that Stryker's claims have met the XLIA self-insured retention amount, Stryker is not entitled to summary judgment against XLIA on the issue of the duty to defend.

*Id.* at ECF No. 603, PageID.6112.

After extensive discovery, a bench trial was held January 29 through February 2, 2007 on the issue of whether Stryker knew or suspected of any loss prior to January 1, 2000 that had

arisen out of a defect or deficiency of the Uni-Knee products. At the bench trial, the court heard competing testimony and evidence regarding whether Stryker knew of or suspected the Uni-Knees were defective before January 1, 2000. XL put forth extensive written evidence along with testimony to support its position that Stryker in fact knew of or suspected before January 1, 2000 that the Uni-Knees were defective, including:

- A memorandum drafted by a Howmedica employee, dated October 28, 1997, which memorialized the "many problems we have experienced in the past with this product line . . ."

- "Howmedica Inc. had a system referred to as the Product Experience Report ("PER") for addressing quality complaints."

- "Separate from the investigation of individual PERs, on a quarterly basis HOC would review the PER system for trends."

- "In the summer of 1999, Wayne Irwin [Howmedica], Manager of the Product Surveillance Department at HOC, advised Ms. Staub [Howmedica] that he had seen a few complaints in which polyethylene older than five years had been implanted."

- Ms. Staub [Howmedica] sent a memorandum to all 'Stryker Howmedica Osteonics distribution and sales units, and independent distributors' (the "Staub Memo"). The Staub Memo reiterated the five-year shelf life policy and the procedures in place to ensure compliance with the policy.

- At least one of the PERs that formed the basis of the Staub Memo was a complaint by Terry Hipps arising out of a defective Uni-Knee.

The Court, however, rejected XL's evidence and stated that "A single PER [the Hipps Complaint] cannot suggest a trend" and reasoned that the "steps HOC took after the discovery of the defect strongly counsel against inferring that any employee of Stryker or HOC knew of or suspected the defect in the Uni-Knees prior to January 1, 2000." *Stryker I,* 04/03/17 Opinion, ECF No. 916. The Court then entered partial judgment on April 3, 2007, in favor of Stryker, determining that XL had a duty to defend and indemnify Stryker for the batch of defective Uni-Knees defined by the July 28, 2000 advisory memorandum. *Id. ,*ECF No. 917, PageID.9407.

After the partial judgment in favor of Stryker, the litigation entered a damages phase. By Order dated December 15, 2008, the Court entered partial judgment in favor of Stryker in the amount of $12.1M. *Stryker I*, ECF No. 1056, PageID.10174. Furthermore, the Court ruled that because XL had breached its duty to defend, XL was not entitled to rely on the $2M self-insured retention. *Stryker I*, ECF No. 949, PageID.9523.[1]

## E.   Stryker Seeks Insurance Coverage for the Pfizer Judgment

Stryker sought coverage for the Pfizer judgment from XL and TIG. XL denied coverage on the basis of the Medical Products Endorsement. TIG denied coverage as well.

In 2005, Stryker commenced a separate lawsuit and sued both TIG and XL for breach of contract. *"Stryker II"*, Case No. 1:05-cv-00051. As respects XL, Stryker alleged that XL was required to indemnify Stryker for the Pfizer judgment as well as indemnify Stryker for various attorney's fees in the *Pfizer v. Stryker* litigation. *Id.*, ECF No. 70, PageID.1517.

XL denied any obligation to defend or indemnify Stryker with respect to the Pfizer lawsuit or the Pfizer judgment. Likewise, in its Answer, TIG denied any obligation to defend or indemnify Stryker for the Pfizer lawsuit or Pfizer judgment.

## F.   Judge Bell's Coverage Rulings

In early 2008, Stryker moved for partial judgment summary against XL and TIG. XL filed an opposition memorandum in which TIG joined. By Opinion dated August 29, 2008, Judge Bell ruled as follows with respect to XL:

> Plaintiffs are entitled to the entry of judgment on Count I which alleges that XLIA breached its obligation under the 2000 XLIA Policy to defend Stryker in *Pfizer v. Stryker*. Plaintiffs are also entitled to a declaratory judgment on Count II that XLIA is obligated to defend Stryker in *Pfizer v. Stryker* and to indemnify Stryker

---

[1] After the Settlement Conference, by opinion dated October 7, 2009, Judge Bell ruled that XL may not rely on the limits of liability because it breached its duty to defend and therefore XL was liable for the "full extent of the judgment or the full settlement, regardless of "the face amount of the policy." *Stryker I,* ECF No. 1092, PageID.10398.

for the final judgment entered in *Pfizer v. Stryker* and for the attorney's fees and costs incurred by Stryker in its defense in *Pfizer v. Stryker*.

*Stryker II*, ECF No. 143, Page ID.2988.

As respects TIG's coverage obligations, Judge Bell held that:

Plaintiffs seek to have the Court declare that under the 2000 TIG Excess Policy, TIG is liable for losses Plaintiffs have incurred in excess of the 2000 XLIA Policy. TIG's response concedes that the 2000 TIG Excess Policy follows the form of the 2000 XLIA Policy. TIG joins in XLIA's response to Plaintiffs' motion. As the Court has determined that Plaintiffs are entitled to summary judgment with respect to XLIA and the 2000 TIG Excess Policy follows the form of the 2000 XLIA Policy, it necessarily follows that Plaintiffs are entitled to summary judgment against TIG.

\* \* \*

Plaintiffs are entitled to a declaratory judgment on Count III that TIG is obligated under the 2000 TIG Excess Policy to cover any loss in excess of the 2000 XLIA Policy.

*Stryker II*, ECF No. 143, Page ID.2987-88 (emphasis added).

XL sought reconsideration of Judge Bell's August 29, 2008 Opinion. Relying on XL's memorandum, TIG also sought reconsideration. Stryker opposed both motions. By Opinion dated January 8, 2009, Judge Bell denied the motions for reconsideration. As to XL, Judge Bell ruled:

Plaintiffs are entitled to the entry of judgment on Count I which alleges that XLIA breached its obligation under the 2000 XLIA Policy to defend the DUK claims underlying Pfizer v. Stryker. Plaintiffs are also entitled to a declaratory judgment on Count II that XLIA is obligated to indemnify Stryker for the final judgment entered in Pfizer v. Stryker and for the attorney's fees and costs incurred by Stryker in its defense in Pfizer v. Stryker.

*Stryker II*, ECF No. 161, PageID.3116.

As respects TIG, Judge Bell ruled:

Plaintiffs are entitled to a declaratory judgment on Count III that TIG is obligated under the 2000 TIG Excess Policy to cover any loss in excess of the 2000 XLIA Policy.

9

*Stryker II*, ECF No. 161, PageID.3117 (emphasis added).

**G.      The Parties' Positions Going into the Settlement Conference**

Stryker, XL, and TIG agreed that it would be worthwhile to have a settlement conference and that Pfizer should be invited to that settlement conference. By Order dated December 16, 2008, Judge Bell ordered the parties to a settlement conference to be held before Magistrate Judge Scoville. Pfizer agreed voluntarily to participate in this settlement conference in an effort to settle its judgment against Stryker for $26 million.

Stryker submitted its settlement position in a January 5, 2009 letter to Judge Scoville. According to Stryker, it was entitled to coverage for: *Stryker I*, in the amount of approximately $24-27 million; *Pfizer v. Stryker*, in the amount of approximately $26 million; and *Stryker II*, in the amount of approximately $16 million. Stryker concluded its letter by demanding "$75 million" and taking "no position on how the loss should be allocated between the insurers." Stryker did not express a willingness to compromise its claim despite various litigation risks.

By letter dated January 5, 2009, XL submitted a settlement position letter to Judge Scoville, setting forth XL's views of disputed legal and factual issues. Among other things, the letter explained that "Stryker's damage assessment has been asserted as though no limits exist in the XL Policy. The claims asserted by Stryker exceed XL's Policy limits, implicating excess coverage issued by TIG."

Finally, by letter dated January 6, 2009, Pfizer submitted a settlement position letter to Judge Scoville. The letter explained that "Pfizer is the judgment creditor on an interlocutory judgment against Stryker Corporation, entered on April 22, 2005, in the amount of approximately $ 17.7 million." The letter continued that, "Pfizer's total award with interest was worth $20,961,331.67." Pfizer also sought more than $5M in attorney's fees, making the "ultimate award in the S.D.N.Y action . . . likely far exceed $25 million." Finally, because the

10

Pfizer Judgment remained "subject to 9% prejudgment interest as well as additional attorney's fees, those amounts will grow substantially if not promptly resolved," according to Pfizer.

## H.      The Settlement Conference

On January 12, 2009, a settlement conference was held with Judge Scoville presiding. At the outset, Mr. Cartier, on behalf of Stryker, demanded that Michael Daly go deal with Pfizer and settle the Pfizer judgment and further explained that Stryker had no intention of participating in discussions or contributing to the Pfizer settlement. Counsel for TIG announced that TIG had no interest in settling, because it disputed coverage, despite court rulings to the contrary.

On January 14, the settlement conference reconvened. Counsel for TIG did not attend, but was instead available by telephone. However, TIG's position had not changed, it still would not participate in any settlement. This left only XL and Pfizer to discuss settlement, aided by Judge Scoville, who conducted shuttle diplomacy throughout the day. However, XL was constrained by its $15M limits of liability. That is, XL would not be able to settle Stryker's Uni-Knee settlements for at least $7.6M and then settle with Pfizer, which was demanding $26M. In light of these constraints, XL followed the instruction of Mr. Cartier and resolved the Pfizer Judgment, which was the largest claim Stryker was facing. In doing so, XL did exactly what was required of it by Judge Bell's ruling in *Stryker II* and precisely what Mr. Cartier requested.

At the end of January 14, XL and Pfizer had agreed to a settlement in principle, which would fully satisfy Pfizer's judgment against Stryker. A Minute Order was filed on PACER which memorialized the settlement:

> Partial Settlement in principle reached between XLIA and Pfizer with regard to XLIA's obligations to satisfy the judgment in Pfizer v. Stryker (SDNY case);

*Stryker II*, ECF 165, Page ID.3129.

I.      **After the Settlement Conference**

By letter dated January 23, 2009, David Gass on behalf of Stryker, wrote to David Bloss,

counsel for XL. Mr. Gass memorialized what occurred on January 14:

> in the afternoon of January 14, you, on behalf of XLIA, and Rick Barnes on
> behalf of Pfizer, announced in Judge Scoville's courtroom that XLIA had reached
> an "agreement in principle" with XLIA to pay the Pfizer judgment in the New
> York litigation. Pfizer claims that the total amount of that judgment is
> approximately $26 million, including Pfizer's settlements and fees in the
> underlying lawsuits, interest on those amounts, and Pfizer's fees with interest in
> bringing that action. You also informed us that, as part of that settlement, Pfizer
> would file a satisfaction of judgment in the New York litigation and that any
> amounts that XLIA paid to Pfizer would not be subject to appeal.

In this letter, Mr. Gass acknowledges he knew the terms of the agreement in principle to

settle between XL and Pfizer: XL was paying $26 million toward the settlement, Pfizer would

file a satisfaction of judgment, and any amount XL paid to Pfizer would be final and not subject

to an appeal with respect to coverage. It was also clear that XL had only settled the Pfizer

judgment and had not settled Stryker's claim for coverage for the Uni-Knee settlements. Also, as

of this point in time, XL had already agreed to pay Stryker's defense costs with respect to the

Uni-Knee claims and lawsuits.

Mr. Bloss responded to Mr. Gass by letter dated January 23, 2009 and explained that:

> As we told you on January 14, the second day of the settlement conference, an
> agreement in principle has been reached between XL and Pfizer. You were
> advised then that a negotiated amount was being proposed to be paid to fully
> satisfy the New York interlocutory judgment. We can add to that information that
> pursuant to the preliminary agreement, the judgment against Stryker in the
> Southern District of New York litigation will be satisfied completely. The
> principal claim in that action will be dismissed with prejudice and without costs.
> Stryker's counter-claim against Pfizer will not be impacted and Stryker will be
> free to pursue that matter. We will, as part of the anticipated settlement, obtain for
> Stryker a complete and unconditional release of all claims, known and unknown,
> with respect to any claims which Pfizer has asserted for indemnity, contribution,
> or legal costs.

* * *

12

> As your letter indicates, Stryker did not participate in the discussions which led to the agreement in principal. It was Stryker's decision, announced at the outset of the settlement conference on Monday, not to negotiate with the other parties. TIG took a position which no one else believed was tenable or likely to lead to a global resolution. This led us to conclude that an agreement with Pfizer was the only one that was plausible, and with the assistance of Magistrate Scoville that is being concluded. The effect of the settlement will be to affirmatively respond to the rulings of Judge Bell in Stryker Case No. 1:05-CV-0051.

**J.     The Sixth Circuit Decisions**

Stryker challenged the XL-Pfizer settlement, essentially making the same argument it makes here, namely, that XL was required to settle the Uni-Knee Settlements first before settling the Pfizer judgment. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 356 (6th Cir. 2012) ("First Sixth Circuit Decision"). The Sixth Circuit, however, unequivocally rejected this argument and explained that there was no "rule regarding the order that XL must pay its claims." *Id.* at 357. The Court went on to hold that XL could, in fact, settle claims in the order it chose. *Id.* at 357 n.3 ("insurer may pay claims in any order it chooses"). The Sixth Circuit also held that the aggregate limits of liability apply to the XL policy, despite XL breaching its duty to defend. *Id.* at 358.

On remand, this Court held that because of the First Sixth Circuit Decision, "XL is entitled to rely on the $2 million SIR." *Stryker II,* ECF No. 304, PageID.4556. The Court also held that "because XL is entitled to rely on the SIR, XL exhausted its policy limits by the amounts it paid in the Pfizer settlement." *Id.* The Court's decision was affirmed by the Sixth Circuit.  See *Stryker Corp. v. XL Ins. Am.*, 576 F. App'x 496 (6th Cir. 2014) ("Second Sixth Circuit Decision").

**K.     Stryker's Supplemental Coverage Action Against TIG and the Sixth Circuit Decision**

Once XL exhausted its policy by payment to Pfizer, Stryker turned to TIG, its excess insurer, to obtain coverage for the Uni-Knee Settlements. Stryker sought coverage from TIG

because this Court had already ruled that "TIG is obligated under the 2000 TIG Excess Policy to cover any loss in excess of the 2000 [XL] Policy." *Stryker II*, ECF No. 161, PageID.3117.

In 2013, Stryker filed a Supplemental Complaint and explicitly alleged that it was TIG that was responsible for indemnifying Stryker for the Uni-Knee Settlements:

> Plaintiffs seek reimbursement of about $7.6 million in settlements that [Stryker] paid to settle products liability lawsuits involving Duracon Uni-Knees. These settlements fall within the scope of TIG Insurance Company's ("TIG") excess insurance policy. TIG has refused to reimburse Plaintiffs for the settlements. Because this Court has ruled that XL Insurance America, Inc. ("XL") exhausted its policy limits, TIG is liable for Plaintiffs' settlements. Plaintiffs are covered for the Uni-Knee settlements.

*Stryker II*, ECF No. 363, PageID.5118. In addition to seeking coverage for the Uni-Knee Settlements from TIG, Stryker also sought interest from TIG under various statutory provisions. *Id.*, PageID.5129. Plainly, Stryker viewed TIG as responsible for the Uni-Knee Settlements, and not XL, as Stryker had acknowledged that XL exhausted its policy limits.

In 2014, this Court squarely addressed whether "TIG is liable for Stryker's direct settlements of the Uni–Knee claims." *Stryker Corp. v. XL Ins. Co.*, 57 F. Supp. 3d 823, 826 (W.D. Mich. 2014). After explaining that "[t]here is no dispute that the XL insurance has been exhausted", this Court determined that "Stryker is entitled to reimbursement for its Uni–Knee settlements, and that TIG does not have a defense to coverage." *Id.* at 838. Later, however, by opinion dated November 18, 2016, the Sixth Circuit reversed and held that Stryker was not entitled to coverage from TIG. *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 842 F.3d 422, 424 (6th Cir. 2016) ("Third Sixth Circuit Decision"). According to the Sixth Circuit, "Because *Stryker* did not satisfy the consent requirement, its direct settlements cannot constitute ultimate net loss, and there is no coverage under the policy." *Id.* at 426.

14

## III. ARGUMENT

**A.   XL Acted in Good Faith, Not Bad, in Settling the Pfizer Judgment First**

Even if Stryker's claim of bad faith somehow states a cognizable cause of action under Michigan law (and it does not, as discussed below), under the very decision relied upon by Stryker, the Michigan Supreme Court has set a stringent standard for bad faith – "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.,* 393 N.W.2d 161, 164 (Mich. 1986). This is Stryker's burden to prove. However, the uncontroverted evidence demonstrates XL acted in good faith in settling the Pfizer judgment first. In doing so, its conduct was not arbitrary, reckless, or indifferent, and it did not act with an intentional disregard of Stryker's interests.

First, when XL settled with Pfizer, XL was complying with Judge Bell's opinion holding that XL was obligated to indemnify the Pfizer judgment:

> Plaintiffs are entitled to the entry of judgment on Count I which alleges that XLIA breached its obligation under the 2000 XLIA Policy to defend Stryker in *Pfizer v. Stryker*. Plaintiffs are also entitled to a declaratory judgment on Count II that XLIA is obligated to defend Stryker in *Pfizer v. Stryker* and to indemnify Stryker for the final judgment entered in *Pfizer v. Stryker* and for the attorney's fees and costs incurred by Stryker in its defense in *Pfizer v. Stryker*.

*Stryker II*, ECF No. 143 Page ID.2988. XL sought reconsideration of this ruling, which the Court rejected and instead reaffirmed that XL, in fact, was required to provide coverage for the Pfizer judgment:

> Plaintiffs are entitled to the entry of judgment on Count I which alleges that XLIA breached its obligation under the 2000 XLIA Policy to defend the DUK claims underlying *Pfizer v. Stryker*. Plaintiffs are also entitled to a declaratory judgment on Count II that XLIA is obligated to indemnify Stryker for the final judgment entered in *Pfizer v. Stryker* and for the attorney's fees and costs incurred by Stryker in its defense in Pfizer v. Stryker.

*Stryker II*, ECF No. 161, PageID.3116. Thus, in settling the Pfizer judgment, XL complied with not one but two existing Orders and the Court's Partial Judgment which obligated XL to

15

"indemnify Stryker Corporation for the final judgment entered in *Pfizer v. Stryker*." *Id.*, ECF No. 162, PageID.3119.

In later proceedings in *Stryker II*, this Court again explained that, when settling with Pfizer, XL did exactly what it had been ordered to do:

> On January 8, 2009, the court determined that XLIA was indeed responsible for satisfying the judgment against Stryker in the Pfizer litigation. Less than one week later, XLIA did <u>exactly what it had been ordered to do by agreeing to pay that judgment on Stryker's behalf</u>.

*Stryker II*, ECF No 360, PageID.5106 (emphasis added). XL's compliance with existing court orders when it settled with Pfizer directly refutes Stryker's bad faith claim. It can hardly be argued that in doing what the Court ordered it to do, that XL's conduct was "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty."

Second, when XL settled with Pfizer, Judge Bell had also issued two separate rulings that TIG was liable to provide coverage for "any loss" in excess of the XL policy limits. In an opinion dated August 29, 2008, Judge Bell held:

> <u>Plaintiffs are entitled to a declaratory judgment on Count III that TIG is obligated under the 2000 TIG Excess Policy to cover any loss in excess of the 2000 XLIA Policy.</u>

*Stryker II*, ECF 143, Page ID.2987-88 (emphasis added). *See also* ECF No. 161, PageID.3117 (same). Not only was XL entitled to rely on these rulings by Judge Bell in believing that, when it settled the Pfizer judgment, TIG owed coverage for any loss in excess of the XL policy limits, but also, these rulings again directly refute Stryker's allegation that XL was somehow acting arbitrary, reckless, indifferent, or with intentional disregard of the interests of the person owed a duty.

Third, when XL settled the Pfizer judgment for $26M its was resolving a far greater claim as compared to the $7.6M underlying Uni-Knee settlements, which was the subject of

*Styryker I.* The Pfizer Judgment was increasing significantly each day due to the 9% pre-judgment interest under New York law that applied to such judgment. As part of XL's settlement with Pfizer, Pfizer agreed that its judgment against Stryker was fully satisfied and also agreed to dismiss its indemnity claims against Stryker. All of this directly benefited Stryker and is further evidence that XL's conduct was not act arbitrary, reckless, indifferent, or an intentional disregard of the interests of the person owed a duty.

Moreover, XL's settlement with Pfizer was done only after Stryker itself requested that XL resolve the Pfizer judgment. That is, before the January 12 settlement conference, Mr. Cartier, Stryker's client representative, demanded that XL settle the Pfizer judgment. Thus, in settling with Pfizer, XL was complying with Stryker's precise demand. There is sworn testimony by XL's client representative, Mr. Daly, that Mr. Cartier made this request.

Furthermore, XL's settlement with Pfizer was the only viable option once TIG announced that it would not participate in any settlement, and that it still disputed coverage, despite court rulings to the contrary. TIG's absence left XL alone to settle the Pfizer judgment. XL's limit of liability was only $15 million, which meant XL could only settle the $26 million Pfizer judgment or the $7.6 million in underlying Uni-Knee settlements, but it could not settle both because the combined amount would exceed the XL policy limits.

Finally, there is no dispute that at the time XL agreed to settle the Pfizer judgment for $26 million, Stryker and XL were unaware that TIG would years later assert a coverage defense that Stryker had failed to obtain TIG's prior consent to the underlying Uni-Knee settlements. This fact fundamentally undermines Stryker's bad faith claim. Stryker has accused XL of settling in a way that compromised Stryker's excess coverage with TIG. But XL could not compromise

Stryker's excess coverage when, at the time XL settled with Pfizer, the grounds TIG would later use to defeat coverage were unknown.

**B.      There is No Cognizable Claim for Alleged Bad Faith as Asserted by Stryker**

Stryker characterizes this action as one for "bad faith settlement" by an insurer. The crux of Stryker's claim is that XL breached its "duty of good faith" when it exhausted its policy limits by paying the Pfizer judgment instead of paying the $7.6 million Uni-Knee settlements first and then paying the rest toward the Pfizer judgment. However, Stryker's cause of action does not constitute a cognizable claim under Michigan law.

In general, "Michigan law does not recognize an implied contractual duty of good faith." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F. Supp. 1101, 1111 (E.D. Mich. 1995), *citing Red Cedars, Inc. v. Westchester Fire Ins. Co.*, 686 F. Supp. 614 (E.D. Mich. 1988); *Dahlman v. Oakland University*, 432 N.W.2d 304, 306 (Mich. App. 1988). Thus, "[w]here the express terms of a contract govern the disputed issue, a court should not imply a duty of good faith." *Id., citing Stockdale v. Jamison*, 330 N.W.2d 389 (Mich. 1982). Accordingly, under Michigan law, insurance bad faith is a narrow, contract-based cause of action. Courts recognize an insured's potential claim against its insurer for bad faith <u>failure to settle</u> at or within the policy limit, if the resulting judgment against the insured exceeds the policy limit. In that instance, the insurer may be liable for the amount of the excess judgment. *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161 (Mich. 1986). *See also J & J Farmer Leasing, Inc. v. Citizens Ins. Co. of Am.*, 696 N.W.2d 681, 684 (Mich. 2005) ("Michigan recognizes an insured's claim against its insurer for bad faith in refusing to settle."); *Humphries v. Allstate Ins. Co*., No. 18-CV-11006, 2020 WL 3248896, at *12 (E.D. Mich. June 16, 2020) ("Michigan law … does not recognize a tort action for bad faith failure" to pay insurance benefits.)

18

Stryker's asserted cause of action is not a "failure to settle claim." Instead, it claims bad faith <u>settlement</u> which purportedly impacted its excess coverage based upon the order in which claims were paid. Such a claim is not recognized by Michigan law and is in direct conflict with Sixth Circuit precedent. *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 429 (6th Cir. 2016) (improperly employ[ing] the obligation of good faith and fair dealing to "override express contract terms"). Here, the XL Policy terms expressly required XL to

> pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract.

In this matter, the insured, Stryker, became legally obligated to pay the Pfizer judgment by way of the insured contract it entered into with Pfizer. This Court determined there was coverage for the Pfizer judgment, which XL ultimately paid. As XL was simply complying with the express terms of its policy, Stryker cannot now seek to use the duty of good faith – or claim "bad faith settlement" – to "override express contract terms."

**C.   Stryker was Aware of the Grounds for Challenging the XL-Pfizer Settlement in February 2009 Such that this Claim is Barred by the Doctrines of Law of the Case and Res Judicata**

Having previously litigated and lost its claim to recover the $7.6 million Uni-Knee settlements against XL before this Court and then the Sixth Circuit, Stryker cannot now re-litigate a claim that XL should pay that $7.6 million. The doctrines of law of the case and res judicata bar any such effort on Stryker's part.

First, Stryker previously challenged XL's settlement with Pfizer, and in fact made the same argument it makes here. *First Sixth Circuit Decision*, 735 F.3d at 351. That is, before the Sixth Circuit in 2012, Stryker argued that instead of settling with Pfizer, "XL should have first paid the judgment in *Stryker I*." *Stryker Appeal Brief*, 2011 WL 1460580, at *43. According to Stryker, XL's payment to Pfizer was inconsistent with the "district court's road map" and "is an

example of insurance bad faith." *Id.* at 43-45. But the Sixth Circuit was wholly unpersuaded by Stryker's position and held: "the district court did not mention a 'roadmap,' nor discuss a categorical rule regarding the order that XL must pay its claims." *First Sixth Circuit Decision*, 735 F.3d at 357. The Sixth Circuit went on to hold that not only may an insurer "pay claims in any order it chooses" but also that "the Pfizer settlement can be used to exhaust the XL policy before considering the *Stryker I* judgment." *Id*. at 357 n.3.

The Sixth Circuit's holding is the law of the case and must be followed by the district court. *See, e.g.*, *Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 782 (E.D. Mich. 2008) ("a district court is bound by the decisions of the Circuit Court of Appeals in which it sits"); *Cochran v. Trans-Gen. Life Ins. Co.*, 60 F. Supp. 2d 693, 698 (E.D. Mich. 1999) ("It is a well-settled rule that a district court is bound by the decisions of the circuit court of appeals in which it sits"). Plainly, the Sixth Circuit has already rejected Stryker's argument that XL was required to settle the *Stryker I* judgment first.

Second, as to res judicata, the Sixth Circuit has stated that "we shall apply federal res judicata principles in successive federal diversity actions." in *J.Z.G. Resources, Inc. v. Shelby Insurance Co.*, 84 F.3d 211, 214 (6th Cir. 1996), The Court further explained that "[t]he rules of res judicata actually comprise two doctrines concerning the preclusive effect of a prior adjudication, claim preclusion and issue preclusion." *Id.*

In this very coverage litigation, the Sixth Circuit applied federal common law to federal court judgments in diversity actions. *See*, *e.g.*, *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 819, 824 n.3 (6th Cir. 2012) ("[t]he preclusive effect of a federal-court judgment is determined by federal common law"). The Sixth Circuit explained:

> Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the

20

same issues as the earlier suit. Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim.

\* \* \*

In order for issue preclusion to apply … the party seeking estoppel must show:

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.* at 824-25 (internal quotations and citation omitted).

All four elements for issue preclusion are clearly satisfied here.

(1) The claim of Stryker to recover $7.6 million from XL was clearly at issue, litigated before, and resolved by this Court and the Sixth Circuit. *See First Sixth Circuit Deci*sion at 357, *et seq.*; *Stryker II,* ECF No. 304, which was affirmed by the *Second Sixth Circuit Decision* at 497.

(2) The rulings by this Court and the Sixth Circuit were absolutely necessary, because Stryker was seeking to recover, in whole or in part, this $7.6 million from XL. See *Stryker II,* ECF No. 304; *First Sixth Circuit Decision* at 353; *Second Sixth Circuit Decision* at 497.

(3) The rulings that Stryker could not recover the $7.6 million from XL were incorporated in the final judgment entered on remand at the direction of the Sixth Circuit. Final Judgment, *Stryker I,* ECF No. 1215. That final judgment was affirmed by the Sixth Circuit. *Second Sixth Circuit Decision* at 497.

(4) In proceedings before this Court and the Sixth Circuit, Stryker had a full and fair opportunity to litigate its $7.6 million claim against XL.

(5) In *Stryker I* and *Stryker II*, Stryker again attempted to assert its $7.6 million claim against XL, but those efforts were rejected by this Court.

XL recognizes that the Court denied its motion for judgment on the pleadings. ECF No.

43. However, XL intends to pursue this issue on appeal to the Sixth Circuit if necessary.

## IV.    CONCLUSION

In sum, XL is entitled to judgment in its favor because Stryker has already litigated and lost its right to recover the $7.6 million in settlements from XL, it does not state a cognizable cause of action against XL under Michigan law, and regardless, the record evidence compels the conclusion that XL's conduct in settling the Pfizer judgment was not arbitrary, reckless, indifferent or an intentional disregard of Stryker's interests.

Dated:  July 28, 2020

PLUNKETT COONEY
By: /s/ *Charles W. Browning*
CHARLES W. BROWNING (P32987)
38505 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
Tel: (248) 901-4000
cbrowning@plunkettcooney.com

and

CLYDE & CO US LLP
PAUL R. KOEPFF (PK8452)
405 Lexington Ave.
New York, NY 10174
Tel: (212) 710-3900
paul.koepff@clydeco.us

*Attorneys for Defendant*
*XL Insurance America, Inc.*

Open.23899.70385.24640255-1

22

## <u>CERTIFICATE OF COMPLIANCE</u>

XL certifies that its Trial Brief contains 7,265 words and was prepared using Microsoft Word 365. The word count was determined using Microsoft Word 365's word count function.

*s/Charles W. Browning*
Charles W. Browning (P32978)