# EXHIBIT B



**Steven Plitt**
Phone: (602) 322-4047
Facsimile: (602) 322-4103

splitt@cavanaghlaw.com
www.cavanaghlaw.com

September 30, 2019

Charles W. Browning, Esq.
Plunkett Cooney
38505 Woodward Ave.
Suite 100
Bloomfield Hills, MI  48304

## EXPERT OPINION LETTER

Re:   *Stryker Corporation and Howmedica Osteonics Corp. v. XL Insurance America,
Inc., fka Winterthur International America Insurance Company*
USDC, Western District of Michigan, Southern Division
Case No. 1:17-cv-00066-PLM-PJG

Dear Mr. Browning:

I have reviewed the materials you have provided to me and have set forth herein my observations based upon my review of those materials.  I reserve the right to alter or change any of my opinions based upon new or additional information that may be received since this report was issued.

### I.    QUALIFICATIONS

I have attached to this report a copy of my CV (**Exhibit 1**).  I have been a licensed attorney within the state of Arizona since 1982.  I have my LL.M. in Insurance Law.  I focus my practice in the field of insurance law.  A large part of my practice has in the past involved working with claims representatives in order to allow claims to be processed consistent with the insurance policy's implied covenant of good faith and fair dealing.  I have directly managed with claim representatives insurance claim files which are under investigation, in real time, or are being processed toward resolution.

I am currently an adjunct professor of law teaching insurance law at the University of Arizona's James E. Rogers College of Law.  I previously taught the insurance law curriculum at Arizona State University's Sandra Day O'Connor College of Law.  Insurance company regulation is part of my teaching curriculum including insurance bad faith.  In my treatise on insurance law, *Arizona Liability Insurance Law*, I have devoted a chapter to insurance bad faith.  I am a contributing senior editor of the *Arizona Tort Law Handbook* where I co-authored the chapter on bad faith.  In my national treatises, *The Claim Adjuster's Automobile Liability Handbook* and my

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 2

two-volume treatise entitled *Practical Tools for Handling Insurance Cases*, I devote chapters to bad faith and Unfair Claims Practices. I am an active speaker regarding the law of bad faith and I have been a frequent lecturer within the insurance industry where I have instructed claims departments of insurance companies on how to properly manage claims in order to be consistent with regulatory requirements as well as compliance with the implied covenant of good faith and fair dealing which is a part of every insurance policy.

I am the current senior author of COUCH ON INSURANCE 3D. My team and I are revising, editing and re-writing the treatise. The COUCH treatise comprises 24 substantive volumes of text on insurance law and is one of the nation's leading treatises on insurance law. The COUCH treatise has been cited as an authoritative national treatise on insurance law by courts and lawyers throughout the United States. I am on the editorial board for the Insurance Litigation Reporter where I am a Senior Contributing Editor. The Insurance Litigation Reporter is a national reporter publication of significant insurance law cases that have been decided nationwide.

I have been cited by the Supreme Courts in 33 states, the Intermediate Appellate Courts in 23 states, 11 of the Federal Circuit Courts of Appeal, 59 Federal District Courts, the Federal Court of Claims, and 4 Federal Bankruptcy Courts. I have also been cited in 95 scholarly articles and the Code of Federal Regulations.

Although I cannot give a precise number within my 36 years of practice experience, I have reviewed thousands of claim files. During my practice career, I would estimate that I have reviewed and analyzed thousands of claim files from more than a hundred different insurance companies.

Over my practice career I have acquired a significant amount of practical knowledge and experience regarding industry standard, custom and practice, generalized claim handling practices within the industry, specific claim handling practices regarding different types of claim categories, claim management and oversight, and other related insurance claims activities and protocols. During my direct representation of insurance companies, as well as part of my consulting retentions, I have reviewed the claim manuals and guidelines, claim bulletins and general corporate claim documentation from many insurance companies. As an attorney, I would regularly speak directly with claim adjusters, supervisors and claim management/legal representatives regarding the processing of claims, in real time. On a regular basis, over the course of 36 years of practice, I have been in direct communication with claim professionals at all levels within the insurance company and industry during which specific claims and claim conduct were discussed and analyzed. I have also reviewed hundreds of depositions and sworn declarations of insurance claims adjusters, claim supervisors, claim legal attorneys and other claim management professionals regarding the handling of specific claims, claims handling generally and claim and underwriting operations.

As a national commentator on insurance law issues, I have reviewed thousands of published and unpublished bad faith cases which have contained within the court opinions the recitation of insurance company practices regarding the handling of specific claims as well as general claims handling practices. I have extensively studied and analyzed the NAIC Unfair

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 3

Claims Settlement Practices Act and its various adopted iterations throughout the United States.  I have also extensively reviewed and analyzed the state-specific regulations which often accompany a state's adoption of its variation of the Unfair Claims Settlement Practices Act.

In my practice I have reviewed hundreds of expert reports from other claim handling consultants who have expressed within their reports their understandings and beliefs regarding industry standard, custom and practice.  I have also reviewed hundreds of depositions from other claim handling consultants where they have testified regarding the claim handling practices of insurance companies that are specific to a particular claim as well as their overall opinions regarding industry standard, custom and practice.

I have participated in many insurance company "roundtable" discussions which are part of the overall claim adjustment and evaluation process.  These "roundtable" committees are populated by claims representatives, supervisors and other claim management personnel where the handling of claims are discussed in real time as the claims in question are being actively processed.  When I have attended a "roundtable" discussion, my role has been to provide guidance and advice on claim evaluation, claim handling conduct, issues and problems, and I have provided independent advice as well as proposed solutions regarding claim impediments that may have arisen in the claim environment on specific claims.  In this specific role, or when I am acting as coverage counsel for insurance company clients, I am directly engaged within the processing of active claims in real time and, therefore, I am part of the claim adjustment process.

In my capacity as an attorney directly representing insurance companies, I have oftentimes been called upon to provide informal advice and guidance regarding the claim handling of a specific claim as well as claim handling practices and procedures.  The foregoing activities, over a span of 34 years of practice, have provided me with a working practical knowledge and experience that informs me as to industry standard, custom and practice regarding claim handling practices and the operation of claim departments, in real time.  Finally, I have adjusted claims for insurance companies.

This practical knowledge and experience informs me as to industry custom, standard and practice.  I have participated in roundtable discussions, claim handling, and bad faith risk avoidance activities as part of my national insurance law practice.

I have been involved with the drafting of insurance policies generally, and endorsements specifically, and I have worked closely with insurance company product development committees and corporate counsel regarding the evaluation of existing policy language and possible amendments.

I have analyzed coverage issues in all 50 states; I have been retained as an expert witness in cases venued in Arizona; California; Colorado; Florida; Georgia; Hawaii; Idaho; Indiana; Kansas; Kentucky; Louisiana; Maryland; Michigan; Minnesota; Mississippi; Missouri; Nebraska; Nevada; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma;

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 4


Pennsylvania; South Carolina; South Dakota; Tennessee; Texas; Utah; Washington; West
Virginia; Wisconsin and Wyoming.

My hourly rate structure is $575 per hour for research, case analysis, review, report, and
travel, $675 per hour for depositions, hearings and trial testimony, and $725 per hour for
depositions or preserving trial testimony by video.

## II.   DOCUMENTS PROVIDED FOR REVIEW

### Claim File
1. XL 0000001-0000718

### Pleadings & Discovery
1. Complaint & Exhibits (1/20/17)
2. Plaintiffs Answers to Defendant's Contention Interrogatories (8/26/19)
3. Defendant XL Insurance America, Inc.'s Responses to Plaintiffs' First Set of Request to Admit (8/27/19)

### 6th Circuit Briefing
**2011 Briefing**
1. Opening Brief of Appellant XL Insurance America, Inc. (1/19/11)
2. Stryker Corporation and Howmedica Osteonics Corp.'s Brief on Appeal (3/23/11)
3. Appellant Reply/Cross Appellant Response Brief of XL Insurance America, Inc. (5/31/11)
4. Reply Brief (Fourth Brief) of Cross-Appellants, Stryker Corporation and Howmedica Osteonics Corp. (7/15/11)

**2013-2014 Briefing**
1. Stryker Corporation and Howmedica Osteonics Corp.'s Brief on Appeal (First Brief) (10/30/13)
2. TIG Insurance Company's Brief on Appeal (First Brief) (10/13/13)
3. Stryker Corporation and Howmedica Osteonics Corp.'s Corrected Brief on Appeal (First Brief) (11/1/13)
4. TIG Insurance Company's Brief on Appeal (Corrected First Brief) (11/8/13)
5. Second Brief of Appellee/Cross-Appellant XL Insurance America (1/3/14)
6. Stryker Corporation and Howmedica Osteonics Corp.'s Reply Brief and Response Brief to XL's Cross-Appeal (Third Brief) (2/19/14)
7. Plaintiffs-Appellants/Cross-Appellees' Reply in Support of their Motion to Supplement the Record (3/10/14)
8. Fourth Brief of Appellee/Cross-Appellant XL Insurance America (3/24/14)

### Decisions
1. 1st Decision (7/5/12)

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 5

    2.  2nd Decision (8/4/14)
    3.  3rd Decision (11/18/16)

**Settlement Submissions**
    1.  Stryker Mediation Statement (1/5/09)
    2.  XL Mediation Statement (1/5/09)
    3.  Pfizer Mediation Statement (1/6/09)
    4.  Mediation Minutes (1/12/09)
    5.  Mediation Minutes (1/14/09)

**Motion for Judgment on the Pleadings**
    1.  Memorandum of Law in Support of XL Insurance America, Inc.'s Motion for Judgment on the Pleadings (3/27/17)
    2.  Stryker's Response to XL Motion for Judgment on the Pleadings and Exhibit A (5/25/17)
    3.  Reply Memorandum of Law in Support of XL's Motion for Judgment on the Pleadings (6/22/17)
    4.  Plaintiffs' Notice of Errata (9/12/17)
    5.  Order (12/5/17)
    6.  Supplemental Brief of XL Insurance Pursuant to the Court's December 5, 2017 Order (1/9/18)
    7.  Stryker's Supplemental Brief in Opposition to XL's motion for Judgment on the Pleadings (1/9/18)
    8.  Brief of XL Insurance in Response to Stryker Corporation's Supplemental Brief in Opposition to XL's Motion for Judgment on the Pleadings (1/23/18)
    9.  Stryker's Response to XL's Supplemental Brief in Support of XL's Motion for Judgment on the Pleadings (1/23/18)
    10. Stryker's Notice of Supplemental Authority and Exhibit 1 (5/29/18)
    11. Response to Notice of Supplemental Authority (6/7/18)
    12. Opinion (8/17/18)
    13. Order (8/17/18)

**Depositions**
    1.  Barnes, Richard [w/Exhibits] (6/6/19)
    2.  Bloss, David [w/Exhibits] (6/18/19)
    3.  Cartier, Michael [w/Exhibits] (5/31/19)
    4.  Gass, David [w/Exhibits] (7/18/19)
    5.  Portinga, Andrew [w/Exhibits] (7/17/19)
    6.  Daly, Michael [w/Exhibits] (8/21/19
    7.  Betz, Michael [w/Exhibits] (8/13/19)
    8.  Hacker, Jonathan [w/Exhibits] (6/12/19)

Charles W. Browning, Esq.
Re:  *Stryker v. XL*
September 30, 2019
Page 6

    9.  Koepff, Paul [w/Exhibits] (6/19/19)
    10. Spencer, Kevin [w/Exhibits] (8/16/19)
    11. Tuhy, Paul [w/Exhibits] (8/14/19)
    12. Virginia Lloyd [w/Exhibits] (09/04/19)
    13. Curtis Hall [w/Exhibits] (09/09/19)

**Stryker Production**
**Correspondence**
1.  2008-2009 XL with Pfizer
2.  DelCarpio Correspondence
3.  Legacy Email
4.  Settlement Conference

**Pleadings**
1.  Exhibits to Third Amended Complaint
2.  Declaration of Michael Betz (11/5/12)
3.  Michael Betz Declaration and Exhibits (8/14/13)
4.  Fees and Settlement List
5.  Exhibits
6.  Satisfaction of Interlocutory Judgment

**Deposition Exhibits**
1.  Shultz
2.  Bendure
3.  Mason
4.  Lameka
5.  Rapponotti
6.  Slavin
7.  Huddleston
8.  Geller
9.  Welsher
10. Pfizer & Stryker Stock & Asset
11. Cartier
12. Hall
13. Henderson
14. Cormack
15. Newman
16. Jolstad

**TIG Response to SDT**
1.  Bollinger Correspondence

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 7

2. Bos Declaration
3. Glover Declaration
4. Manos Declaration
5. Privilege and Redaction Log
6. Redacted Documents

**Pfizer (Goodell Devries) Production**
1. W.D.MICH.117-cv-66/GDLD_0001-0254

**Bloss Betz Production**
1. BB-00000001-00000155

## III.   PRIOR TESTIMONY

In the past four years, I have testified as follows: (See **Exhibit 2**)

## IV.   CASE OVERVIEW

This case involves three separate litigated matters which all converge to some extent in the present lawsuit against XL Insurance America, Inc. An overview of the relevant facts can be found in the opinions of several courts, which are set forth below.

In *Stryker Corp. v. XL Ins. Am., Inc.*,[1] the U.S. District Court for the Western District of Michigan provided the following predicate facts leading up to the current litigation:

> Howmedica sold the Uni-Knees in 1997 and 1998 while it was a subsidiary of Pfizer, Inc. Stryker purchased the assets of Howmedica in 1998 under the terms of an Asset Purchase Agreement ("APA") with Pfizer. Patients who received the Uni-Knees as implants began suing Stryker and Pfizer in 2000, after the implants failed.
>
> *Stryker sues XL to obtain coverage for the Uni-Knee claims against Stryker (Stryker I).*
>
> Stryker's primary liability insurer for the relevant time period was XL. XL's policy provided $15 million in coverage, after a $2 million self-insured retention. Stryker also had coverage from TIG Insurance Company ("TIG"), which provided $25 million in excess coverage under a policy that followed the form of XL's policy. After XL and TIG refused to defend or indemnify Stryker for the Uni-Knee claims, Stryker settled with the individual claimants for a total of $7.6 million ("Uni-Knee Settlements"). Stryker then brought suit against XL to recover its costs of settlement and defense. *See Stryker Corp. v. XL Ins. Am.*, No. 4:01-cv-157 (W.D. Mich.) ("*Stryker I*"). In April 2007, the Court held that XL had a contractual obligation to defend and indemnify the Uni-Knee claims. (*Stryker I*, 4/3/2007 Op., ECF No. 916.) In December 2008, the Court entered a partial judgment against XL for approximately $12 million, not including pre-judgment interest.[1] (*Stryker I*, 12/15/2008 Order, ECF No. 1056.) This amount included the $7.6 million in Uni-Knee Settlements, as well as some of Stryker's

---

[1]     *Stryker Corp. v. XL Ins. Am., In*c., No. 1:17-CV-66, 2018 WL 3950899, at *1–4 (W.D. Mich. Aug. 17, 2018).

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 8

costs for defending the Uni-Knee claims. Only the $7.6 million applied toward XL's policy limit.

*Stryker sues XL and TIG to obtain coverage for the claims against Pfizer (Stryker II).*

Many of the patients with failed implants also sued Pfizer, and Pfizer sought coverage from Stryker, arguing that the APA required Stryker to defend and indemnify Pfizer for these claims. Stryker refused to provide coverage, and Pfizer sued Stryker in the Southern District of New York. In 2004, the district court in New York ruled in Pfizer's favor, holding that the APA required Stryker to defend and indemnify Pfizer.

The policies issued by XL and TIG also covered Stryker's liability to Pfizer, and Stryker filed a new lawsuit against XL and TIG in 2005 to obtain coverage for the Pfizer claim. *See Stryker v. XL Ins. Am.*, No. 1:05-cv-51 (W.D. Mich.) ("*Stryker II*"). After the district court in New York entered an interlocutory judgment in Pfizer's favor for $17.7 million, Stryker tendered this judgment to XL and TIG, but they refused to pay. On January 8, 2009, this Court held that XL was obligated to defend and indemnify the claims by Pfizer, and that TIG was liable for any excess above the limits of XL's policy. (*Stryker II*, 1/8/2009 Am. Op., ECF No. 161, PageID.3117.)

*XL settles with Pfizer.*

About a week later, Stryker, XL, TIG, and Pfizer gathered at the Court for a two-day settlement conference. TIG maintained its position that its policy offered no coverage and it decided not to participate in the second day of the conference. However, XL agreed to settle the *Pfizer* judgment for $26 million ("Pfizer Settlement"). Curiously, the settlement allocated exactly $17 million to costs that would apply to XL's policy limit.[2] The rest of the settlement was allocated to costs that likely did not apply to the policy limit, including pre-judgment interest and $500,000 of "miscellaneous" expenses. (*Stryker II*, ECF No. 499-15, PageID.8704.)

Stryker alleges in its complaint that it was not involved in the discussions between XL and Pfizer and did not consent to the settlement. Nor was it informed of the terms of the settlement before XL agreed to it.

*Stryker argues that XL acted in bad faith.*

XL subsequently sought a declaration from the Court that the Pfizer Settlement exhausted the limit of its policy. Stryker objected, contending that XL acted in bad faith by settling with Pfizer before paying the Uni-Knee claims at issue in *Stryker I*. (*Stryker II*, Pl.'s Br. in Opp'n, ECF No. 183, PageID.3367.) At a hearing on XL's motion, the Court expressed concern that the settlement had been "structured" in a manner intentionally designed to exhaust XL's policy at the expense of other parties. (*Stryker II*, 9/21/2009 Mot. Hr'g Tr., ECF No. 198, PageID.3534.) XL's attorney responded that the settlement would not harm Stryker, because Stryker could recover any remaining damages related to the Uni-Knee claims from TIG. (*Id.*, PageID.3534-3536.) Of course, TIG's attorney disagreed.

*The Court finds XL liable for the Uni-Knee Settlements, notwithstanding XL's policy limit.*

After the motion hearing, the Court held that the Pfizer Settlement did not fully exhaust the limits of XL's policy, and that XL was liable for the Uni-Knee Settlements as consequential damages for XL's refusal to defend the Uni-Knee claims. (*Stryker I*, 10/7/2009 Op., ECF No. 1092, PageID.10401.) XL appealed that decision.

*Stryker again argues that XL acted in bad faith, but the Court of Appeals holds that the Pfizer Settlement can apply to XL's policy limit.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 9

On appeal, Stryker again raised the issue of bad faith. It argued that the Pfizer Settlement did not exhaust XL's policy limit, in part, because XL should have paid the Uni-Knee Settlements first. Stryker argued that XL tried to "game the system" by avoiding liability for penalty interest under Mich. Comp. Laws § 500.2006 for the Uni-Knee Settlements, which were tendered to XL long before the *Pfizer* judgment. (Stryker Br. on App. 43, Case No. 10-2383 (6th Cir.), ECF No. 30; *see Stryker II*, 4/18/2013 Joint Status Rep., ECF No. 312, PageID.4607.) The Court of Appeals rejected these arguments, holding that "exhaustion turns on the actual payment of money on behalf of the insured," and that "[a]s it is clear that XL entered into the Pfizer settlement before it paid any claims under *Stryker I*, the Pfizer settlement can be used to exhaust the XL policy[.]" *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 357 (6th Cir. 2012). The Court of Appeals also noted that "Stryker cites no Michigan case law stating that an insurer has an obligation to pay claims in a particular order. Case law in other jurisdictions, however, makes clear that the general rule is that an insurer may pay claims in any order it chooses." *Id.* at 357 n.3. The Court of Appeals overturned this Court's decision that XL would be liable for the Uni-Knee Settlements as consequential damages, and remanded the matter to this Court to determine precisely how much of the Pfizer Settlement exhausted XL's policy. *Id.* at 359.

On remand, this Court held that the Pfizer Settlement fully exhausted the limit of XL's policy. (*Stryker I*, 2/8/2013 Op., ECF No. 1198.)

*Stryker attempts to assert a contingent claim of bad faith against XL.*

With XL's policy fully exhausted, Stryker turned its attention to TIG. After Stryker filed a motion for summary judgment against TIG, TIG objected to coverage of the Uni-Knee Settlements on the basis that Stryker failed to provide adequate notice of the Uni-Knee claims, and failed to obtain TIG's consent for the settlements as required by TIG's policy. Stryker also sought to add a "contingent" claim of bad faith against XL in *Stryker I*. (*Stryker I*, 4/18/2013 Joint Status Report, ECF No. 1206.) Stryker maintained that it did not need TIG's consent for the Uni-Knee Settlements, but if the Court held otherwise, then Stryker wanted to pursue a claim that XL settled with Pfizer in bad faith. (*Id.*, PageID.11659.) The magistrate judge recommended that the Court deny Stryker's request to add a new claim of bad faith because the claim likely accrued as early as January 2009, when XL settled with Pfizer, yet Stryker never attempted to supplement its complaint with this claim before the Court entered a final judgment in *Stryker I* later that year. (*Stryker I*, 4/22/2013 R&R, ECF No. 1210, PageID.11692-11693.) In addition, the magistrate judge noted that, according to Stryker, Stryker's claim was not ripe. (*Id.*) Stryker did not object to the magistrate judge's report and recommendation, so the Court adopted it. (*Stryker I*, 5/16/2013 Order Approving & Adopting R&R, ECF No. 1212.)

Stryker also attempted to supplement its complaint in *Stryker II* to assert a "contingent" claim of bad faith against XL for satisfying the *Pfizer* judgment before paying the Uni-Knee Settlements. The Court denied Stryker's motion because its new cause of action was not related to any claims originally asserted in that case. (*Stryker II*, 10/7/2013 Op., ECF No. 360, PageID.5107.) *Stryker II* concerned XL's liability for the Pfizer judgment, not XL's liability for the Uni-Knee Settlements. Also, a judgment had already been entered against XL in Stryker II for the claims in the non-supplemented complaint. It made no sense to further "prolong" the case against XL. (*Id.*, PageID.5113.)

*The Court finds that TIG is liable for the Uni-Knee Settlements.*

This Court subsequently held that Stryker provided adequate notice to TIG and that Stryker did not need to obtain TIG's consent for the Uni-Knee Settlements because the language of TIG's policy regarding consent[3] contained a latent ambiguity. Stryker argued, and this Court

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 10

agreed, that the consent requirement only applied to claims within TIG's coverage layer. Even TIG's claims adjusters testified that they were not concerned about any claims that were below TIG's coverage layer. (*Stryker II*, 10/30/2014 Op., ECF No. 546, PageID.10264-10266.) Moreover, requesting consent would have been meaningless because TIG had already denied coverage for the Uni-Knee claims. (*Id.*, PageID.10266-10269.)

*\*4 The Court of Appeals holds that TIG is not liable for the Uni-Knee Settlements.*

The Court of Appeals overturned this Court's decision regarding the need for consent, finding that the plain language of TIG's policy required TIG's consent for any settlements. *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 428 (6th Cir. 2016). Consequently, because TIG did not consent to the Uni-Knee Settlements, it was not required to reimburse Stryker for them. *Id.* at 430.

*Stryker files the instant action, claiming XL acted in bad faith.*

In this action, Stryker again argues that XL should have paid the Uni-Knee Settlements before settling with Pfizer. Stryker asserts that it has been harmed by XL's decision because Stryker is unable to recover the Uni-Knee Settlements from TIG. If XL had paid the Uni-Knee Settlements, then presumably Stryker could have recovered the amount due under the *Pfizer* judgment from TIG because TIG's policy does not require consent for judgments.

Stryker claims that XL breached its duty of good faith to Stryker in the following ways: (1) settling with Pfizer in order to minimize XL's liability for penalty interest while compromising Stryker's ability to obtain excess coverage from TIG; (2) failing to investigate the impact of the Pfizer Settlement on Stryker's ability to obtain excess coverage; and (3) failing to effectively negotiate with Pfizer to "negotiate the best possible deal with Pfizer." (Compl., ECF No. 1, PageID.18.)

The Sixth Circuit, in two separate decisions, also discussed the predicate case facts. In 2012 the Sixth Circuit described the predicate facts case as follows[2]:

A.   The Claims

In 1997 and 1998, Howmedica, Inc., an Irish company which was a wholly-owned subsidiary of Pfizer, Inc. ("Pfizer"), manufactured and distributed an artificial knee joint known as Duracon Unicompartmental Knees ("Uni-Knees"). *Stryker Corp. v. XL Ins. America, Inc.*, No. 4:01-cv-157, 2007 WL 1031641, at \*1 (W.D.Mich. April 3, 2007) ("Stryker I Coverage Opinion"). Key components of the Uni-Knees were made of ultra-high-molecular-weight-polyethylene ("UHMWPE"). *Id.* In the mid-1990s, it was discovered that the standard procedure to sterilize medical devices after manufacture—gamma irradiation—caused UHMWPE to degrade slowly when exposed to the air contained in the device packaging, potentially leading to device failure. *Id.* Howmedica and Pfizer determined that, because of this potential problem, Uni-Knees should have an expiration date of five years after manufacture. *Id.* To ensure that expired products did not ship to customers, Pfizer developed a computerized database program to monitor all of their products containing UHMWPE. *Id.* However, as became clear later, Uni-Knees were accidentally not entered into the database.

At the end of 1998, Stryker acquired Howmedica from Pfizer pursuant to a stock and asset purchase agreement ("the Agreement"). *Id.* Under the terms of the Agreement, Stryker was to indemnify Pfizer for any costs associated with claims brought against Pfizer relating to Howmedica products, such as Uni-Knees.

---

[2]    *See, Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 352 (6th Cir. 2012).

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 11

In late 1999, a Stryker sales representative prepared an incident report disclosing that an expired Uni–Knee had been implanted in a patient. *Id.* at *11. After an investigation, Stryker believed that the error was "at the hospital end," i.e., that hospitals had been using inventory that had been sitting on their shelves past the five-year expiration date. *Id.* On December 30, 1999, Elizabeth Staub, Stryker's Vice President for Quality Assurance, Regulatory Affairs, and Clinical Research, distributed a memorandum to Stryker sales personnel, reminding them of the five-year expiration date and instructing them to reinforce the rule with their customers ("the Staub Memo"). *Id.* at *11–12. By 2000, however, it became clear that the error was on Stryker's end—expired Uni–Knees were being kept in Stryker warehouses and from there sold to hospitals and implanted in patients. *Id.* at *13. This fact was memorialized in a July 28, 2000, letter to Stryker personnel. Beginning in 2000, Stryker was the subject of lawsuits from patients who received expired Uni–Knees and had those devices fail after implantation. In total, seventy-seven suits were brought against Stryker, and many of those cases also contained claims against Pfizer.

In 2016 the Sixth Circuit set forth the following predicate facts:

Stryker is a medical technologies firm. In the late 1990s, it purchased a subsidiary of Pfizer, Inc. that made and sold orthopedic products. One of those products, an artificial knee joint called the Duracon Unicompartmental Knee (or "Uni-Knee" for short), turned out to be defective. These medical devices were sterilized using gamma rays, which caused ultra-high-molecular-weight polyethylene in the artificial knees to degrade and, if implanted past their five-year shelf-life, potentially fail. Due to an inventory oversight, a number of expired Uni-Knees were sold to hospitals and implanted in patients. As a result, in the early 2000s, Stryker was subject to over 70 individual product-liability claims and potentially obligated to cover Pfizer's losses as well. *See Stryker*, 735 F.3d at 352–53.

Stryker turned to its insurers for relief from exposure. Two policies, effective during the year 2000, are relevant here: a "commercial umbrella" policy, issued by XL, and an "excess liability" policy, issued by TIG. The umbrella policy covered any "batch" of losses that Stryker became "legally obligated to pay by reason of liability imposed by law or assumed by the [i]nsured ... because of [b]odily [i]njury." That policy was limited to $15 million, after a $2 million self-insured retention. The excess-liability policy followed form, kicked in after the umbrella policy was fully "exhausted," and extended to Stryker's "ultimate net loss ... in excess of all underlying insurance" up to $25 million.

The insurance companies balked at Stryker's request for defense and indemnification. In October 2001, XL denied coverage outright, arguing that the Uni-Knee claims were "known or suspected" prior to the inception of the policy, while TIG waited in the wings, hoping that its excess layer would not be implicated at all. Stryker, in turn, filed multiple lawsuits against XL and TIG in the Western District of Michigan. During the pendency of that protracted litigation, Stryker unilaterally settled all of its individual product-liability claims for $7.6 million and was separately adjudicated liable in the Southern District of New York for $17.7 million of Pfizer's losses. *See Stryker*, 735 F.3d at 353–54; see also *Pfizer, Inc. v. Stryker Corp.*, 348 F.Supp.2d 131, 159 (S.D.N.Y. 2004).

Stryker's case against XL was resolved over a decade later. In July 2012, we conclusively held that XL was obliged to "provide[ ] coverage for the claims made against Stryker in connection with [the defective] Uni-Knees." *Stryker*, 735 F.3d at 356. With concrete figures in hand and its legal obligation apparent, XL decided to cover Stryker's losses. But it did so in non-chronological order: XL paid out the larger Pfizer judgment first, exhausted the limits of its coverage, and left Stryker's individual product-liability claims on the table. See *id.* at 357 & n.3 ("[T]he general rule is that an insurer may pay claims in any order it chooses.").

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 12

And so, one score was left unsettled. In October 2013, back in the Western District of Michigan, Stryker filed a supplemental complaint against TIG, seeking to recover the remaining $7.6 million paid to settle its direct product-liability claims. TIG disputed its coverage obligation, raising a defense that was "unique to [its] policy." *Stryker*, 681 F.3d at 825 & n.4. In TIG's view, the direct Uni-Knee claims did not constitute "ultimate net loss" because Stryker failed to obtain "written consent" at the time the settlements were made. Section III.B of the policy defines "ultimate net loss" as "the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with the written consent of [TIG], after making proper deduction for all recoveries and salvages."

Discovery ensued and ultimately, in July 2014, the parties filed cross-motions for summary judgment. Stryker claimed that the policy, as applied to the idiosyncratic facts of this case, is latently ambiguous: because XL satisfied the Pfizer judgment first (and exhausted its policy), Stryker was forced to present its direct settlements to TIG years after they were made. Relying on the testimony of TIG's former claims adjusters and underwriters, Stryker argued that the excess-liability policy did not actually require "consent to the Uni-Knee settlements when they were made." In response, TIG urged the court to apply the plain language of the policy, and disputed Stryker's characterization of its former employees' testimony.

In October 2014, the district court granted summary judgment to Stryker, concluding that the contract indeed contained a latent ambiguity. *Stryker Corp. v. XL Ins. Co.*, 57 F.Supp.3d 823 (W.D. Mich. 2014). "On the one hand," the court said, "the policy, as interpreted and applied by TIG's own employees, does not require TIG's consent to settlements entered into below the TIG layer." *Id.* at 831. "[O]n the other hand," it recognized, the policy's plain language "does require consent if those settlements are [ultimately] offered to TIG for payment." *Id.* Thus, in the court's view, the term "claims" in the definition of ultimate net loss was "susceptible to more than one interpretation." *Id.* Having found the term ambiguous, the court then construed the contract against TIG based on various policy rationales. *Id.* at 831–35. All in all, the district court found that Stryker's claims were covered under the policy, TIG could muster no defenses to enforcement, and Stryker was entitled to a grand total of $8.6 million in damages and interest.[3]

## V.     REVIEW OF XL CLAIM FILE FOR RELEVANT TIME PERIOD [4]

During the time period between November 2008 through the settlement conference in January 2009, the XL claim file is mostly populated with communications of the involved lawyers. This is common in this type of case. I will focus on the highlights of the claim file.

The XL claim file contains a large loss report involving Stryker I and Stryker II (combined). It appears that the first large loss report was initially created on September 9, 2006 and was then updated on April 4, 2008 (454), August 12, 2008 (454), April 2, 2009 (359), and May 1, 2009 (340).  Using the most current large loss report dated May 1, 2009 (340-346)

On November 3, 2008 (68) attorney David Bloss (Bloss Betz, attorney for XL Insurance), corresponded with the Honorable Robert Holmes Bell, the U.S. District Court Judge assigned to

---

[3]         *See, Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 424–26 (6th Cir. 2016).

[4]         The XL Insurance Company Claims File prefix "XL 00000#"is being shortened to "#" only from this point forward in the Report.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 13

the Stryker/Howmedica v. XL matter in the U.S. District Court for the Western District of Michigan.  He reported that his review of the "Case Management Order (Damages Phase)," did not call for a settlement conference.  However, the Order did mandate a final pretrial conference, at which time either counsel or a client representative "with full authority" had to attend.  He asked the Court to either set a separate settlement conference or to engage in an attempt to settle at the final pretrial conference.

On November 11, 2008 (57-58) attorney Michael Betz (Bloss Betz) corresponded with attorney Davis Gass (Miller Johnson, counsel for Stryker), highlighting what XL's counsel believed were the various parties' damages calculations.  He wrote the following:

> I am providing to you, by means of enclosure, XLIA's analyses of the amounts that would be available to Stryker for collection were the presently-effective (but currently-interlocutory) judgments, rulings, and assertions in Stryker Case No. 4:01 cv 157 and Stryker Case No. 1:05cv0051 to be determined final. Included in our calculations is a separate determination of the "penalty interest" sum that would be recoverable under the Michigan Uniform Trade Practices Act were a decision in Stryker's favor to be made on that issue as a result of Stryker's pending Motion for Partial Summary Judgment in Stryker Case No. 4:01 cv 157.

> So there is no confusion over what is being presented, it is XLIA's position that the maximum sum constituting Stryker's potential recovery against XL under the present status of the two ongoing Stryker v XLIA suits ranges between $28,398,767 and $31,893,074. These numbers contrast markedly with all of the various sums suggested by you and by Messrs. Hall and Cartier in the discussions and position statements in which Stryker has previously participated. While the parties thus appear to be substantially separated by their disparate views, it is XLIA's hope that the exchange of information that this letter completes will afford the parties an opportunity to assess alternative arguments and ultimately recognize the need for mutual concessions if this litigation is to be brought to a conclusion in the foreseeable future.

> While I fully understand that there is a substantial discrepancy between the $44 million "concession" ascribed to Mike Daly by Michael Cartier in the aftermath of the principals' October 6 meeting and the $28.4 million "best case scenario" outlined in the attached chart, I do not believe that such a discrepancy should be used as a basis for canceling further discussions. The difference between the $44 million ascribed to Mr. Daly and the $28.4 million resulting from this office's analysis - the sum of $ 15.6 million — is less than the $ 18.9 million difference between the $55 million sum asserted by Messrs. Hall and Cartier on October 6 as Stryker's optimal recovery and your "recalculation" that turned that sum into $73.9 million.

> In my several discussions with Mr. Daly, including one that took place just minutes after he had concluded his discussions with Messrs. Hall and Cartier, he has never spoken of an offer or concession at the amount of $44 million. He has repeatedly asserted that such a number did not come from him. He does inform me that he referred to $44 million as an indication as to the best XL would do, if XL lost all its defenses. He was mistaken in his calculation. He telephoned Messrs. Hall and Cartier to express this sentiment to them. Apparently, they did not have the opportunity to return his calls. He has requested that I extend to you and your client his regrets for whatever he did or said that created that false impression.

> It remains my hope and expectation, both personally and on behalf of my client, that Stryker will agree to further discussions in which positions can be fully explained and explored. Such a process should allow the parties to come to a mutually-satisfactory (or perhaps mutually-unsatisfactory) resolution which will forestall the need for further litigation, appeals, and all the other re-trials, etcetera that could delay a final resolution for many additional years.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 14

On November 26, 2008 (03) Mr. Betz wrote to George Rilanos with TIG, advising that U.S. District Court Judge Bell had inquired regarding any progress being made to effectuate an omnibus settlement conference involving Stryker, the insurers, and representatives of Pfizer. Mr. Betz also reported a call from the attorney for Stryker, advising that Pfizer was on board with the concept. Mr. Betz had tried to reach Mr. Rilanos and Ms. Ehrhart to discuss the prospect of a settlement conference, but they were not responsive. In the absence of Mr. Rilanos and Ms. Ehrhart, a conference call was conducted with Magistrate Judge Scoville, who cleared his calendar to hold the settlement conference. For the settlement conference to be successful, Mr. Betz reported that someone from the Bollinger Ruberry & Garvey firm, together with a TIG representative with authority, would have to be present. Given the fact that Stryker was asserting that it had liability for coverage sums which were at least $3.4 million in excess of XL's applicable policy limits. Mr. Betz asked Mr. Rilanos and Ms. Ehrhart to advise of their availability and willingness to participate in a meaningful fashion.

Mr. Betz had a discussion with attorney Diane Ehrhart regarding Judge Bell's interpretation of the meaning and application of the XL Medical Products Endorsement. *See* December 2, 2008 (4-6). Mr. Betz provided to Ms. Ehrhardt the following explanation regarding the application of the Medical Products Endorsement and how the Court's ruling impacted the case:

> My reading of that endorsement indicates that there are six potential means of establishing an occurrence date:
>
> 1) If the Duracon Uni-Knee has been explanted before the issuance of an advisory memorandum, the date of the explant shall be the occurrence date;
>
> 2) If a claim is made or suit is brought before the issuance of an advisory memorandum, that will be the date of the occurrence;
>
> 3) If "a professional opinion is rendered which provides a basis for a claim under the coverage provided" before the advisory memorandum is issued, that will be the date of occurrence;
>
> 4) If "medical expenses are incurred" as a result of damage arising from the defective product before the advisory memorandum is issued, the date of incurring that medical expense may be deemed to be the date of occurrence;
>
> 5) If death occurs as a result of the defect or deficiency in the medical product before the advisory memorandum is issued, then the date of the death would be the date of occurrence, and
>
> 6) The date of issuance of the advisory memorandum "will be considered the date of occurrence for all claims resulting from or relating to the batch."
>
> The coverage grant requires that bodily injury take place in the policy period, but contains no provision that the occurrence took place during the policy period.
>
> In the "direct claims" suit brought against XL, XL was precluded from arguing alternative dates of occurrence by virtue of an admission that all Duracon Uni-Knee claims would qualify for "batch" coverage in the original coverage declination letter. In the case in which TIG is a named defendant, the Court found that the issue of every knee claim qualifying for "batch" coverage had already been decided and for that reason multiple occurrence dates could not be argued and the single occurrence date triggered by the issuance of an advisory memorandum

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 15

could not be contested. The implied conclusion is that a single occurrence equates to coverage under a single policy.

If, as the Court has now ruled in both cases, "the date of the advisory memorandum will be considered the date of occurrence for all claims resulting from or relating to the batch," there is only one occurrence. That occurrence has attached to it the date of the issuance of the advisory memorandum (June 28, 2000). The Court found that bodily injury took place in 2000 for all implant recipients. For that reason there cannot be multiple coverage years implicated.

On January 5, 2009 (52-56) attorney Gass wrote to Magistrate Judge Scoville a letter summarizing the status of the three pending cases of Stryker I, Stryker II, and Pfizer v. Stryker. Mr. Gass reported the following:

For your convenience, we will send you a notebook that contains the key rulings in the three cases, the key precedents for the unresolved issues, and spreadsheets showing damage calculations.

1.  **Stryker I (Case No. 01-cv-157)**

    a.   **The case**

Stryker I involves amounts that Stryker paid to defend and settle products liability cases involving Duracon Uni-Knees.

    b.   **Matters resolved**

The Court has ruled that XLIA breached its duty to defend and indemnify Stryker and that XLIA must pay the reasonable settlements and defense costs incurred by Stryker in defending the underlying cases. (Notebook, Tab 1). The Court also ruled that the settlements and defense costs are presumptively reasonable; XLIA bears the burden of proving otherwise. (Notebook, Tab 2). The Court further ruled that, because XLIA breached its duty to defend, XLIA is not entitled to the benefit of the $2 million self-insured retention. That is, XLIA must pay the retention. (Notebook, Tab 2).

The Court has entered partial judgment, in the amount of approximately $12.1 million, in favor of Stryker. (Notebook, Tab 3). This amount represents all of the settlements and most of Stryker's defense costs.

The Court also awarded 12% interest, per MCL 500.2006, on Stryker's damages. (Notebook, Tab 3). This interest commences 60 days after XLIA received notice of each of the Duracon Uni-Knee claims. Id Because of the amount of time that has passed, the amount of interest is significant, and it almost equals the principal.

    c.   **Matters unresolved**

Approximately $1.8 million in legal fees remain in dispute. These were fees billed by Hogan and Hartson in defense of the underlying claims. There is no dispute that these fees were billed and paid; the only issue is whether the fees are reasonable. The damages trial commences on February 9, 2009.

If Plaintiff prevail at the damages trial, the final judgment in Stryker 7, with interest included, will be approximately $27 million. (Notebook, Tab 14). Even if Plaintiffs lose everything that remains in dispute, the final judgment in Stryker /will still be approximately $24 million.

Another unresolved issue is whether XLIA will be able to bond the judgment on appeal Under MCL 500.436(f), an insurer is required to pay a final judgment within a reasonable period. If the insurer fails to do so, the Insurance Commissioner may revoke the insurer's certificate of

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 16

authority. Stryker contends that XLIA must pay the final judgment in Stryker I, subject to any rights of restitution that exist, even if XLIA wishes to appeal. If XLIA fails to do so, Stryker will file a complaint with the Michigan Insurance Commissioner.

### 2. Pfizer v. Stryker (Case No. 02-cv-8613) (S.D. N.Y.)

#### a. The case

Pfizer v. Stryker involves Pfizer's claim for indemnification against Stryker. Pfizer claimed that, under an Asset Purchase Agreement between Pfizer and Stryker, Stryker was required to indemnify Pfizer for its settlement and defense expenses involving post-December 4, 1998, implants. Stryker counterclaimed against Pfizer, alleging, among other things, that Pfizer breached the representations and warranties in the Asset Purchase Agreement and therefore was liable for those expenses.

#### b. Matters resolved

Judge Kaplan bifurcated the trial of Pfizer's claims from Stryker's counterclaims. (Notebook, Tab 4). Under the Asset Purchase Agreement, Stryker's recovery on its counterclaims is net of insurance. Judge Kaplan held that Stryker's counterclaims would be held in abeyance until resolution of Sttyker I. (Notebook, Tab 4).

After a trial on Pfizer's claims, the court entered interlocutory judgment in favor of Pfizer and against Stryker in the amount of approximately $17.7 million. (Notebook, Tab 5). Approximately $1.1 million of this judgment was vacated on a Rule 50 motion. (Notebook; Tab 6). The court also awarded Pfizer its attorneys' fees, per the Asset Purchase Agreement (Notebook, Tab 7). These fees will be included in die final judgment The amount of the attorneys' fee award has not yet been determined. Pfizer has stated that it will seek $5 million in attorneys' fees, including interest on its fees.

Under New York law, the pre-judgment interest rate is 9%, simple. According to Pfizer, the current value of the "Pfizer v. Stryker judgment, when attorneys' fees and interest are included, is approximately $26 million. (Notebook, Tab 15).

#### c. Matters unresolved

The New York court still needs to resolve Pfizer's claim for attorneys' fees. Stryker's counterclaims are still unresolved. Those counterclaims are net of Stryker's insurance recovery in Stryker I.

### 3. Stryker II (Case No. 05-cv-005)

#### a. The case

Stryker II involves Stoker's claim for insurance coverage for the Pfizer v. Stryker judgment

#### b. Matters resolved

Judge Bell entered a declaratory judgment in favor of Stryker and against XLIA and TIG, ruling:

IT IS FURTHER ORDERED that DECLARATORY JUDGMENT is entered in favor of Stryker Corporation and Howmedica Osteonics Corporation and against XL Insurance America on Count n of Plaintiffs' Third Amended Complaint. XL Insurance America is obligated to defend Stryker Corporation in Pfizer v. Stryker and to indemnify Stryker Corporation for the final judgment entered is Pfizer v. Stryker and for the attorney's fees and costs incurred by Stryker Corporation in its defense in Pfizer v. Stryker.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 17

IT IS FURTHER ORDERED the DECLARATORY JUDGMENT is entered in favor of Stryker Corporation and Howmedica Osteonics Corporation and against TIG Insurance Company on Count HI of Plaintiffs' Third Amended Complaint TIG Insurance Company is obligated under the 2000 TIG Excess Umbrella Liability Policy to cover any loss in excess of the 2000 XL Insurance America Commercial Umbrella Policy.

(Notebook, Tab 8) (emphasis added).

c.   Matters unresolved

XLIA and TIG have filed motions for reconsideration, which are pending.

The amount of the final judgment in Pfizer v. Stryker is still unresolved, as discussed above. According to Pfizer, the value of the final judgment is approximately $26 million.

Although the Court ruled that the insurers must pay the attorneys' fees incurred by Stryker in the defense of Pfizer v. Stryker, the amount of fees to which Stryker is entitled is unresolved. Stryker incurred approximately $3.1 million in defending the Pfizer v. Stryker case. Under MCL 500.2006, Plaintiffs are entitled to 12% interest on this amount With interest, Stryker's attorneys' fee claim will be approximately $6.0 million. (Notebook, Tab 16).

XLIA and TIG will argue that Stryker's attorneys' fees must be allocated between expenses incurred in defending Pfizer's claims and expenses incurred in pursuing its counterclaims. Under this Court's precedents, however, an insurer's duty to defend encompasses the duty to pursue counterclaims, when those counterclaims are brought to limit or defeat the insured's liability. See Oscar W. Larson v. United Capitol Ins., 845 F.Supp. 458 (W.D. Mich. 1993), and Alticor, Inc. v. National Union, 2008 WL 4057845 (WJD. Mich.) (Notebook, Tabs 9 and 10). Here, Stryker brought its counterclaims as part of its overall defense of the Pfizer claims. As a result, allocation of fees is inappropriate.

Stryker also asserts that MCL 500.2006 requires the insurers to pay 12% interest on the final judgment in Pfizer v. Stryker. This interest is a penalty for the insurers' failure to timely pay a covered claim, and it is mandated by Michigan law. Oriswold v. Lexington Ins., 276 Mich. App. 543 (2007) (Notebook, Tab 11). Under Judge Bell's prior ruling, the interest runs from the date that XLIA received notice of Pfizer's claim against Stryker. The amount of penalty interest on the Pfizer v. Stryker final judgment is approximately $16 million. (Notebook, Tab 17).

Stryker's claims against National Union are also still unresolved.\

Mr. Gass reported that the total amount at stake was approximately $75 million according to Stryker and that Stryker took no position on how the loss should be allocated between the various insurers. By letter dated January 5, 2009, attorney Betz also corresponded with Magistrate Judge Scoville, providing an overview and status of the pending cases. Mr. Betz wrote the following:

As the Court is well aware, this case involves a dispute concerning insurance coverage for claims made by multiple recipients of Duracon Uni-Knee implants that contained expired polyethylene components. In preparation for the Settlement Conference now scheduled for January 12 and 14, 2009, counsel for Stryker and XL (and perhaps TIG) will be holding a preliminary meeting with your honor on Monday, January 5, to discuss a number of issues and disputes that appear significant to settlement discussions and to lay out the positions of the parties concerning those matters. It is my intention with this letter to provide the Court with a concise summary of the issues which our office, as XL's counsel, considers to be either unresolved or, even if partially or completely resolved on the trial level, still an impediment to the reaching of a settlement agreement.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 18

The first of those matters constitutes a perception, not a fact. The trial Court's rendering of decisions favorable to Stryker and unfavorable to XL is perceived by XL as a substantial disincentive to Stryker's willingness to consider compromise. While it does not appear to us that there is anything which can be done by either XL or its attorneys, on an immediate basis, to temper Stryker's optimism, we can advise the Court and Stryker's counsel that the following positions are genuinely held, truly believed to be meritorious, and based on valid arguments and legal principles.

A single, overarching issue applies to the entirety of Stryker's claim - - that is the potential that the Court of Appeals will rule that the trial court erred in its factual conclusion that no employee of Stryker or Howmedica Osteonics knew of or suspected the defect in the Uni-Knees prior to January 1, 2000 (the inception date for the Winterthur Policy). A finding of fact that some employee of Stryker or Howmedica Osteonics knew or suspected the defect or deficiency in the Uni-Knees prior to that date would defeat batch coverage and eliminate any potential for a payment obligation on the part of XL. It continues to be the belief of XL and its counsel that the Court's conclusion, in Stryker Case No. 4:01 cv 157, that no employee knew of or suspected that Uni-Knees were available in inventory for implantation beyond their shelf life is contrary to specific findings of fact made by the Court and expressed in the Trial Opinion. The following items, found to have been established as matters of fact in that Opinion, lead, from XL's perspective, to the logical conclusion that coverage is precluded by clear evidence of knowledge (or at least a validly-based suspicion) on the part of a Howmedica Osteonics employee that an outdated Uni-Knee had been available in HO's inventory, had been shipped to a surgeon and implanted, and had failed as a consequence of the age of its polyethylene component. The elements that establish this are:

1) The Court determined in its Pre-trial Opinion and Order of July 14, 2006 that the at-issue defect in Duracon Uni-Knees for purposes of policy interpretation and application was their "availability for implantation beyond their intended shelf life."

2) The Court found that the policy provides that "batch coverage shall not apply to any loss which arises out of a defect or deficiency that is known or suspected prior to 1-1-00."

3) The Court also found that the policy provision quoted in 2), above, applied to the knowledge or suspicion of any employee of the insureds.

4) The Court combined those three preliminary findings to determine in its Trial Opinion dated April 3, 2007 that "if any employee [of Stryker or its subsidiaries] knew or suspected of the defect or deficiency in the Uni-Knees prior to January 1, 2000, then there is no batch coverage for the Uni-Knees."

5) Edward Lipes, who was the "Group President" of Howmedica Osteonics from December, 1998 until the end of 2003, testified at trial to several pertinent matters:

A)  Only one hospital in the U.S. had a consignment of Duracon Uni-Knees and that was a hospital in Alexandria, Virginia; as a logical consequence, the Highlands Regional Medical Center in Sebring, Florida (where Terry Hipps was implanted with an expired Duracon Uni-Knee in May of 1999) could not have had such a consignment.

Mr. Lipes' testimony thus established that the knee implanted in Mr. Hipps had to have come from a Howmedica Osteonics-controlled warehouse.

B)  Mr. Lipes also testified: In 1999, Tim Ford was an employee of Howmedica Osteonics, working as a Sales/Service Representative and that Howmedica Osteonics' Sales/Service Representatives were an integral part of the corporation's

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 19

quality assurance programs, since they were the point of contact between company and doctor and were the most common conduit for a complaint involving a defective product.

6) In November, 1999, Tim Ford, in his capacity as a Sales/Service Representative for Howmedica Osteonics and in response to a physician complaint, submitted a Product Experience Report to Howmedica Osteonics' Quality Assurance Department stating that a Duracon Uni-Knee that had come from inventory had been implanted in Terry Hipps in May of 1999, had failed and had been replaced. He recited in his submission that at the time of its implantation, the Uni-Knee had been "outdated for more than a year of shelf life." The broken pieces of the implanted Uni-Knee's tibial component (that had failed after only 3 Vi months of use) were forwarded along with the component's labeling and the information establishing the product's expiration date.

Therefore, the proofs introduced at trial established that an HOC employee having responsibility in the area of quality assurance knew, in 1999, that an out-of-date Duracon Uni-Knee had been shipped out of HOC's warehouse inventory and supplied to a doctor for implantation, resulting in failure of the polyethylene component and necessitating explant and replacement of the Duracon Uni-Knee.

The facts found by the trial court thus established all the elements necessary to application of the policy provision eliminating batch coverage. The only element missing from the Court's Opinion was the logically-unavoidable conclusion that all of the factual elements outlined above added up to an employee's knowledge or suspicion. Given the absence from the Trial Opinion of any mention of analysis concerning the import or consequences of Mr. Ford's knowledge, XL holds a reasonable expectation that an appeal will result in a reversal of the trial court's finding of coverage and the entry by the Court of Appeals of a judgment denying any recovery.

---

A number of additional disputes exist concerning specific elements or amounts being pursued by Stryker. They are listed below:

1) **Amounts paid by Stryker for defense of the claims underlying Stryker Case No. 4:01 cv 157 (defense costs).** XLIA has conceded the reasonableness of all defense costs not associated with Hogan & Hartson's activities. XLIA's expert has posited that 40 percent of matters posted in Hogan & Hartson's bills constitute unreasonable/unwarranted expenditures of time or unnecessary work. That issue is the sole issue remaining for resolution in the February 9, 2009 trial.

2) **Amounts paid by Pfizer for defense of the claims asserted against Pfizer.** Those amounts were awarded as damages to Pfizer in the New York litigation. XL's Policy provides no coverage for defense costs expended by a stranger to the insurance contract. While Stryker, through the Asset Purchase Agreement, contractually agreed to reimburse Pfizer for all defense costs incurred by Pfizer in defending itself against claims which were rightfully the responsibility of Stryker, the policy purchased by Stryker did not include coverage for such obligations. XLIA's Policy affords coverage only for "liability assumed [by Stryker] under an insured contract because of bodily injury." The policy further defines an insured contract as one by which another party's tort liability for bodily injury is assumed. Pfizer's costs of defending itself against claims does not constitute Pfizer's tort liability for which coverage was afforded. The defense costs do not constitute tort liability assumed because of bodily injury. Those damages are not recoverable under the policy and therefore cannot be recovered.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 20

3) **Amounts paid by Stryker to defend itself in the Pfizer v Stryker litigation.** The trial court has ruled, in response to a preliminary Motion, that Stryker was entitled to be defended against the claims asserted by Pfizer by XLIA. However, this relief was neither pled in Stryker's Complaint nor sought by Stryker in the Motion which resulted in the Court's Decision. In fact, recovery of those sums as a policy benefit was specifically disclaimed in Stryker's Court submissions. The Court's granting of relief not pled, pursued or argued is the subject of a pending Motion.

4) **Attorneys fees and costs incurred by Pfizer in pursuit of its contract claims against Stryker in the Pfizer v Stryker litigation.** XLIA's Policy provides no coverage for this expenditure. Even if Stryker had requested a defense against Pfizer's claim, XL had defended and an award of Pfizer's costs had been made, none of Pfizer's attorneys fees and costs would have been recoverable as a policy benefit. The fact that Stryker contractually agreed to reimburse such sums does not give rise to policy coverage in the absence of some policy language granting that coverage. (XL's counsel is not aware of any insurance policy that provides coverage for the attorneys fees of a plaintiff who sues its insured.)

   If Stryker is contending that this is part of what XLIA's Policy covers under the "insured contract" provisions of the policy, it is not recoverable from XLIA because XL's policy limits have already been exceeded.

5) **Prejudgment interest on amounts awarded in the Pfizer v Stryker interlocutory judgment.** The United States District Court for the Southern District of New York issued a judgment for Pfizer on April 20, 2005. That judgment included an amount of prejudgment interest. Stryker argues that pre-judgment interest continues to run. However, prevailing New York case law follows an "interest on the balance" rule when calculating the interest to be paid in a matter involving a claim and counter-claim. See e.g., Inducrqft, Inc. v Bank of Baroda, 87 F3rd 614 (2nd Circuit, New York, 1996); Manshul Construction Corp v Dormitory Authority, 436 NYS 2nd 724, 727, 79 A.D. 2nd 383, 436 (1981). The "interest on the balance" rule states that prejudgment interest is to be awarded on the net balance of the two competing claims as calculated only after the counter-claim award has been set off against the award on the principal claim. The net balance can be calculated only after all claims have been decided. Here, there has been no determination of the merits of Stryker's counter-claim. Stryker is contractually obligated to pursue that counter claim under the "no compromise of XL's position" provisions of the policy. If the amount of Pfizer's judgment against Stryker exceeds the amount awarded to Stryker on its claims against Pfizer, interest (both pre-judgment and judgment) can be calculated and awarded. However, since a determination of the amount to be awarded to Stryker on its counter-claim is a condition precedent to an award of interest, a grant of interest at this time would be premature.

6) **"Penalty Interest" on the Pfizer v Stryker judgment amount to be paid in Stryker Case No. I:05-cv-0051.** It is the position of XL that New York law should apply to a New York claim asserted on the basis of a New York contract in a New York Court. New York's Unfair Claim Settlement Practices Act contains no provision for "Penalty Interest" and restricts an aggrieved insured to a claim for compensatory damages only.

Mr. Gass pointed out to Judge Scoville that the arguments contained in his letter were contrary to the position that was being asserted by Stryker. Mr. Gass noted that until an assessment of the relative merits of the two parties' positions could be ascertained, settlement was going to be difficult. Mr. Gass also reported to Judge Scoville that an additional issue existed as to the impact of the trial court's determination that XL's failure to defend Stryker against the claims asserted directly against it eliminated the SIR provisions in the policy.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 21

On January 16, 2009 (34) Mr. Betz wrote to Linda Woolf (Goodell, DeVries, Leech & Dann) confirming XL's commitment and intent to proceed with the settlement proposed during the settlement conference held on January 12 and 14, 2009. Mr. Betz reported that XL would pay the agreed-upon sum contingent upon the ability of XL and Pfizer to agree on an allocation of funds acceptable to both parties. Ms. Woolf expressed the same commitment and intent on behalf of Pfizer. *See* January 16, 2009 (35).

The file contains a breakdown of settlement to be paid to Pfizer in satisfaction of the New York interlocutory judgment (per Judge Bell's January 8, 2009 Opinion and Order). *See* January 8, 2009 (29). On January 16, 2009 (28) Mr. Betz sent to Ms. Woolf a draft allocation of the tentative agreed-upon settlement sum among the various obligations of Stryker to Pfizer. Ms. Woolf then provided an updated spreadsheet of the components of damages. *See* January 16, 2009 (30). Mr. Betz incorporated Ms. Woolf's updated numbers into the allocation and provided an updated spreadsheet. *See* January 16, 2009 (32). Mr. Betz noted that even if all of the $1,503,598 in interest on the Pfizer v. Stryker legal fees was counted (only part was counted in the spreadsheet), there still needed to be $429,146 in interest or other costs chargeable by Pfizer against Stryker to eradicate the line item involving Pfizer having to continue to litigate with Stryker in New York. *Id.* Mr. Betz advised that XL was (1) willing to reduce the total to be paid to buy peace with Pfizer to $25,570,854; (2) able to pay taxable costs to make up the difference; or (3) was willing to engage in discussions about some other, fact-based allocation. Mr. Betz reiterated that what could not be done was to have XL pay more than its policy limits of $17 million (Stryker's SIR ($2m) and the policy limits ($15m)) to satisfy judgment amounts. *See* January 16, 2009 (32).

On January 23, 2009 (1-2) attorney Mr. Gass wrote to attorney Mr. Bloss regarding the Pfizer settlement. According to Mr. Gass, he had a discussion with Mr. Bloss on January 15 as they stood before Judge Scoville and discussed the Pfizer settlement discussions. The following is set forth in Mr. Gass's letter:

> I am writing to you in connection with the settlement negotiations conducted with Judge Scoville on January 12th and 14th and to put into writing what I told you on January 15th, when we spoke with Judge Scoville concerning your client's discussions with Pfizer, among other things.
>
> Late in the afternoon of January 14th you, on behalf of XLIA, and Rick Barnes, on behalf of Pfizer, announced in Judge Scoville's courtroom that XLIA had reached an "agreement in principle" with Pfizer to pay the Pfizer judgment in the New York litigation. Pfizer claims that the total amount of that judgment is approximately $26 million, including Pfizer's settlements and fees in the underlying lawsuits, interest on those amounts, and Pfizer's fees with interest in bringing that action. You also informed us that, as part of that settlement, Pfizer would file a satisfaction of judgment in the New York litigation and that any amounts that XLIA paid to Pfizer would not be subject to appeal.
>
> We did not participate or approve of those negotiations, nor have we been informed of the specific terms of any settlement We have asked you to provide us with details about any payment by XLIA to Pfizer, but you have refused to do so. We believe that you are required to. The Partial Amended Judgment requires the insurers to "indemnify" Stryker, so Stryker is entitled to that information. XLIA's good faith obligation to its insured also requires full

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 22

disclosure. *See Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127,138 (1986)(discussing an insurer's duty to keep the insured informed of developments in a case).

We also want to make it very clear that XLIA's voluntary decision to pay all of the Pfizer judgment in the New York litigation (which is accruing pre-judgment interest at nine percent), including its apparent decision to do this without TIG's participation, does not in any way prejudice Stryker or waive any of its rights in connection with the Stryker I and Stryker JI lawsuits. XLIA has an obligation to Stryker to protect Stryker's interests in settling the Pfizer case. Commercial Union, supra at 137 ("If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent").

Mr. Gass's letter was responded to by Mr. Bloss on January 27, 2009 (38-39) as follows:

This is to respond to your correspondence of January 23,2009 concerning the settlement negotiations which are ongoing between XL and Pfizer. I should note that a final settlement agreement has not been completed; if it is concluded successfully, we certainly will provide you with a copy of the Agreement.

As we told you on January 14, the second day of the settlement conference, an agreement in principle has been reached between XL and Pfizer. You were advised then that a negotiated amount was being proposed to be paid to fully satisfy the New York interlocutory judgment. We can add to that information that pursuant to the preliminary agreement, the judgment against Stryker in the Southern District of New York litigation will be satisfied completely. The principal claim in that action will be dismissed with prejudice and without costs. Stryker's counter-claim against Pfizer will not be impacted and Stryker will be free to pursue that matter. We will, as part of the anticipated settlement, obtain for Stryker a complete and unconditional release of all claims, known or unknown, with respect to any claims which Pfizer has asserted for indemnity, contribution, or legal costs.

The Settlement Agreement will set forth the precise amounts for the various damage elements which are being resolved. These are based upon the various rulings by Judge Kaplan and Judge Bell and documents which underlie those decisions. Stryker will not have to pay or contribute anything toward the settlement. Stryker will receive the obvious benefits of elimination of a judgment obligation entered against Stryker and a full satisfaction of the judgment rendered in the Stryker Case No. 1:05-CV-0051.

As your letter indicates, Stryker did not participate in the discussions which led to the agreement in principle. It was Stryker's decision, announced at the outset of the settlement conference on Monday, not to negotiate with the other parties. TIG took a position which no one else believed was tenable or likely to lead to a global resolution. That led us to conclude that an agreement was Pfizer was the only one that was plausible, and with the assistance of Magistrate Scoville that is being concluded. The effect of the settlement will be to affirmatively respond to the rulings of Judge Bell in Stryker Case No. 1:05-CV-0051.

In resolving the Pfizer claim against Stryker, XL is doing exactly what Stryker has asserted was our responsibility under the policy. Further, the settlement is consistent with Judge Bell's rulings in Stryker II. The judgment against Stryker will be satisfied, in a manner that fully protects your client's interests, and Stryker may proceed with its counter-claim without having to worry about reduction of any recovery obtained.

Your citation to a case involving a cause of action by an excess carrier against a primary, Commercial Union Insurance Company v Liberty Mutual Insurance Company, 426 Mich 127 (1986) is somewhat surprising, given the different circumstances of our case. In Commercial Union, Justice Archer set forth twelve examples of what would demonstrate bad faith in the

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 23

> context of an excess insurer suing a primary which had failed to settle within its limits.
> Assuming that the decision continues to represent Michigan authority, none of the examples
> would be applicable to this matter.
>
> As indicated above, we are still in the process of finalizing what we hope to be the final written
> settlement agreement with Pfizer. Once it has been executed, we will immediately provide you
> with a copy.

Mr. Bloss pointed out that Stryker had announced at the outset of the settlement conference, first
day, that it would not negotiate with the other parties.  Additionally, TIG took a position that the
parties believe was untenable or was likely to lead to a global resolution.  Because of this, XL
decided to reach an agreement with Pfizer which was the only agreement that could be pursued
given the positions of Stryker and TIG.  In turn, Mr. Gass responded to Mr. Bloss on January 30,
2009 (26-27) as follows:

> I am responding to your January 27th letter concerning the settlement negotiations which you
> say are ongoing between XLIA and Pfizer.
>
> To clarify, we took the position during the two-day settlement conference that,
>
> under a global settlement of all three cases {Stryker J, Stryker II, and the New York litigation},
> 1) it was XLIA's obligation to felly the settle New York litigation (as required by Judge Bell's
> Amended Partial Judgment in Stryker II) and 2) we would not settle separately with XLIA and
> TIG. That is, we were not interested in a partial settlement of the case. I affirmed this when
> you and I spoke with Judge Scoville by telephone on January 15th.
>
> We did not indicate that it would be appropriate for Pfizer and XLIA to partially settle the case
> without the participation and consent of Stryker. We were surprised when the two parties
> announced at the end of the day on January 14 an "agreement in principle" reached without
> our participation. Therefore, we reiterate that Stryker is entitled, as XLIA's insured, to know
> the terms of any such agreement before it is executed. This is consistent with XLIA's
> obligation of good faith and fell disclosure to its insured, as well as with its obligation under
> Judge Bell's Amended Partial Judgment requiring XLIA to indemnify Stryker for the Pfizer
> partial judgment, attorney fees, and interest Therefore, we do not believe that XLIA is honoring
> its obligations merely by supplying us with a copy of the agreement after it is executed.
>
> That being said, we understand your January 27,2009, letter to mean that Stryker will not be
> prejudiced in any way by XLIA's payment to Pfizer, and that this settlement will not in any
> way reduce Stryker's total recovery from its insurers.
>
> We also take issue with XLIA's unilateral determination of "the precise amounts for the
> various damage elements which are being resolved," which amounts you say will be set forth
> in a settlement agreement.  Stryker reserves its right to object to any such agreements between
> Pfizer and XLIA that adversely impact Stryker's interests.
>
> It also may be true that your voluntary payment of the entire Pfizer partial judgment and fees
> in the New York case gives rise to an equitable subrogation claim by XLIA against TIG, As
> you correctly observed, TIG did not exhibit good faith at the settlement conference. It will be
> XLIA's obligation to pursue any such equitable claims against TIG.

On February 2, 2009 (19-20) Mr. Bloss wrote to Mr. Gass, providing details of the Pfizer
settlement:

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 24

I am writing to provide you and your client with specific information concerning a settlement with Pfizer Corporation that has now been effectuated by XLIA on behalf of Stryker. As you are aware from 1) the discussions that took place in Judge Scoville's Courtroom on the afternoon of January 14,2) the information that has been provided to you since that date and 3) my letter of January 27, Pfizer and XL have, since January 14, been working on reaching agreement on the multitude of questions and details which arise in a settlement such as this. The parties to that agreement have now reached a resolution of all the matters and issues inherent in the Interlocutory Judgment and other Orders entered in the Pfizer v Stryker litigation.

XL has agreed to pay a total of $17 million (its full policy limits of $15 million plus the $2 million SIR sum ordered to be paid by Judge Bell) to Pfizer to obtain a full satisfaction of Pfizer's damage judgment in the New York litigation. In addition, through the payment of an additional $9 million, XL has obtained a satisfaction of the other awards to Pfizer in the New York case - - Pfizer's claims for pre-judgment interest, interest on Pfizer's defense costs awarded in the interlocutory judgment, interest on Pfizer's legal fees in the Pfizer v Stryker lawsuit, taxable costs and any additional expenses, fees and costs awardable or recoverable by Pfizer in connection with Pfizer's claims asserted in that litigation. In consideration of those payments, XLIA is obtaining for Stryker, its officers, directors, employees, servants, subsidiaries, affiliates, predecessors and successors, Pfizer's full, final and complete release from any all claims, actions, causes of action, demands, losses, rights, interests, damages, attorneys fees, costs, interests (pre-judgment and post-judgment) and claims for compensation of any kind arising from or relating to the claims asserted by Pfizer in the Pfizer v Stryker litigation. Within ten days of XLIA's payment, Pfizer will be entering in the record of the Pfizer v Stryker litigation a Notice of Satisfaction of the Interlocutory Judgment and all matters related thereto. The settlement agreement between Pfizer and XLIA specifically recognizes the continuing existence of Stryker's counter-claim and should not impede, in any fashion, Stryker's right to pursue those claims.

It is XLIA's intention, in conjunction with this settlement with Pfizer, to pay directly to Stryker the following sums for the following purposes:

1) The sum of $6,282,875 in reimbursement of the defense costs incurred by Stryker in defense of the claims underlying the Stryker Case No. 4:01-cv-157 litigation (as we expect will be awarded by Judge Bell in his Final Judgment in that matter when it is entered); and

2) Pre-judgment interest on those defense costs (to be paid as soon as agreement has been reached on the appropriate sum or a court order establishing the interest amount has been entered).

XLIA further recognizes that the uncertainty created by the Court's current Briefing Order prevents any action concerning the previous award of Stryker's defense costs in the Pfizer v Stryker litigation. XLIA's final position on that matter will need to await the Court's decision on that issue as part of the matters subject to the current briefing schedule.

XLIA would appreciate your notification to our office of your client's preference concerning the transfer of those additional funds outlined in items one and two above (whether by wire transfer, check, etcetera).

A copy of the parties' signed Settlement Agreement and Release is attached for your review. Please note that by its terms (Paragraph 9), the Agreement and all its provisions are subject to a Confidentiality Agreement. The copy being provided to you is being supplied subject to that agreement and conditioned on your (and your client's) agreement to be subject to the provisions of that confidentiality language. If that condition is not acceptable to you or your client, please return the document unread.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 25

> Should you have questions concerning matters which are not addressed in this letter, we stand
> ready to talk with you concerning them.

Mr. Bloss wrote to attorney Andrew Portinga, one of Stryker's attorneys at Miller Johnson, on
February 5, 2009 (193) requesting confirmation that Stryker had incurred defense costs of
$6,282,875.16 with interest on that amount being $5,783,300.54 for a total of $12,066,175.70.
XL's counsel advised that once those numbers were confirmed, together with Stryker providing
its wire transmission information and federal tax ID numbers, along with an agreement to a
document reflecting that the payments satisfied those elements of the prior judgment, then XL
would make the payment within ten days. Mr. Gass confirmed the calculations with a slight
difference on February 6, 2009 (220-221). Mr. Gass further reported to XL's counsel that
"[a]cceptance of these funds by Stryker does not waive any of its rights, including any claims that
Stryker has for payment of additional amounts from XLIA . . ." On the same day, attorney Bloss
provided XL with an electronic copy of the fully executed settlement agreement and release with
Pfizer. *See* February 6, 2009 (137).

On February 9, 2009 (80-81) attorney Bloss wrote to the attorneys for Stryker (Gass and
Portinga) regarding several issues that needed to be resolved in order to proceed with the payment
of defense costs. On February 10, 2009 (186) Mr. Bloss wrote to Mr. Portinga, providing
Mr. Bloss's calculation of the defense costs with interest as he had calculated it ($12,074,439.70).

## VI.   RELEVANT DEPOSITION TESTIMONY

### A.   Deposition of Richard Barnes, June 6, 2019

In 2008 Mr. Richard Barnes' law firm (Goodell, DeVries, Leech & Dann) represented
Pfizer in connection with the claims Pfizer brought against Stryker. Pp. 10:20-11:11. His law
firm filed a lawsuit against Stryker on behalf of Pfizer for indemnification for various settlements
that Pfizer paid regarding the sale of the orthopedic implant. *Id.* Liability was based upon a stock
mass purchase agreement under which the parties, Stryker and Pfizer, apportioned responsibility
for the sale of products according to the closing date of December 19, 1988. Pp. 11:12 12:7. Pfizer
was seeking indemnification for settlements and expenses for post-closing claims. These claims
were probably the responsibility of Stryker, which had acquired the orthopedic business. *Id.* The
claims arose out of the DUK Unicompartmental Knee implant. *Id.*

During the settlement conference before Judge Scoville, no representative of Stryker came
to Mr. Barnes or his colleague, Ms. Woolf, indicating that Stryker wanted to settle the Pfizer
claims. Pp. 19:15-29:16.

Regarding the first day of the settlement conference, Mr. Barnes does not recall that there
were any substantive comments or negotiations on that first day. Pp. 45:3-47:3. According to
Mr. Barnes, Pfizer representatives were waiting for reports back from what was going on with the
other parties and their position was stated in Pfizer's mediation statement. *Id.* He did not recall
that he or Ms. Woolf met separately with any Stryker representatives to discuss settlement on the
first day. *Id.* The same goes for XL. *Id.* He and his colleagues never received a report from Judge

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 26

Scoville regarding the views of Stryker, TIG, or XL on January 12. Pp. 47:4-48:1. There were no settlement discussions or negotiations with anyone on January 13. Pp. 49:3-50:18. On January 14 he was the only person at the settlement conference representing Pfizer. Pp. 50:19 52:15. During the 14th he had minimal contact with anyone during the course of the day. Pp. 52:16-53:5. At some point he recalls Judge Scoville communicating to him that XL was willing to satisfy the Pfizer judgment plus interest. Pp. 56:3-58:9. Judge Scoville asked Mr. Barnes to communicate that to his client. *Id.* Mr. Barnes has no recollection of having direct discussions with Mr. Daly, Mr. Betz, or Mr. Bloss. *Id.* While he's sure there were some discussions, he doesn't recall anything of major substance being discussed with any party. *Id.* The discussion with Judge Scoville in which Judge Scoville indicated that XL was willing to satisfy the judgment, happened in mid-afternoon on January 14. *Id.* Mr. Barnes communicated with Pfizer and then told Judge Scoville that he was willing to meet with the parties to discuss settlement in the room. *Id.* He advised Judge Scoville that his client was willing to accept settlement of the judgment, all interest, fees, and costs as calculated from a date certain. Thus, they had reached agreement in principal. *Id.* They went back to Judge Scoville's chambers, at which time he advised that Pfizer would agree to the terms offered by XL. *Id.* Counsel for Stryker and XL were in the room with the judge at that time. *Id.* Judge Scoville stated to all the parties (Barnes/Pfizer, Stryker/attorneys, and XL/attorneys) that settlement in principle had been reached. Pp. 58:10-59:5. Mr. Barnes did not recall any party raising any objections. The only thing Mr. Barnes recalled saying was to confirm Pfizer's willingness to accept XL's offer to satisfy the judgment, including interest and costs. Pp. 60:1-61:20.

Mr. Barnes had no recollection of having any direct discussions with XL or its representatives during January 14. His recollection is that there were no offers conveyed directly by Mr. Bloss, Mr. Betz, or Mr. Daly. Pp. 92:18-94:8. Other than pleasantries, he didn't have any discussions with Mr. Bloss, Mr. Betz, or Mr. Daly on January 14 after the settlement offer was conveyed by Judge Scoville. *Id.* After the settlement offer was conveyed to pay Pfizer's settlement in full, Mr. Barnes conferred with his client and then advised Judge Scoville that Pfizer would accept full payment. *Id.*

According to Mr. Barnes, no offers to settle were conveyed to him on January 12 and he didn't convey any settlement proposals to others that he can recall. Pp. 78:1-79:14. The same goes for the morning of January 14. In mid-afternoon on January 14 when Judge Scoville told him that XL was ready to satisfy the judgment, he believed that was the first offer he received in the course of his second day of mediation. *Id.* The offer was to satisfy Pfizer's judgment against Stryker in full and Pfizer accepted that offer. *Id.* Prior to that offer, XL did not make any attempts to negotiate Pfizer's claim down from the top number that he can recall. Pp. 79:15-80:14. There was only one offer and one acceptance of the offer. Pp. 79:15-80:14.

Mr. Barnes did not recall anything happening after Judge Scoville made the announcement that a settlement in principal had been reached. Pp. 69:8-70:3. He left immediately once they confirmed that settlement had been reached in principal. *Id.* Before leaving for the airport, he did not have any discussions as he recalls with Mr. Gass, Mr. Portinga, or Mr. Cartier about what

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 27

happened. *Id.* He did not recall having any further discussions with Mr. Bloss, Mr. Betz or Mr. Daly. *Id.* Between January 14 and February 2 he did not have any discussions with Mr. Cartier. Pp. 70:4-17. He did not recall any conversations with Mr. Gass or Mr. Portinga. *Id.* However, at that point in time Ms. Woolf had taken the lead on documenting the terms of the settlement and he would have only been consulted as appropriate. *Id.*

According to Mr. Barnes, the discussions regarding settlement centered around the Sum of $26 million without there being a breakdown or apportionment by elements which added up to that gross amount. Pp. 61:21-62:16. He believes it was understood from Pfizer's mediation statement what the elements were. *Id.* Thus, they talked about a gross amount, but not how it would be allocated at that time. *Id.*

Regarding the settlement, $12.8 million was the total amount that Pfizer had paid to settle the underlying tort claims. Pp. 101:6-102:15. Approximately $1.1 million was for defense costs incurred by Pfizer for claims against it and included the interlocutory judgment award. Pp. 102:16-103:7. That was basically the total amount of defense costs that Pfizer was seeking from Stryker. *Id.* Regarding Pfizer's attorney's fees incurred in the Pfizer v. Stryker matter of $3.05 million, to the best of his recollection there had been no adjudication of the reasonableness of those fees at that point. Pp. 103:8-104:6. It had not been adjudicated at that point. *Id.* Interest on the settlements that had been reached at 9% amounted to a total of $6.2 million. Pp. 105:13-106:11. Mr. Barnes was not aware that that figure was compromised. *Id.* The amount of interest on defense costs at $530,030 was not compromised. *Id.* $1.5 million was put in by Mr. Betz for future litigation costs. Pp. 106:12-107:18. The math totaled up to $26 million. *Id.* Mr. Barnes believed the attorney's fees and expenses incurred by Pfizer litigating against Stryker in the Southern District of New York were reasonable and necessary. Pp. 173:6-175:2. If Stryker ever decided to contest the reasonableness of those fees they would have fought that issue. *Id.* At no time did he recall on January 12 that Mr. Portinga told him that defense costs incurred by Mr. Barnes' firm in the Pfizer case were too high and that they were unreasonable. Pp. 175:3-19. Mr. Barnes had no idea of why XL decided to satisfy the Pfizer judgment as opposed to paying the judgment in Stryker I. Pp. 167:11-168:12. He doesn't recall the judgment entered in Stryker I coming up in his discussions with XL's attorneys. *Id.* When he was asked whether the attorneys at XL talked to him about whether XL was protecting Stryker's interests, he responded not stated that way. In the sense that they satisfied the judgment on behalf of Stryker, one could infer that, but no discussion that he could recall. *Id.* He didn't recall any discussions with XL's attorneys on excess insurance coverage. Pp. 168:13-169:4. Mr. Barnes had no recollection of any XL attorney ever discussing with him the penalty interest that may have been accruing under Michigan law against XL. Pp. 160:7-161:11. Mr. Barnes did not recall XL's attorneys ever discussing with him XL's desire to get out of the judgment that Stryker won. *Id.*

Mr. Barnes did not know why the January 16, 2009, January 23, 2009, January 26, 2009 were not sent to Stryker. Pp. 108:19-109:16. Mr. Barnes did not believe that Mr. Bloss, Mr. Betz, or Mr. Daly asked Mr. Barnes to keep the terms of the settlement secret from Stryker. Pp. 97:2-15.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 28

Mr. Barnes did not recall that there were any discussions with Mr. Portinga or Mr. Gass in the hallway of the courtroom as he was heading out. *Id.*

Mr. Barnes did not recall Mr. Portinga ever writing to him and asking what the terms of the settlement being negotiated were from January 12 to February 2. Pp. 175:20-176:17. He did not recall Mr. Portinga telephoning him, trying to find out what was going on. *Id.* He did not recall Mr. Gass writing to him or Ms. Woolf trying to find out what was going on. *Id.* Mr. Barnes did not recall that there were any discussions with Mr. Portinga or Mr. Gass in the hallway of the courtroom as he was heading out. *Id.* Mr. Barnes did not recall any conversation with Stryker's counsel regarding the filing of the satisfaction of judgment. Pp. 169:10-171:1. He did not recall Portinga ever writing to him asking him to not file the satisfaction of judgment because it was somehow going to prejudice Stryker. *Id.* He also had no recollection of Portinga calling him after the satisfaction of judgment was filed, asking him why he filed it because it was somehow going to prejudice Stryker and that he shouldn't do it. Regarding Mr. Gass, he did not recall Mr. Gass ever contacting him and asking him not to file the satisfaction of judgment because it was somehow going to prejudice Stryker. Pp. 171:2-20. Mr. Barnes did not recall that after he filed the satisfaction of judgment Mr. Gass asked him in any way to withdraw it because they objected to it as prejudicing Stryker in the Southern District case. *Id.*

### B.   Deposition of Andrew Portinga, July 17, 2019

Andrew Portinga was one of Stryker's outside legal counsel. He is a current member of the state and federal bars of Michigan. Pp. 5:23-6:21. He worked for Stryker since 2003, including insurance-related work. Pp. 6:22-8:18. He estimated that 25% of his current work was on Stryker matters. *Id.* Stryker was in the top 10 clients of the Miller Johnson firm for billings. Pp. 9:3-25.

At the settlement conference, initially the lawyers sat around the table in Judge Scoville's courtroom. Pp. 48:4-49:19. Michael Cartier advised the parties that he wanted to have a global settlement, and he indicated it was the insurers' problem because they had coverage since Stryker had won its cases. *Id.* He did not recall Amy Miner or Rick Barnes saying anything in that initial discussion. *Id.* The parties then broke into groups. Pp. 49:20-52:3. The only thing Mr. Portinga recalls occurring on January 12 was that at some point Judge Scoville came into their caucus room and said that TIG was saying that the loss needed to be spread across policy periods. *Id.* He recalls Mr. Cartier articulating to Judge Scoville that Stryker had coverage because Stryker had won the cases and had judgments and that Stryker wanted the insurers to figure out who was going to pay what. *Id.*

On January 12 there were no separate discussions between Stryker representatives and Pfizer representatives or discussions between Stryker representatives and XL representatives. Pp. 52:12-54:24. Mr. Portinga indicated that neither Stryker nor its attorneys expressed any complaint or concern to Judge Scoville about what was happening at the settlement conference on January 12. *Id.* On January 13 Mr. Portinga does not believe anyone from his law firm had any discussions with anyone representing XL, Mr. Daly, Ms. Woolf, Mr. Barnes, or anyone representing TIG. Pp. 56:23-58:22. There were no discussions with Judge Scoville on January 13.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 29


*Id.* No one from Stryker or Mr. Portinga's law firm asked anyone what had happened on January 12. *Id.*

Mr. Portinga testified that he, Mr. Gass, and Mr. Cartier, were present at the settlement conference on January 14, 2019. Pp. 59:8-25. TIG did not physically attend the settlement conference on that day. *Id.* The parties were advised by Judge Scoville that Ms. Miner was available by telephone if needed on behalf of TIG. *Id.* Mr. Portinga did not believe that anything of significance happened on January 14. Pp. 60:1-62:4. The parties were separated in different caucus rooms and to his recollection the Stryker people and lawyers didn't have any communication with anyone all day, including no communication from Judge Scoville. *Id.* He did recall that toward the end of the day, Judge Scoville, and maybe Rick Barnes, came into the Stryker caucus room and said that XL was going to pay off the Pfizer judgment. *Id.* Mr. Portinga did not recall Stryker/Stryker's attorney's response. *Id.* They did want to know about the judgment that they had against XL, which was approximately $12.8 million, and he did not recall receiving an answer from either Judge Scoville or XL at that point. *Id.* Because Mr. Barnes was trying to catch a flight and was leaving for the airport, they followed him out and asked what the deal was, and Mr. Portinga testified that Mr. Barnes said that he could not talk to them. *Id.* What Mr. Barnes did say was that XL did not push Pfizer on its number. *Id.* Mr. Portinga's takeaway was that Mr. Barnes was referring to XL. *Id.*

Mr. Portinga also recalled that on January 14 both Mr. Bloss and Mr. Barnes came into the Stryker caucus room and indicated that a deal had been reached between XL and Pfizer. Pp. 62:5-65:12. It concerned Mr. Portinga that they weren't being told what was going on all day. *Id.* Mr. Portinga thought that they may have asked Mr. Bloss and Mr. Barnes what the deal was and that they wouldn't tell them the specifics. *Id.*

Mr. Portinga did not recall Stryker people ever complaining to Judge Scoville that they weren't being told what was going on. *Id.* The Stryker people never went to Pfizer to ask what was going on. He did not recall if he had sought out Mr. Barnes at any time during the settlement conference. *Id.* At the end of the January 14 settlement conference, Mr. Portinga heard (either from Judge Scoville or Mr. Barnes) that XL was going to pay the Pfizer judgment or at least settle with Pfizer. Pp. 67:10-68:3. Mr. Portinga did not recall asking Judge Scoville for more details on this element. *Id.* He did remember asking Mr. Bloss and Mr. Barnes for the details. *Id.*

Mr. Portinga was shown Exhibit 14, which were the minutes of the January 12 settlement conference. The minutes stated the following: "Partial settlement in principle reached between XLIA and Pfizer with regard to XLIA's obligations to satisfy the judgment in Pfizer v. Stryker (SDNY case.)" Pp. 68:4-69:2. Although this was learned at the settlement conference, no one told Mr. Portinga what was going to happen with the Stryker settlements. Mr. Portinga did testify that Stryker would not have had any objection to the fact that XL was going to satisfy the judgment in Pfizer to the extent that it did not impair Stryker's coverage. However, if it was going to impair Stryker's coverage, then absolutely they would object. Pp. 68:4-69:2. This testimony is significant because, as demonstrated above, it was the belief of Stryker that there was no consent issue raised

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 30

by TIG at that point and the settlement with Pfizer would exhaust the XL limits, passing the coverage obligation on to the excess layer through TIG. On January 14 Mr. Portinga did not express any objection to Mr. Bloss, Mr. Betz, or Mr. Daly about the settlement. Pp. 69:3-23. While Mr. Portinga did ask what was going on, and was not told what was going on, he did not level any objection at that time.

On January 15 Mr. Portinga did not remember any conversation or speaking with Judge Scoville to find out the specifics of the settlement or to object to what had happened. Pp. 69:24-71:25. However, he did testify that on the 14th Judge Scoville would have known that the Stryker representatives had concerns about being kept in the dark about what the settlement agreement was. *Id.* From January 15 to the end of January no communication took place from Stryker and its representatives to Judge Scoville raising any objections to what had happened. After the settlement conference, Mr. Portinga called Mr. Barnes to inquire as to the details of the settlement. Pp. 71:2-74:1. Mr. Barnes replied that he couldn't tell Mr. Portinga what the deal was other than the fact that the Pfizer judgment was going to be satisfied. *Id.*

Prior to the Pfizer settlement in January 2009, he had read the TIG policy, including the section of the policy involving "ultimate net loss" where the consent to settlement language appeared. Pp. 19:8-20:8. Mr. Portinga testified that both Stryker and his law firm (Miller Johnson) were fully aware of the TIG policy provision involving the definition of "ultimate net loss" prior to January 2009. Pp. 20:9-21:3.

According to Mr. Portinga, at the time Stryker individually settled the Uni-Knee claims for a total of $7.6 million, Stryker did not seek TIG's consent to enter into those settlements because at the time the settlements were made, they were within XL's layer and Stryker/Miller Johnson believed that acquiring consent was unnecessary because the settlements were well within XL's layer of coverage and were, therefore, XL's responsibility. Pp. 22:6-23:18. Mr. Portinga had various discussions with TIG's counsel (Ms. Miner, Ms. Ehrhart and Mr. Manos at the Bollinger firm) in 2008.

There was a statement made by TIG's counsel, Amy Miner, at the settlement conference to the effect that she did not believe TIG had a coverage obligation. *Id.* Based upon that simple statement, Stryker was aware that TIG was not going to pay, that TIG was disputing coverage, and that TIG was looking for a way out. *Id.* However, Ms. Miner did not specifically raise the consent issue at that time. *Id.* To Mr. Portinga's observation, Stryker knew that TIG was looking for a way to dodge coverage, but TIG had not figured out how they were going to do it yet. *Id.* Ms. Miner was the only person at the January 12 settlement conference on behalf of TIG. Mr. Portinga reiterated that while TIG, through Ms. Miner, had conveyed that it did not believe there was any coverage obligation, no reference was made to the consent issue specifically. Pp. 31:8-20.

At the deposition, Mr. Portinga was shown the declaration of Mike Cartier dated January 31, 2014. Pp. 27:24-29:1. *(See Cartier Exhibit 1).* Mr. Portinga helped prepare the declaration. *Id.* To his knowledge, the declaration was true and accurate. *Id.* The declaration was prepared with the direct input of Mr. Cartier to ensure the declaration's accuracy. *Id.* Paragraph 11 of the

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 31

declaration states, "At no time prior to the January 2009 settlement conference did TIG inform Stryker that TIG would not cover Stryker's settlements because TIG had not consented to the settlements." *Id.* He did not disagree with that statement. Pp. 29:2-13. Paragraph 12 of the Cartier declaration stated, "At no time prior to the 2009 settlement conference did TIG inform Stryker that XL's settlement with Pfizer would jeopardize coverage for Stryker's Uni-Knee settlements." Pp. 29:16-25. Mr. Portinga did not disagree with that. Pp. 27:24-29:1. In fact, to Mr. Portinga's experience, no one from TIG had raised any issue about consent before the settlement conference. Pp. 29:16-25. Paragraph 13 of the declaration stated, "If TIG had informed Stryker that TIG would not cover Stryker's settlements because TIG had not consented to those settlements, then Stryker would have taken action to attempt to block XL's settlement with Pfizer. Stryker would not have allowed XL to unilaterally jeopardize coverage for Stryker's settlements." Pp. 30:1-31:7. Mr. Portinga did not disagree with that statement. Pp. 27:24-29:1. Referencing Stryker's reply brief submitted to the Court on October 9, 2012 (Exhibit 117) Mr. Portinga admitted that he was the primary author of the brief, although it was a team effort. Pp. 31:23-33:8. Reference was made to pages 2 and 3 of the brief where the briefing reads: "Now, on remand, TIG argues for the first time that it's not liable for Stryker's Uni-Knee settlements because TIG never consented to those settlements." Pp. 33:9-36:3 (emphasis added). Mr. Portinga testified that the first time he could recall TIG specifically raising the issue of consent was after the remand in the summer of 2012 when he had a conversation in August 2012 with Carlos Del Carpio. Pp. 36:4-37:12. During the conversation Mr. Portinga asked Carlos if TIG was going to pay under its policy and Carlos responded by indicating TIG thought it had a consent defense. *Id.* Through October 2012, Stryker was taking the position that TIG had not previously raised the coverage defense of consent. *Id.* He wrote in the brief the following: "Instead of giving prompt notice of a 'consent to settle defense,' TIG did the opposite; it told this Court that the only coverage issue under its 2000 policy was whether the XL policy provided coverage." Pp. 37:13-38:8. Mr. Portinga acknowledged that that was a true statement. Additionally, the briefing stated the following: "On at least three different occasions, TIG lawyers – acting as officers of this Court – said that coverage under the TIG policy turns solely on whether the XL policy provides coverage." *Id.* That also was a correct statement according to Mr. Portinga. *Id.*

Mr. Portinga expected TIG to participate in the settlement. Pp. 42:6-18. He expected the insurance companies (XL and TIG) to take care of the problem that was facing Stryker, which would have included both carriers trying to settle the claims. At the settlement conference, TIG attended through TIG's coverage counsel, Ms. Miner, without the principal attending. Pp. 40:12-42:5. Ms. Miner stayed for the first full day, January 12, but did not come back for the second day on January 14. *Id.* Mr. Portinga learned from the settlement judge that TIG's attorney was saying that the loss needed to be spread across policy periods. *Id.* There was no reference to a consent defense. No one from Stryker reached out to TIG on January 14 to find out what TIG's position was. Pp. 65:13-66:25. The Stryker people did not have any conversations with TIG on the January 14. *Id.*

As of January 12 Stryker was demanding full coverage from XL because Stryker had won its case. The judgment against XL was a partial judgment for approximately $12.8 million,

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 32

consisting of $7.6 million in settlements and $6 million approximately in defense costs. Stryker believed that was XL's liability. Pp. 54:25-56:2. The Pfizer judgment had a principle amount of approximately $7.7 million and the interest claim raised it to $26 million. *Id.* Stryker was demanding $70 million from XL in an effort to settle. *Id.* The $70 million demand included the penalty interest because under Michigan law, Mr. Portinga believed that if an insurer did not promptly pay, the insured was entitled to 12% interest. As of 2009, Stryker alleged it had been waiting to receive its insurance benefits for 8 years so the interest was significant. *Id.* Mr. Portinga acknowledged that at the settlement conference (January 12 and 14), Stryker in no way indicated to Judge Scoville or any other party (TIG or XL) that it was seeking something less than $75 million. Pp. 120:12-121:13. According to Mr. Portinga, it was always Stryker's position that the loss was covered, that the Court had ruled that Stryker had coverage, that the insurers needed to take care of the judgments, and Stryker didn't care how they divided it up. *Id.* Mr. Portinga does not recall that there were any discussions regarding numbers at the settlement conference. No one on behalf of Stryker ever indicated that Stryker would be willing to take $75 million in Mr. Gass' settlement letter to Judge Scoville dated January 5, 2009. *Id.* During the deposition, Mr. Portinga was critical of the XL lawyers because they agreed to pay the full amount of the Pfizer judgment without negotiating with Pfizer. Pp. 76:24-78:15. What Mr. Portinga does not recognize is that Pfizer may have been just as adamant in not reducing the amount owed as Stryker was.

Mr. Portinga and his law firm were provided with a copy of the Settlement Agreement and Release between Pfizer and XL on February 2 or February 3, 2009. Pp. 74:2-75:2. He was asked at his deposition to identify the specific provisions that he objected to in the agreement. He responded that the issue wasn't that XL had paid the Pfizer settlement because Stryker believed it was good that they paid that. The issue was that they did it in a way that compromised Stryker's coverage for Stryker's settlements. Pp. 74:2-75:2. He testified that if the agreement had not been reached, Stryker would have recovered its settlements from XL and the liability for the Pfizer judgment would have been divided between XL and TIG. *Id.* The testimony regarding objecting because it would somehow compromise Stryker's ability to be reimbursed, Mr. Portinga must have been talking perspectively because as the record demonstrates above, up through the settlement conference there was no reason for Stryker to believe or conclude that TIG was not going to pay based on a failure of consent defense.

After the Miller Johnson firm got the settlement agreement, Mr. Portinga and Mr. Dave Gass had a meeting with Mr. Bloss and Mr. Betz on February 4, 2009. During this meeting the Stryker attorneys asked the XL attorneys what XL was going to do with the Stryker settlements and, according to Mr. Portinga, the XL attorneys wouldn't answer the question. Pp. 75:6-76:11. It didn't make sense to Mr. Portinga that XL would pay $26 million to Pfizer while being subject to judgment in Stryker I. He claims that Mr. Bloss said words to the effect of, think about the penalty interest, and said nothing more. *Id.* The meeting then ended. During the meeting, Stryker did not give any objections to the XL attorneys regarding the agreement. *Id.* He was shown an email (Cartier 21) from Linda Woolf to Mr. Gass, Mr. Portinga, Mr. Betz, and Mr. Bloss dated February 13, 2009, titled, "Satisfaction of Judgment, Pfizer v. Stryker" with a Satisfaction of Judgment that had been entered in New York. The last sentence of the email read, "Please feel

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 33

free to contact me or Rick Barnes if you have any questions concerning this filing."
Pp. 78:16-81:5. Mr. Portinga did not call in response because the Miller Johnson firm and Stryker
had no objection to the satisfaction of the Pfizer judgment at that time. *Id.* He claims that his
objection was to XL settling in a way that could compromise Stryker's coverage. *Id.* As stated
above, there was no indication that TIG would deny coverage on the consent issue at this time and
therefore the testimony of Mr. Portinga in that regard does not appear to be applicable in this
timeframe. If Mr. Portinga is now taking the position that at or around the time of the settlement
conference Stryker and its attorneys were concerned about consent, then they should have been
proactive in the settlement conference and throughout. Moreover, they should never have made
the settlements without seeking consent from TIG first. Stated differently, the Portinga testimony
now supports a conclusion that Stryker and its attorneys knew that they were required to get
consent from TIG because they had read the policy before the settlement conference and were
aware of the consent requirement, and presumably were aware of the requirement of consent
throughout. If the trier-of-fact concludes that, then Stryker, with knowledge, disregarded the
consent provision when it entered into the Stryker settlements.

In Stryker's brief supporting the motion for summary judgment against TIG on remand
dated August 17, 2014 (Exhibit 118), Stryker, through its attorneys, took the position that TIG had
waived any coverage defenses. Pp. 85:21-86:4. Mr. Portina believed that statement was true in
January 2009, as well as during the briefing in August 2012. *Id.* Based upon the brief, Stryker
took the position that because TIG had waived coverage defenses, it was liable for the Uni-Knee
loss to the extent that the loss exceeded XL's policy limits. Pp. 86:5-18. That was XL's position
in January 2009, as well as August 2012. In the briefing, Stryker noted that from the time Stryker
notified TIG of the Uni-Knee claims, up through August 2012, TIG had never issued a denial letter
or a reservation of rights letter. Pp. 87:14-21. No coverage defenses had been raised by TIG in
Stryker III, which was TIG's own coverage action. Pp. 87:22-88:23. Stryker III was the lawsuit
that TIG filed against XL and Stryker seeking a declaration of its obligations under the policy. In
the briefing, in that case Stryker asserted that "TIG judicially admitted that coverage under its
policy turn[ed] solely on whether there [was] coverage under the 2000 XL policy. TIG admitted
this in its briefs." Pp. 88:24-89:10. Mr. Portinga acknowledged that was Stryker's position, both
prior to the settlement conference in January 2009, as well as August 2012. *Id.* Stryker also
asserted that Judge Scoville noted at the Rule 26 conference the following: "The Court: So is it
fair to say that except for this prior knowledge defense that might be separate, that TIG's liability
issues stand or fall with the first level of coverage." Pp. 89:11-90:5. Ms. Ehrhart, counsel for TIG,
responded: "Correct." That admission was made on August 20, 2007. *Id.* The admission was
made in open court in front of both Stryker's and XL's counsel. *Id.* Stryker's briefing further
noted that in opposition to Stryker's motion for summary judgment made in 2008, that TIG did
not present any coverage defense that was unique to its policy. Pp. 90:6-19. Rather, TIG "piggy-
backed" on XL's arguments." *Id.* That statement in the briefing was true in both January 2009
and August 2012. *Id.* Stryker, in its briefing under "Relief Requested" noted that TIG had
repeatedly admitted that its policy covered the Uni-Knee loss if the XL policy covered it.
Pp. 90:20-91:12. That was a true statement in January 2009 and August 2012. *Id.* Those were
admissions that were made before the January 2009 settlement conference. *Id.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 34

After TIG took the position that there had been a failure of consent, Stryker reached out to XL to ask XL for assistance in defeating TIG's lack of consent defense in proving that it was without merit.  Pp. 94:24-99:2.  In fact, XL joined in Stryker's motion for summary judgment against TIG (Exhibit 120).  In the motion, XL agreed with Stryker that TIG could not, as a matter of law, rely on the failure of consent because (1) when Stryker entered into the settlements, the amount of each settlement was within XL's layer and therefore there was no need to get TIG's consent to the settlements.  Stryker only needed to get TIG's consent after XL settled with Pfizer, which pushed all of the settlements up to the TIG layer of coverage.  Pp. 100:3-101:13.  (2) The first time the TIG coverage was triggered was the settlement between XL and Pfizer.  Pp. 101:14-102:9.  XL was agreeing with Stryker's position in the briefing that no consent from TIG was necessary for the Stryker settlements because it was XL's action that pushed those settlements up into the TIG layer.  (3) TIG had been denying coverage and therefore TIG was not entitled to insist upon consent.  Pp. 102:10-19.  That was an argument Stryker was making at the time against TIG and XL was supporting Stryker on that point.  *Id.*  Finally, TIG did not previously raise a failure to consent challenge.  Pp. 102:20-103:3.  Because of this, TIG waived the failure to consent argument.  *Id.*  That was an argument Stryker was making and XL agreed.  *Id.*

Stryker argued to the Court that TIG had admitted to the Court that its coverage defenses turned "solely" on interpretation of the underlying XL policy.  Pp. 108:1-15.  On three other occasions cited in the briefing, TIG made similar admissions.  *Id.*

Mr. Portinga admitted that in the ensuing discovery in Stryker II, depositions were taken of present and former underwriters and claim personnel at TIG on the issue of the consent requirement.  Pp. 111:21-113:16.  Mr. Portinga admitted that the claim handlers and underwriters uniformly testified that Stryker did not need to get TIG's consent to Stryker's settlement as long as those settlements were in underlying, being the XL, coverage layer.  *Id.*  Later the District Court rejected TIG's consent defense.  Pp. 113:17-114:8.

C.     **Deposition of David Gass, July 18, 2019**

Mr. David Gass started doing work for Stryker at Miller Johnson in 2003 and has continued, regularly, doing work for them.  Pp. 6:24-7:23.  Stryker is one of the firm's biggest clients.  Pp. 7:24-8:19.  Regarding the Stryker Uni-Knee claims, most of those claims were first settled starting in about 2000 and the bulk of them had already been completed prior to the time that Miller Johnson got involved.  Pp. 30:7-32:1.  The insurance companies were given notice of each and every claim because of the documentation he saw.  *Id.*  Most of the settlements took place before his firm was engaged by Stryker.  *Id.*  His firm was not involved in any settlements that occurred before their engagement.  *Id.*  However, there were a few settlements that occurred after his firm was engaged and retained by Stryker.  Pp. 32:2-34:6.  After his firm was engaged, notice was given to each of the insurers of these straggler claims.  *Id.*  He believed the straggler claims came up later in 2006 while most of the claims were made and resolved in 2003.  Pp. 30:7-32:1.  He admitted that as to the straggler claims, when his law firm was involved, consent was not sought from TIG to settle those claims.  Pp. 32:2-34:6.  He testified that while they gave notice to TIG,

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 35

there was no need to seek consent, as TIG acknowledged, as all of the adjusters acknowledged, because it was well below TIG's layer of coverage. *Id.* Miller Johnson was not involved in Stryker's decision not to seek consent from TIG with respect to the post-2003 settlements. *Id.*

Mr. Gass testified that TIG never informed Stryker that TIG would not cover the Stryker settlements because TIG had not consented to the settlements prior to the January 2009 settlement conference. Pp. 34:7-35:7. He believed this was so because at that time TIG did not have the defense because Stryker was not asking TIG to reimburse Stryker for the Stryker settlements. *Id.* It is accurate, nevertheless, to say that at no time prior to the January 2009 settlement conference TIG informed Stryker that TIG would not cover Stryker's settlements because of the lack of consent. Pp. 35:8-22. He was shown Stryker's reply brief (Exhibit 117) and acknowledged that he reviewed it and approved it before it was filed. Pp. 37:6-39:1. The statements in the reply brief are accurate. *Id.* He acknowledged that TIG, prior to the settlement conference, did not assert a consent defense. Pp. 37:6-39:1. Mr. Gass was not certain as to when he learned what TIG's settlement position was as of January 12, 2009 and whether he learned it at the settlement conference or later. Pp. 39:2-40:1.

Regarding the settlement conference, Mr. Gass testified that the Stryker attorneys got to the courthouse and the settlement conference began with a meeting with Judge Scoville in the courtroom. The meeting did not last long. Pp. 44:17-45:18. Mr. Cartier made clear Stryker's position that he expected the insurers to settle the matters and achieve a global settlement. *Id.* He can't recall Mr. Cartier's precise words. *Id.* They then broke out into separate caucus rooms. *Id.* Judge Scoville was facilitating communications among the parties. At no time did he ask the Judge to tell him where the various parties were. Pp. 45:19-47:12. There was no rule that precluded him from meeting with the parties in the other rooms. Pp. 47:13-48:6. According to Mr. Gass, Stryker had made its position clear and it was up to the other parties to figure out whether or not they could negotiate a global settlement of all three cases. *Id.* He did not believe he needed to meet with the other parties. Pp. 47:13-48:6.

Mr. Gass did not recall having any substantive discussion with Mr. Barnes at the January 12 and 14, 2009 settlement conference. Pp. 13:22-15:2. He had no recollection of what he told Judge Scoville and Mr. Barnes at the end of the day, nor does he have a recollection of what, if anything, Judge Scoville and Mr. Barnes said at the end of the day. *Id.* He did recall that Stryker representatives were informed that there was a settlement in principal and that Stryker was seeking information as to what the settlement was and were told by XL/Pfizer they were not going to tell them. Pp. 15:3-19. They were told by the lawyers for XL/Pfizer that they would not provide the information at that time. *Id.* What Mr. Gass recalls is that he asked Mr. Barnes for the information and Mr. Barnes declined to provide it. *Id.* He also did not recall that he or Mr. Portinga asked Judge Scoville to help get that information in order to learn what the terms of the settlement were. Pp. 15:20-16:9.

Mr. Gass recalled that Mr. Cartier indicated accurately at the settlement conference that Stryker had prevailed in the litigation against both TIG and XL and that Mr. Cartier expected a

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 36

global settlement, as well as expecting the insurers to handle it. That was the scope of the communication with the insurers. Pp. 18:6-19:20. Mr. Cartier expected XL to pay everything if TIG wouldn't participate in the settlement, but he did not know what was in Mr. Cartier's mind. Pp. 19:21-21:12. Mr. Cartier expressed that Stryker had won their case after trial and that Mr. Cartier expected the insurers to take care of Stryker I and Stryker II and to figure out between themselves a global settlement. *Id.*

Mr. Gass did not recall the lawyers who defended Stryker in the Pfizer action ever telling him that the judgment Pfizer received had a settlement value. Pp. 27:5-28:11. Mr. Gass did not recall ever communicating in writing that the Pfizer judgment had a settlement value. *Id.* He did not recall ever telling Mr. Betz or Mr. Bloss that the Pfizer judgment had a settlement value. *Id.* He did not know whether, prior to 2009, Stryker had ever offered to settle the judgment that Pfizer obtained. Pp. 28:12-29:8. He did not know if prior to January 2009 Pfizer ever made a settlement demand to Stryker for settling the judgment. *Id.*

Regarding the TIG excess policy, Mr. Gass testified that he had read the policy many times. Pp. 29:9-30:6. He reviewed the TIG policy in connection with filing a motion for summary judgment against TIG. *Id.* It is an accurate statement to say that he knew the TIG policy fairly well and had great familiarity with it. *Id.*

$75 million was the demand to XL and TIG from Stryker. Pp. 51:19-53:4. Stryker did not care who paid or how much they paid. *Id.* There were no discussions regarding stryker reducing its $75 million demand. Pp. 59:21-62:2. In their settlement letter to Judge Scoville they did not break out specific amounts. *Id.* He did not recall communicating to Judge Scoville on January 12 that Stryker would take anything less than $75 million. *Id.* Stryker was still demanding $75 million. *Id.*

Regarding the Pfizer judgment against Stryker, he was shown Exhibit 32 which was a letter from the Goodall firm dated January 6, 2009. The Goodall firm represented Pfizer. Pp. 54:13-56:10. The letter was signed by Linda Woolf and was addressed to Judge Scoville, Mr. Gass and others. *Id.* The letter represented Pfizer's settlement submission. In the letter he acknowledged that Pfizer took the position that $20,961,331.67 was what Pfizer claimed it was entitled to for the judgment. *Id.* There was an additional $5 million requested which he assumed represented interest, fees, and disbursements. *Id.* He believed that was referring to Pfizer's own legal fees and expenses in pursuing Stryker. *Id.* He did not make any settlement calculations in preparing for the settlement conference regarding Pfizer's claim. Pp. 56:11-57:18. He did not make any calculations on Pfizer's claim for prejudgment interest as of January 12 and 14. *Id.* He acknowledged that it was possible that it would be in addition to the approximate $26 million. *Id.*

On January 14 he believed that the Stryker representatives spoke with Judge Scoville more than once but less than 10 times. Pp. 59:21-62:2. Nothing of substance was discussed, however. *Id.* He testified that he was not kept informed regarding the nature of the discussions that were taking place with other parties. *Id.* He did not ask Judge Scoville what was going on in the discussions with the other parties. *Id.* There was no reason that prohibited him from asking Judge

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 37

Scoville what was going on in those discussions. *Id.* There wasn't any specific reason he couldn't have gone to the XL people to see what was going on. *Id.* He was not precluded from going to talk with Mr. Barnes. *Id.* He did not recall having any substantive discussions with Mr. Bloss, Mr. Betz, Mr. Daly, or Mr. Barnes on January 14. Pp. 62:14-63:7. He does recall at the conclusion of the day they were informed by the parties that there was an agreement in principle and they sought information about the details, but those were not given. *Id.* While he did not recall who specifically told him a settlement had been reached, there was no question that Stryker learned that fact at the end of the day. Pp. 63:8-64:5. On January 14 he never went to Judge Scoville and complained about what was going on that day. Pp. 64:6-17. He did not recall ever objecting to Judge Scoville about not being kept apprised of the discussions. *Id.*

He was aware by the end of January 14 that the settlement with XL and Pfizer would settle the judgment, although they didn't have additional details. Pp. 66:16-67:2. He claimed that he was not told that a satisfaction of judgment would be filed in the New York litigation. Pp. 67:3-68:8. Mr. Gass did not recall any discussions with Mr. Daly, Mr. Betz, Mr. Boss or Mr. Barnes on January 15, 2009. Pp. 64:18-66:15. He did not recall being told on January 15 that Stryker would no longer have any liability for the Pfizer judgment. *Id.* He did not recall being told on January 15 that as a part of the settlement there would be a satisfaction of judgment filed with the Southern District. *Id.*

Mr. Gass recalled meeting with Mr. Bloss and Mr. Betz on or about February 4, 2009. Pp. 68:9-69:5. Present at the meeting were Mr. Betz, Mr. Bloss, Mr. Portinga, and Mr. Gass. *Id.* Mr. Gass requested the meeting in order to find out what XL was doing. *Id.* At the meeting Mr. Gass complained to XL's lawyers that they were being frozen out. Pp. 69:6-70:17. While Mr. Gass acknowledged that the attorneys for Stryker could have gone to Judge Scoville about the situation, they did not go to Judge Scoville because they didn't know the details. *Id.* On February 4, Stryker received the settlement agreement but did not know what XL's intention was regarding the Stryker I judgment. Pp. 70:18-71:8. When they inquired of the XL attorneys regarding this, the XL attorneys wouldn't tell them, other than that they were thinking about the penalty interest. *Id.*

Neither he nor Mr. Portinga objected to the filing of the satisfaction of judgment. Pp. 73:4-13. By February 4 Stryker knew the settlement amount was $26 million. He did not recall Mr. Portinga on February 4 saying in words or substance to Mr. Bloss and Mr. Betz that the $26 million was an unreasonable settlement amount. Pp. 73:14-74:2.

Mr. Gass was shown Stryker's briefs in support of its motion for summary judgment against TIG filed on August 17, 2012 (Exhibit 118). He helped prepare the brief and signed it. Pp. 76:5-77:4. The statements in the brief were true at that time. *Id.* He was asked to read the last sentence of the first paragraph: "In fact, in the 12 years since TIG first received notice of Stryker's Uni-Knee loss, TIG has never asserted a coverage defense that is unique to its policy." Mr. Gass stood by what he wrote in the brief as being true as of January 2009. *Id.* He acknowledged that Stryker's position, both in January 2009 and August 2012, was stated in the last paragraph:

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 38

"Because TIG has no coverage defenses that are unique to its policy, and because it has waived any defenses that it might have had, TIG is liable for the Uni-Knee loss to the extent that the loss exceeds XL's policy limits. Pp. 77:5-15. Again, reading from the brief, the brief states: "In the 12 years since TIG was first notified of the Uni-Knee loss, TIG has never identified a single provision of its policy that precludes coverage." Pp. 77:16-78:20. That was true both in 2009 and 2012. *Id.* The brief further states: "TIG judicially admitted that coverage under its policy terms solely on whether there is coverage under the 2000 XL policy. TIG admitted this in its briefs." *Id.* That statement was also true in both 2009 and 2012. *Id.*

D. **Deposition of Michael Cartier, May 31, 2019**

Mr. Michael Cartier is the Deputy General Counsel for Stryker Corporation. Pp. 6:3-25. He leads a team called Global Legal Practice Group. *Id.* He is responsible for all of Stryker's litigation. *Id.*

He recalled attending a settlement conference with Judge Scoville on January 12 and 14, 2009. It was a combined settlement conference involving the Stryker I case, which was the case his company brought against XL and National Union back in 2001, and the Pfizer v. Stryker case. Pp. 13:18-15:23. He attended the settlement conference as the corporate representative for Stryker and Howmedica Osteonics Corp. Pp. 15:24-19:21. The settlement conference also included the 2005 Stryker v. TIG case. *Id.* He testified that if all three cases were going to be resolved in their entirety at the settlement conference he would have needed to consult back with the general counsel. *Id.* If there was going to be a settlement of any significance he would have to confer with Mr. Curtis Hall, the general counsel, who would in turn likely take it to the CFO or CEO. *Id.* No one at Stryker had sole authority to settle. *Id.*

Mr. Cartier recalled a woman attorney appearing on behalf of TIG at the settlement conference. Pp. 21:8-23:7. He recalled that she stood up and stated that while she represented TIG, TIG was not planning on participating in the settlement conference. *Id.* That was the last time he heard her speak and does not recall any interactions with her. *Id.*

He made it clear that Stryker would not compromise their claim. Stryker wanted to be paid 100% of what they were entitled to as the policyholder. Pp. 99:24-101:23. He also stated that he did not tell everyone they wanted 100% of their claim. *Id.* He did say Stryker was not willing to compromise its position. He acknowledged the effect was the same. *Id.* Mr. Cartier did not recall telling XL at the settlement conference that he did not want to settle any of the matters unless TIG also agreed to participate in the settlement. Pp. 82:16-85:16. What he did state was that everything had to be resolved and that the insurance companies should figure it out. *Id.* He did have a recollection that the XL representatives went to meet with the Pfizer people and that neither he nor Stryker's lawyers requested to be included in those discussions. Pp. 85:17-86:23. At some point they learned that Pfizer was meeting directly with XL. He was okay with that as long as they didn't "screw" Stryker and/or do something to Stryker's detriment and prejudice Stryker's rights to recoveries. *Id.* Mr. Cartier testified that Stryker was not going to compromise its claim at the settlement conference. Pp. 77:21-79:22. He denies ever telling representatives of XL to first settle

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 39

with Pfizer, pointing to the Pfizer lawyers, and then to come back and settle the rest of the claim with Stryker.  He denies that he pointed to the Pfizer lawyers as they exited the courtroom, telling XL to go settle with them.  Pp. 79:23-80:6.

At the deposition Mr. Cartier further acknowledged the statement in his declaration where he stated: "At no time prior to the January 2009 settlement conference did TIG inform Stryker that TIG would not cover Stryker's settlements because TIG had not consented to the settlements." Pp. 24:12-23.  He also acknowledged the statement where he indicated: "At no time prior to the 2009 settlement conference did TIG inform Stryker that XL's settlement with Pfizer would jeopardize coverage for Stryker's Uni-Knee settlements."  *Id.*  Mr. Cartier asked Judge Scoville to advise the parties that Stryker was expecting the conference to result in its two insurance companies resolving, in their entirety, all matters pending in the three lawsuits (Stryker I, Stryker II, and Pfizer v. Stryker).  Pp. 73:17-74:7.

Regarding the settlement, Mr. Cartier admitted that removal of the Pfizer judgment removed a serious matter from Stryker's concern, but then led to another serious matter. Pp. 105:20-106:10.

E.     **Declaration of Michael Cartier, July 31, 2014**

In his Declaration dated July 31, 2014 in the matter *Stryker Corporation and Howmedica Osteonics Corp. v. TIG Insurance Company*, before Judge Robert Bell, Mr. Cartier stated as follows:

* * *

5.      On January 12 and 14, 2009, I attended a settlement conference in this case before Magistrate Judge Joseph Scoville. This was a combined settlement conference for this case, Stryker I, and Pfizer v. Stryker. Representatives of XL and Pfizer, Inc. also attended this conference.

6.      To my knowledge, TIG did not participate in any negotiations during that conference.

7.      At the end of the conference, representatives of XL announced that they had reached a settlement agreement with Pfizer. Through this settlement, XL satisfied Pfizer's judgment against Stryker.

8.      Stryker did not participate in, or approve of, XL's settlement with Pfizer.

9.      XL's settlement with Pfizer eroded XL's policy limits. The effect of XL's settlement with Pfizer was to push some or all of Stryker's settlements into the TIG layer of coverage.

10.     Before the settlement conference, TIG had told Stryker, through pleadings and in open court, that TIG's coverage turned solely on whether XL's policy provided coverage.

11.     At no time prior to the January 2009 settlement conference did TIG inform Stryker that TIG would not cover Stryker's settlements because TIG had not consented to the settlements.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 40

      12.    At no time prior to the 2009 settlement conference did TIG inform Stryker that XL's settlement with Pfizer would jeopardize coverage for Stryker's Uni-Knee settlements.

      13.    If TIG had informed Stryker that TIG would not cover Stryker's settlements because TIG had not consented to those settlements, then Stryker would have taken action to attempt to block XL's settlement with Pfizer.  Stryker would not have allowed XL to unilaterally jeopardize coverage for Stryker's settlements.

## F.    Deposition of David Bloss, June 18, 2019

Mr. David Bloss recalled that at the settlement conference, Mr. Cartier told the XL attorneys, in the presence of the Pfizer representatives, to go settle with him and Mr. Cartier gestured with his left arm toward the Pfizer people. Pp. 47:6-49:7. Mr. Cartier then said come talk to us, told them after settling with Pfizer then they should talk with Stryker. *Id.* This stood out in Mr. Bloss' mind because it was unusual. *Id.*

Mr. Bloss did not participate in Mr. Daly's discussions with Pfizer. Pp. 50:21-51:17. He did not know if Mr. Betz was involved either. *Id.* He did recall at some point an agreement in principle was reached between XL and Pfizer to satisfy the Pfizer judgment against Stryker. Pp. 51:18-52:17. He was not involved in any negotiations with Pfizer about the amount XL would be paid. *Id.* He did not know if there were any negotiations over the actual number XL would pay.

To his understanding, when the attorneys for XL reached an agreement in principle with Pfizer it wasn't a final agreement. Pp. 53:17-54:8. There was a dollar figure arrived at but Mr. Bloss does not know what other details had been agreed to because he wasn't participating in the discussions with Pfizer. *Id.*

Mr. Bloss does not recall a conscious decision he made to not share with Stryker or its attorneys the detail of the settlement with Pfizer. Pp. 54:9-56:4. Mr. Bloss was asked if he knew why Stryker was kept in the dark at the settlement conference as to the details of the Pfizer settlement, to which he responded that the parties didn't have a settlement agreement with any kind of detail to provide to Stryker and that they did not know whether or not they would achieve a real live agreement. Pp. 56:14-57:21. Other than disclosing to Stryker in the courtroom that a settlement in principle had been reached, Mr. Bloss did not recall the parties disclosing any details beyond that. *Id.* He doesn't know who came up with the idea to pay the Pfizer judgment. Pp. 57:22-58:7. There was only one person in the room with money to spend, Mr. Daly. *Id.* He did not recall having any recollection of attending at the time of the agreement in principle with Pfizer to argue that XL should be relieved from a portion of the judgment in Stryker I. Pp. 59:15-61:3. Mr. Bloss did not know why Stryker wasn't copied on various emails following the settlement conference. Pp. 73:10-75:10. It was his sense of things that it was an intentional decision not to communicate with Stryker about the details of the settlement until the document was signed on February 2, 2009. *Id.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 41

No representative from TIG showed up on the second day of the settlement conference. Instead, a representative called in. Pp. 61:4-24. Mr. Bloss did not have any individual discussions with TIG's attorney on day 2 of the settlement conference. *Id.* TIG's counsel called in and Judge Scoville put her on a squawk box on his coffee table and it was a very short conversation. *Id.* Neither he nor anyone at XL to his knowledge provided any details to TIG about the proposed settlement with Pfizer that he recalls. *Id.* Mike Betz was the attorney within his firm who worked out the details with Pfizer regarding the settlement. Pp. 65:17-66:24.

Mr. Bloss did not recall TIG saying at the settlement conference that there was no coverage under its excess policy. Pp. 80:21-81:14. What Mr. Bloss does know is that he didn't communicate with TIG's lawyers at any time in any way before the agreement was signed on February 2, 2009. *Id.*

Referring to Mr. Betz' affidavit dated August 14, 2013 which indicated in paragraph 6 that: "at the outset of the January 12 session Mr. Cartier was asked by Judge Scoville to explain Stryker's position on the settlement. As part of his response Mr. Cartier made clear that Stryker was expecting the conference to resolve and its two insurers resolving in their entirety all matters pending in the 3 lawsuits." What Mr. Bloss recalls is Mr. Cartier saying by gesturing toward the Pfizer people, go settle with them and then come back and talk to us and settle with us. Pp. 85:7-86:25.

He did not believe XL provided Stryker with the terms of the agreement before it was executed. Pp. 107:2-25. They provided it to Stryker promptly upon its execution. *Id.* Stryker never asked during the course of the two days of the settlement conference to participate. *Id.*

### G. Deposition of Kevin Spencer, August 16, 2019

Kevin Spencer is a large loss specialist with XL based in Dallas, Texas. Pp. 6:3-7:2. In that role, he makes coverage determinations and adjusts claims. Pp. 10:14-11:25. He also manages coverage litigation if there has been a denial of coverage. *Id.* In 2009 he was a claims examiner/claims adjuster. Pp. 12:1-14:22. In 2009 he believes he had $1 million of claim authority. Pp. 18:16-19:13.

Mr. Spencer has been responsible for the handling of the Duracon Uni Knee claims since the time that XL bought Winterthur as well as other people being involved. Pp. 35:6-35:5. He did have responsibility for most of the day-to-day activity, however. *Id.* Mr. Mike Daly (global head of casualty claims) was responsible for the strategic direction of the matter. Pp. 35:6-11. *See* 15/17/18/15. During the period of time that Mr. Daly was responsible for the strategic handling of the claim, he was responsible for the day-to-day claim handling aspects like processing bills, i.e., administerial functions. Pp. 120:18-121:16. At the January 2009 settlement conference, attorneys Mr. David Bloss and Michael Betz represented XL. Pp. 100:21-102:23. XL was maintaining its denial of coverage going into the settlement conference. *Id.* Mr. Spencer did not attend the settlement conference. *Id.* He had no involvement in the settlement conference. Pp. 102:24-105:1. At the point of the settlement conference, Mr. Daly had taken over the strategic

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 42

handling of the claim file. *Id.* Mr. Spencer did not know why Mr. Daly had assumed the file handling responsibility at that point. *Id.* Mr. Spencer did not know the details regarding the outcome of the settlement conference. Pp. 112:14-113:1. He did recall at some point being told there was a possibility to settle with Pfizer, but he didn't recall the amount of the settlement. *Id.*

Mr. Spencer did not know who recommended the approach to satisfy the Pfizer judgment. Pp. 113:2-114:13. He did not know why XL satisfied the Pfizer judgment instead of paying the judgment entered against it in favor of Stryker. Mr. Daly was in charge of the resolution of the Pfizer claim. *Id.* Because of that, Mr. Spencer had no knowledge of whether or not XL satisfied the Pfizer judgment for the purpose of exhausting its policy limits or satisfying the Pfizer judgment in order to cut off penalty interest under Michigan law. *Id.* In fact, Mr. Spencer did not know what Michigan law was regarding penalty interest. *Id.* Mr. Spencer had no involvement with the decisions that were made at the settlement conference on behalf of XL. Pp. 118:10-120:17. He was not involved in the decision to satisfy Pfizer's judgment as opposed to paying the judgment against Stryker. *Id.* He wasn't involved in drafting the settlement agreement. *Id.* Mr. Daly made the decision to satisfy the Pfizer judgment at the settlement conference. Pp. 126:7-127:4. In fact, Mr. Spencer couldn't testify as to whether Stryker was included in that decision or not. *Id.*

To his knowledge, XL has not utilized a pay and chase approach in large loss matters where excess coverage is implicated. Pp. 114:14-118:9.

H.     **Deposition of Michael Daly, August 21, 2019**

Mr. Daly was not an employee of XL Insurance. Pp. 10:3-14:25. He was employed with XL Services Company at the relevant times herein. *Id.* He did not know the relationship between his employer and XLIA. *Id.* He was employed at XL Services from 2007 to 2015. *Id.* He retired in 2015. *Id.* Mr. Daly worked in the general counsel's office and provided advice to the claims department regarding evaluation, management, and modernization of coverage litigation and bad faith lawsuits. Pp. 10:3-14:24.

Mr. Daly traveled to Stryker's offices when he got involved in the matter. Pp. 74:7-78:15. The trip was an exploratory trip to gain understanding of the issues and how to resolve the dispute. Pp. 78:16-81:24. He testified that it was reasonable to infer that the entry of summary judgment against XL and TIG resulted in his involvement in the case. Pp. 90:5-94:6. He met with Mr. Cartier and Mr. Hall individually while at Stryker's offices. Pp. 90:5-94:6. He wanted to educate himself about the nature and scope of the dispute between Stryker and XL and to gather facts to consider how to resolve the matter. *Id.* The meeting with Mr. Cartier wasn't long and his general recollection of the meeting was that they explored and negotiated settlement. *Id.* His understanding of the dispute at that time was that the monetary demand to settle made by Stryker to XL was unreasonable. *Id.* Stryker had given a huge number, although he cannot recall what the exact number was. *Id.* He wanted to explore the idea of ADR/mediation. *Id.* With respect to his meeting with Mr. Hall, he recalled that Mr. Hall didn't know why he would settle. *Id.* Overall, Mr. Daly recalled leaving the meetings with Mr. Cartier and Mr. Hall, thinking that he better get familiar with the facts and the law and talk to the lawyers for XL because it didn't seem to him

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 43

that it would settle anytime soon. *Id.* What he did recall of why he believed the settlement number proposed by Stryker was unreasonable was because XL only had a $15 million policy limit and Stryker was demanding multiples of $17 million. Pp. 94:7-95:14. He felt that the demand by Stryker did not take into consideration the reality of appeal and that Stryker could lose the appeal. *Id.* At the Stryker meeting with Mr. Cartier and Mr. Hall, Mr. Daly did not recall there being any discussion about improper conduct of XL's lawyers during the course of the litigation. Pp. 95:15-97:11.

In preparation for the January 2009 settlement conference, Mr. Daly familiarized himself with the TIG policy, the case facts, and spoke to outside counsel to understand all of the facts, legal issues, and litigation risks. Pp. 100:16-105:15. He would have spoken to Paul Kopff. *Id.*

Mr. Daly had significant settlement authority which was up to the policy limits in this case. Pp. 113:11-117:9. He could get more settlement authority from Paul Tuhy if he needed it. *Id.* He believes that Mr. Tuhy's authority was in the mid- to high-$20 million, but he did not know specifically. *Id.* Both Mr. Daly and Mr. Tuhy were in agreement about the value of the case. *Id.*

Mr. Daly knew that TIG had an excess policy issued to Stryker. Pp. 120:4-124:5. He had no recollection of having any communications with anybody at TIG up to the time of the settlement agreement. *Id.* He knew that the judge had ruled there was coverage so he didn't know what their position was beyond that. *Id.* He did not know whether TIG intended to appeal the partial summary judgment ruling finding TIG had coverage. It was his recollection that TIG was unwilling to participate in the settlement conference, but he did vaguely recall that TIG sent a lawyer, at least for the first day of the settlement conference. *Id.* At the settlement conference, the TIG attorney, Amy Miner, took the position that TIG had no obligation to do anything until the XI policy limits were exhausted by payment. *Id.* What Mr. Daly recalls about TIG was that Judge Bell had ruled that there was coverage under TIG's policy so whatever TIG's coverage position was didn't mean anything to him. Pp. 124:6-24. Judge Bell's ruling was the ruling for partial summary judgment in the Stryker II litigation. *Id.* His understanding of Judge Bell's order of partial summary judgment in Stryker II on December 15, 2008 established that there was coverage for both the Pfizer and Stryker claims and that TIG, along with XL, had coverage. Pp. 128:14-132:7.

Mr. Daly recalled that on the first day of the settlement conference, Judge Scoville explained to all of the parties in a joint caucus how he conducted mediations. Pp. 155:16-162:11. A question came up about how he planned to mediate the case when so many parties were involved. *Id.* At that point there was an open discussion about that issue and Mr. Daly recalled Mr. Cartier telling Mr. Daly to solve the case with Pfizer, which he did. *Id.* Mr. Daly did not recall if Cartier indicated that Stryker was interested in a global settlement as opposed to a partial settlement of the litigation. *Id.* Mr. Daly knew that the biggest part of what was involved in the dispute was the Pfizer judgment. *Id.*

When Mr. Cartier directed Mr. Daly to settle with Pfizer, Mr. Daly then extended the policy limits and settled with Pfizer as requested to do so. *Id.* Mr. Daly went to the settlement conference

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 44

with the hope that he could find a way to resolve part or all of the case. *Id.* From what Judge Scoville said at the conference, he was led to believe that a global settlement wasn't going to happen. In that regard he recalls Judge Scoville escorting him out of the room and that's when Mr. Cartier told him to go and settle with Pfizer. *Id.* At that time he knew that the Pfizer dispute was based on the court ruling that there was coverage and he knew that it would take his policy limits to settle the case. *Id.* XL's settlement with Pfizer resolved the Pfizer participation. *Id.*

Based on what Mr. Daly heard from Judge Scoville, Pfizer wasn't very interested in a compromise because there was a lot of prejudgment interest above the $17 million. *Id.* Because of this, Mr. Daly knew that the settlement would consume his policy limits. *Id.* At the time of the agreement, he thought the settlement was in Stryker's best interest because Stryker could get whatever money that they needed from TIG because of the determination adverse to TIG's coverage. *Id.* The policyholder, Stryker, had told him to settle with Pfizer and in his judgment it was in Stryker's best interest to settle at the policy limits. *Id.* At that point Stryker would be able to turn to TIG and tell TIG that XL had exhausted its limits through payment and collect from TIG. Mr. Daly knew when he went into the settlement conference that he was going to exhaust his policy limits. *Id.* When Mr. Daly began negotiating with Pfizer, he knew that the $17 million of XL coverage was going to be paid. Pp. 172:21-175:22. He believed that the payment of $17 million allocated to the Pfizer judgment would exhaust XL's policy limits. *Id.* He did not give any thought about what would happen to the judgment in Stryker I because once he paid his limits there was nothing more to be had. *Id.* What drove his decision was fulfilling the terms and conditions of the policy. *Id.* He asked the policyholder what to do and he was told to settle with Pfizer. *Id.* He could not save any money from his limits. *Id.* Mr. Daly did not see any need to keep Mr. Cartier informed during negotiations with Pfizer because he had the right to settle on the policy and Cartier had told him to settle with Pfizer. Pp. 175:23-178:10. He recalled that the XL policy was not a consent to settle policy. *Id.* He did not need the insured's consent to settle since that clause was not in the XL policy. The reason he did not advise Stryker about what he was doing with Pfizer was because Cartier had directed him to settle the case with them. *Id.* He had no recollection that Pfizer objected to not being part of the settlement negotiations. *Id.* Judge Scoville provided several options for settlement. Pp. 186:5-188:19. One of Judge Scoville's suggestions was to settle with Pfizer. *Id.* A second suggestion was to settle with Stryker. *Id.* Judge Scoville also suggested paying more and going after TIG. *Id.* The suggestion to pay and chase TIG was an approach that Judge Scoville came up with. *Id.* After receiving these options, Mr. Daly asked Judge Scoville if he could speak to Stryker to see what they wanted to do. *Id.* He then went out of the room with Mr. Cartier and was directed by Mr. Cartier to settle with Pfizer since he couldn't control them. *Id.* What Mr. Daly considered was that on balance the bigger judgment against Stryker was what happened with Pfizer and probably the best way to act in accordance with the policy was to ask the policyholder what the policyholder wanted to do. *Id.* Judge Scoville shared with Mr. Daly his interpretation of Pfizer's position that they weren't interested in any amount that would be less than the policy limits of $17 million. Pp. 193:4-194:3. Because of this he didn't explore offering less than $26 million. *Id.* He did not go back to Mr. Cartier after an agreement in principle was reached with Pfizer and asked to talk about the judgment in Stryker I. Pp. 196:12-199:12. At that point Mr. Daly knew that by settling with Pfizer he was benefitting Stryker because the Court had

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 45

determined there was coverage with the TIG policy. *Id.* The settlement got Stryker out from under what was owed to Pfizer. *Id.* Mr. Daly believes it is highly improbable that he was involved in any of the negotiations between the lawyers for XL and Pfizer after an agreement in principle was reached. *Id.* He did not give any consideration to XL's position for the judgment in Stryker I because he was acting in accordance with the policy and Stryker had told him to settle. Pp. 178:11-181:10. He couldn't get a settlement for less than the policy limits. He was not involved with all of the paperwork after the settlement and didn't need to be involved once the mediator told him the deal was done. *Id.* He resolve the liability that Stryker asked him to get rid of and there was nothing more that he could do since h could only pay the policy limits. *Id.* His involvement was done at that point. *Id.*

Mr. Daly recalled that interest was accumulating in Stryker I at a pretty high rate. His motivation in settling the Pfizer litigation was a judge had told XL and TIG that there was coverage and Mr. Daly wasn't going to take on anymore litigation risk relative to the Stryker litigation. Pp. 162:12-166:4. He also had a policyholder telling him to settle with Pfizer. *Id.* It was important to Mr. Daly to act in the best interest of Stryker at the settlement conference and that it what he did. *Id.* He knew that there was a determination of coverage and that all he had was $17 million in limits. *Id.* When Mr. Cartier told him to talk to Pfizer, it was his judgment that was the right thing to do. *Id.* Mr. Daly did not recall if he talked to Cartier about the Stryker I case. He did not know if XL had retracted its denial of coverage or not, but once Judge Bell made the coverage determination, it was his inclination to see that the matter get resolved. *Id.*

The Stryker I judgment was not part of his scope of consideration during the settlement conference because Mr. Cartier told him to settle with Pfizer. Pp. 199:13-200:15. He owed coverage and therefore he paid his policy limits. *Id.* At that point Stryker was in position to get money from TIG based on the Court's determination of coverage. *Id.*

He did not recall what his expectations were about TIG's prospect for continuing to contest coverage. Pp. 240:4-241:6. His recollection was that at the settlement conference they had no obligation under the underlying XL policy until the underlying XL policy was exhausted by payment. *Id.*

I.    **Declaration of Michael W. Betz, August 14, 2013**

In his Declaration dated August 14, 2013 in the matter *Stryker Corporation and Howmedica Osteonics Corp. v. XL Insurance America, Inc.*, (Case No. 4:01-CV-157), consolidated with *Stryker Corporation and Howmedica Osteonics Corp. v. XL Insurance American, Inc., and TIG Insurance Company*, (Case No. 1:05-CV-0051) before Judge Robert Bell, Mr. Betz stated as follows:

* * *

6.    At the outset of the January 12 session, Mr. Cartier was asked by Judge Scoville to explain Stryker's position concerning settlement As part of his response, Mr. Cartier made clear that Stryker was expecting the conference to result in its two insurers resolving, in their entirety, all matters pending in the three lawsuits.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 46

7.      On behalf of TIG, Ms. Miner stated that TIG was not going to participate in any substantive settlement discussions because there was no coverage under the TIG policies for the underlying claims. She then indicated that any further communications with her could be conducted by phone and she left the Settlement Conference. Even if TIG's position concerning coverage had not been cleanly stated previously, it was stated directly to Stryker by Ms. Miner on January 12.

8.      XL, through its representative, indicated XL's desire to resolve the claims involved in the three suits and its willingness to have discussions to that end.

9.      Pfizer's counsel stated that Pfizer s participation in the conference had a single goal: to negotiate a settlement that would result in satisfaction of its Interim Judgment in excess of $26 million against Stryker.

10.     At that point, Mr. Cartier stated Stryker's position concerning the anticipated negotiations: XL was to deal directly with Pfizer in satisfying Stryker's judgment obligation. Stryker would not participate in those discussions and it would not make any contribution to facilitate a resolution.  Only after Stryker's judgment obligation to Pfizer had been resolved in its entirety would Stryker then be willing to accept XL's payment in full for its Stryker I claims.

11.     In light of those developments and the asserted limitations on Stryker's and TIG's participation, Judge Scoville began mediating discussions between XL and Pfizer. Over the remainder of the first day and into the second day, there were extensive negotiations between XL and Pfizer in trying to reach an agreement that would satisfy the judgment which Pfizer had against Stryker. During the second day of the conference and \with the assistance of Magistrate Judge Scoville, XL and Pfizer reached an agreementin principle to settle, with many details and a written settlement agreement, still to be approved by the principals of the two settling parties.

12.     At the conclusion of the January 14 Settlement Conference, XL, Pfizer's counsel and Magistrate Judge Scoville all told Stryker's counsel and representative that a settlement in principle between XL and Pfizer had been reached, with certain details still to be resolved. XL further told Stryker that the XL / Pfizer settlement would result in full satisfaction of the Pfizer judgment and a release from any other claims Pfizer had against Stryker.

13.     In a January 23,2009 letter, Stryker's counsel asserted that: Stryker had not participated in or approved the settlement negotiations; Stryker had not .been informed of the specific terms of the settlement Stryker had asked XL to provide it with details about any settlement payment to Pfizer, but XL had refused to do so despite being required to as Stryker's insurer; and XL had an ongoing obligation to protect Stryker's interests in satisfying the Pfizer judgment and that if it did not do so, XL would be acting in bad faith under Michigan law in settling the Pfizer judgment. A copy of the January 23 letter is annexed as **Exhibit 3**.

14.     In response to the January 23 letter, XL sent a January 27 letter, which, among other things, pointed out that: Stryker would not have to pay anything to Pfizer under the settlement; the settlement would result in a full satisfaction of the judgment which Pfizer had obtained against Stryker; and XL was working with Pfizer's counsel toward finalization of the settlement with the assistance of Magistrate Judge Scoville.  XL also pointed out that the settlement constituted an affirmative response to the rulings of District Court Judge Bell in Stryker II. A copy of the January 27 letter is annexed as Exhibit 4.

15.     By letter dated January 30, Stryker acknowledged XL's January 27 letter. Stryker reiterated its position that if XL did not disclose the terms of the XL / Pfizer settlement before its finalization that XL was acting in bad faith. A copy of the January 30 letter is annexed as Exhibit 5.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 47

16.     Thereafter, XL and Pfizer entered into a definitive settlement agreement with the effective date of February 2, 2009. As part of a February 2 response to Stryker's January 30 letter, XL provided Stryker specific information and details regarding the XL / Pfizer settlement and also provided Stryker's counsel with a copy of the Settlement Agreement. A copy of the February 2 letter is annexed as Exhibit 6.

17.     Thus. Stryker knew all the terms by which Stryker's judgment obligation to Pfizer was settled no later than February 2, 2009. Moreover, by that date, Stryker had been advised by TIG's counsel that TIG had totally denied coverage under its policy, not just for the Pfizer claims, but also for the settlement costs of the direct Uni-Knee claims settled by Stryker long before February 2009.

18.     From Februaiy 2009 through conclusion of the appeals to the Sixth Circuit from the first final judgment, Stryker never sought to amend or supplement its complaints in Stryker I or Stryker II to assert any claim that XL had .acted in bad faith in settling the Pfizer claims. The first time that Stryker sought to amend or supplement its complaints in Stryker I and Stryker II to assert any such claim was in April 2013 ~ more than four years after XL had settled the Pfizer v. Stryker matter.

19.     While it did not seek to assert formal "wrongful settlement" claims against XL until after the appeals were concluded, Stryker did present a "'wrongful settlement" challenge to XL's settlement of the Pfizer claims in opposing XL's appeal to the Sixth Circuit Stryker argued that XL could not rely upon the settlement of the Pfizer claims to impair or exhaust the XL policy limits because XL had improperly settled the Pfizer claims in bad faith. (See Case: 09-2332, Doc. # 006110905566 at pp. 39-49). Stryker argued that:

> XL's attempt to evade M.C.L. 500.2006(4) not only contravenes Michigan law but also is an example of insurance bad faith. An insurer may not settle claims in a manner that harms the insured. See Commercial Union Ins. Co. v. Liberty Mut Ins. Co., 393 N.W.2d 161,164 (Mich. 1986)("If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent").

(ld. at 45).

20.     Thus, in its Stryker I appeal, Stryker challenged XL's settlement of the Pfizer judgment on the ground that XL had acted in bad.faith, the very same basis upon which Stryker now seeks to supplement its complaint in Stryker II. Indeed, the Commercial Union Ins. Co. decision cited in Stryker's appellate brief to support the "bad faith settlement" argument made there is the very same case that Stryker cited in its January 23, 2009 letter and now relies upon in making its bad faith claim in its proposed Supplemental Complaint.

21.     In its Amended Opinion, the Sixth Circuit rejected Stryker's "bad faith" challenge to how XL settled the Pfizer claims. (Case: 09-2332, Doc. # 006111358903). The Sixth Circuit held that Stryker's argument in this regard was "flawed for several reasons," that "the Pfizer settlement can be used to exhaust the.XL policy before considering the Stryker I judgment" and that the reason why the Pfizer settlement may be used to exhaust limits is because "an insurer may pay claims in any order it chooses." (Am. Op, pp. 10-11; &. 3).

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 48

### J.    Testimony of TIG Representatives

In *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,[5] the Court summarized the testimony of TIG's representative as follows:

> • Michael Mulkey, a claims adjuster, stated that consent was not required for any sums within the "self-insured retention" and the "XL layer," but that TIG's interest would be piqued if Stryker was "asking [it] to spend money."

> • Valerie Lameka, another claims adjuster, said that she "could[n't] care *429 less" about consent, unless TIG was "going to write the check."

> • Norton Geller, a fellow claims adjuster, testified that "Stryker was free to settle the lawsuits when XL denied coverage, as long as it did not impact the TIG policy."

> • Peter Salvin, yet another claims adjuster, similarly testified that consent was not required, so long as Stryker was "not spending [TIG's] money."

> • Donald Bendure, an underwriter, said that consent was only required under the excess-liability policy if Stryker "call[ed] upon TIG to [pay]."

> • And Marilyn Schultz, another underwriter, attested that the consent-to-settle provision was not implicated "[a]s long as the settlements were paid by XL."

### K.    Testimony of Paul Kopff, June 19, 2019

Mr. Paul Kopff is an attorney representing XL. He did not originally represent XL in the Stryker v. XL (Stryker I) 2001 case, but at some point did enter into a representation in that case. Pp. 5:3-16. At some point he also started representing XL in the 2005 case (Stryker II). His representation of XL and Stryker I began in the early part of January 2009, just a few days before the settlement conference began on June 12, 2009. Pp. 6:13-7:8. Prior to the settlement conference on June 12, he did not have any conversations with Judge Scoville, Pfizer's representatives, TIG's representatives, or Stryker's representatives. *Id.* He did not attend in person either day of the settlement conference (January 12 and January 14). Pp. 7:9-9:25. He had no discussions with Mr. Daly, Mr. Betz, or Mr. Bloss during either settlement conference. *Id.* He did have conversations after the settlement conferences had ended for the day with Mr. Daly, Mr. Betz and Mr. Bloss, but he does not know which day those conversations occurred on, and it might have been both days. Pp. 7:9-9:25. He had no discussions with Judge Scoville on January 12. *Id.* He did not speak to Judge Scoville on either day of the settlement conference. Pp. 10:1-12:14. He did not speak with any representatives of Pfizer or TIG on January 12 or 14. *Id.* He had no discussions with Judge Scoville on the 12th or 14th, although it is possible. Pp. 10:1-12:14.

Mr. Kopff recalled that Mr. Goss, Mr. Portinga, and Mr. Kopff demanded that TIG recognize its obligation to provide coverage and settle at the settlement conference. Pp. 12:15-14:11.

---

[5]     *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 428–29 (6th Cir. 2016).

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 49

Mr. Kopff acknowledged that TIG was not a party in the Stryker I case and therefore was not a party to Judge Bell's ruling that required XL to indemnify Stryker for Stryker's settlements in the Duracon Uni Knee cases. Pp. 23:12-24:7. However, the way Judge Bell's ruling went was that TIG was bound by what happened in Stryker I, notwithstanding the fact that TIG was not a party, because Judge Bell ruled in Stryker I in favor of coverage under XL's policy and TIG was a follow form policy. *Id.*

Mr. Kopff has no personal knowledge of whether anyone on behalf of XL reached out to TIG before the Pfizer/XL settlement agreement was entered to determine what defenses TIG might assert to coverage. Pp. 25:23-26:21. He does recall that on the first day of the settlement conference TIG announced that there was no coverage under its policy and that TIG would not continue to participate in settlement discussions that day and the attorney left. *Id.*

Regarding the Pfizer/XL settlement agreement, the agreement was negotiated between XL and Pfizer and Stryker did not participate in the negotiation of the agreement. Pp. 30:6-31:10. Under the settlement agreement, XL paid Pfizer $26 million. Mr. Kopff refused to agree with the concept that XL allocated $17 million to sums that were within its policy limits because from Mr. Kopff's perspective, XL's contractual obligation was limited to $17 million. *Id.* Therefore, it was not a question of allocation. *Id.* The question when XL settled with Pfizer revolved around whether XL had an obligation to pay covered damages in excess of $17 million and they did not. *Id.* That was reaffirmed by the 6th Circuit. *Id.* XL was not going to pay more than its policy limits and they would not pay more than its supplementary payments under the policy. *Id.*

As of January 2009 it was unequivocal that Stryker had obtained rulings that TIG was obligated to provide coverage and that TIG's coverage kicked in as soon as the XL policy exhausted. Pp. 35:5-36:23. That was a position that both Stryker and XL took at that time. *Id.* The reason Stryker did not get its excess coverage was because Stryker did not seek the prior consent of TIG that was required by the policy. *Id.* The failure to get consent had nothing to do with any conduct on the part of XL. *Id.* Mr. Kopff believed in January 2009 Mr. Goss was aware that TIG would argue the failure to consent as a defense. *Id.* However, the first time TIG actually and formally raised the failure to consent defense was in late September 2012 when they first opposed the motion for summary judgment made by Stryker which was authored by Mr. Portinga and Mr. Goss.

When TIG raised the failure to consent defense, both Mr. Portinga and Mr. Goss came to Mr. Kopff and asked for XL's help in demonstrating that TIG's failure to get consent defense was without merit. Pp. 35:5-36:23. Until the 6th Circuit ruled on the issue, Mr. Kopff and XL took the position, to help Stryker, that TIG's failure to consent defense was incorrect and time-barred. Pp. 37:2-17.

In January 2009 TIG made it clear that it was not going to pay under its excess policy, although TIG never mentioned the consent defense. Pp. 38:1-39:2. TIG made it clear that their intention was to avoid any payment under the excess policy based upon Judge Bell's rulings. *Id.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 50

Mr. Kopff disagreed with Stryker's pay-and-chase scenario.  He rejected the notion that XL could pay the entire loss and then pursue the action for recovery against TIG.  Pp. 50:8-51:22. In January 2012 XL had $17 million in limits because it included by order the Judge's payment of the SIR.  *Id.*  Therefore, XL's legal liability under the policy was $17 million for damages.  *Id.* XL had no legal obligation to pay more than $17 million for covered damages except for the addition of supplemental payments.  *Id.*  There was no equitable contribution or subrogation theory available and any payment would be considered voluntary, making XL a volunteer.  *Id.*  The 6th Circuit Court of Appeals held that XL had no legal obligation to pay more than $17 million. Because of this, Mr. Kopff strongly disagreed that XL could have paid the entire loss and then brought a claim against TIG for equitable subrogation.  *Id.*

Stryker (Mr. Portinga, Mr. Goss) argued that XL had an obligation to indemnify Stryker for more than its policy limits of $17 million.  That argument was rejected by the 6th Circuit Court of Appeals.  Pp. 56:16-57:8.  Because of this, there was no breach of the duty to indemnify when XL paid its $17 million as part of the Pfizer settlement.  To the extent XL did not pay something more than that, Mr. Kopff testified XL had no legal obligation to do so based on the 6th Circuit ruling that Stryker lost.  Pp. 58:19-59:25.

At the deposition Mr. Portinga attempted to attribute a comment to Mr. Kopff that XL did not have any obligation to obtain consent from TIG, Mr. Kopff responded that in late September or October 2012 TIG submitted an opposition to Mr. Portinga's motion for summary judgment which stated that there was no TIG coverage under the policy because Stryker did not seek the prior consent for the settlement.  That assertion caught Mr. Goss, Mr. Portinga, and Mr. Kopff by surprise.  Pp. 60:22-61:24.  At that point, Mr. Goss, Mr. Portinga, and Mr. Kopff discussed developing a legal position which they later put in papers to the court, to state that the position taken by TIG was not timely asserted, there was no reservation of rights letter preserving the position, and therefore Stryker did not need prior consent for the $7.6 million settlement.  *Id.*  That issue went before both Judge Bell and then up to the 6th Circuit.  *Id.*  XL did its best to help Mr. Portinga and Stryker in making that argument.  To this day, Mr. Kopff remains surprised that the 6th Circuit ruled the way they did.  *Id.*

When XL made the $26 million payment to Pfizer, it was making a payment to satisfy a judgment against Stryker in the Southern District of New York.  Pp. 84:24-86:8.  The payment it made resulted in the satisfaction of the judgment against Stryker.  *Id.*  XL was satisfying the single largest liability against Stryker in a judgment which was accruing 9% interest annually.  *Id.*  When asked why XL did not provide independent counsel to Stryker in connection with the negotiation, Mr. Kopff responded that Stryker had its own lawyers there (Mr. Portinga and Mr. Goss).  Both Mr. Portinga and Mr. Goss were attending the settlement conference to protect Stryker's interest. Pp. 86:9-87:15.  In accordance with the court's construction of XL's coverage obligation of the medical products endorsement, XL paid $26 million to Pfizer on Pfizer's behalf.  Pp. 87:17-90:15. The payment made by XL did not prejudice Stryker, but did just the opposite.  Pp. 88:24-90:15. The payment completely absolved Stryker of a huge judgment plus interest against it arising from Stryker's own unsuccessful effort to deny indemnification liability.  *Id.*  The payment also ensured

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 51

that Stryker could cover its remaining Uni-Knee liabilities through TIG's excess policy which followed form to the XL policy. *Id.* Based upon what was known as of May 31, 2011 it was everyone's view that Stryker's payment to Prizer ensured that Stryker could recover its remaining Uni-Knee liabilities through TIG's excess policy. *Id.* Obviously, things changed when TIG later advanced a theory for the first time that neither Stryker nor XL had anticipated. *Id.* No one anticipated that TIG would not provide coverage. When the briefing was written, everyone believed that Judge Bell's rulings would be sustained because TIG had never raised the failure to consent defense before. *Id.* In hindsight, after the 6th Circuit had ruled, he would feel differently now. *Id.*

Referring to one of the case briefs (Exhibit 59), XL lawyers wrote the following: "XL agrees with Stryker that TIG cannot as a matter of law rely on the defense of Stryker's failure to obtain the prior consent from TIG for the Uni-Knee settlements for at least the following reasons." Pp. 95:13-97:2. The last sentence of the first bullet point in the brief states, "Thus there was no obligation on the part of Stryker to seek consent from TIG since TIG's excess policy was not, and could not, be implicated by any of these settlements, whether considered individually or in the aggregate." Mr. Kopff agreed with that statement. *Id.* He reiterated that one of the reasons everyone thought Stryker would prevail against TIG was that when Stryker settled for $7.6 million in settlements, why should there be an obligation on Stryker to go to an excess carrier whose attachment point is $15 million. That made no sense to them at the time and it makes no sense even today to Mr. Kopff. *Id.* He doesn't agree with that requirement/obligation. *Id.* Turning to the second bullet point of the brief, it states, "The first time that TIG's excess policy became implicated is when XL settled the underlying claims brought by Pfizer against Stryker for $26 million. However, no prior requests for consent from Stryker or permission to settle from TIG was necessary at that juncture because it was XL on its own that settled the Pfizer claims and that was done over the objections of Stryker." The brief goes on to say that, "It goes without saying that Stryker did not need to get consent to this settlement which was done by XL and which was done over Stryker's objection." Mr. Kopff believes that is correct because it was done by XL and Pfizer together. Pp. 97:3-20.

L.   **Testimony of Michael Betz, August 13, 2019**

Mr. Betz is currently retired. He retired in 2012. Pp. 11:15-12:5. Mr. Betz attended the first day of the settlement conference along with Mr. Bloss and Mr. Daly. Pp. 74:8-76:1. Initially all of the attorneys for the parties congregated in the hallway and then proceeded into the courtroom. They assumed positions pursuant to Judge Scoville's clerk's instructions. *Id.* Judge Scoville began by explaining that he was there to facilitate a resolution of a long-standing and complicated case and he hoped to be successful. *Id.* He asked each party initially to give a summary of their position as far as what was going to be necessary in order to resolve the matter. He explained that a good deal of what was going to transpire was not going to be with everyone in the same room together, but there were going to be individual locations for the parties. He had already assigned those locations. *Id.* At that point he discharged TIG and Pfizer, leaving representatives of Stryker and XL in the courtroom with Judge Scoville. *Id.* Judge Scoville

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 52

expressed to Stryker and XL that they were the keys to a resolution of the cases. *Id.* Judge Scoville asked the parties, "What's the bottom line?" to which Mr. Cartier initially responded and then Mr. Daly responded. After that, Stryker and XL were separated in different locations and Judge Scoville began shuttle diplomacy. *Id.* Based upon what Judge Scoville had indicated, it was Mr. Betz' impression that Judge Scoville was leaving Stryker out of the discussions until such time as he had something to offer them. *Id.*

When Mr. Cartier stated his bottom line to Judge Scoville and XL's representatives, he stated that Stryker had not been treated in conformity with what Mr. Cartier had anticipated when the insurance was purchased. Pp. 76:25-77:25. Mr. Cartier continued by indicating that Stryker was not in a position to compromise on anything involving its claim, mostly because of it having emerged victorious from all of the battles in the past. *Id.* Mr. Cartier never expressed to Mr. Betz any willingness to take less than the full amount of the Stryker I judgment to settle. Pp. 91:8-92:12. Stryker had no desire to deal with, talk with, or come in contact with anyone from Pfizer. *Id.* Mr. Cartier's estimate of the way things should transpire was that XL should go talk with Pfizer and resolve the Pfizer claim to conclusion, which involved the judgment that had been rendered in the Southern District of New York. *Id.* After resolving the Pfizer judgment, then Mr. Cartier wanted XL to come back to Stryker and pay Stryker everything to which it was entitled. *Id.*

Mr. Betz recalls specifically having a conversation with Rick Barnes representing Pfizer. Pp. 80:13-82:22. It was not a lengthy conversation. Mr. Betz asked how firm Mr. Barnes was on Pfizer's demand for $26 million plus additional monies. *Id.* Mr. Barnes advised him that Pfizer was very firm on those numbers. *Id.* That was the only direct conversation Mr. Betz can recall with Mr. Barnes. *Id.*

Mr. Betz recalls that in the early afternoon on day 1 of the settlement conference, Judge Scoville came into XL's caucus room and expressed his view, after having heard the various positions of the parties, and having read the parties' submission, that if there was going to be any settlement progress, XL would have to do something. Pp. 82:23-90:7. Judge Scoville provided four alternative paths/goals: (1) do a full court press on TIG trying to convince TIG of the error of its way and how TIG did have coverage; (2) XL could go it alone, pay Pfizer and Stryker for whatever could be negotiated down from their demands, and then chase TIG; (3) pay a sum of money into court and let the court disseminate the funds to the parties; and (4) reach an agreement between XL and Pfizer on the Pfizer judgment. Pp. 82:23-90:7; pp. 205:19-209:5. Judge Scoville was encouraging option 4, which is what ultimately occurred. *Id.* Mr. Betz did not discuss any of Judge Scoville's suggested four options with Stryker. Pp. 122:5-123:13.

XL did not make any offer on day 1 of the conference through Judge Scoville or otherwise directed to settling the Pfizer claim. Pp. 99:21-100:14. The first day involved an exploration to find out how much water there was in Pfizer's demand, as well as to learn what other things they were demanding. *Id.* Based on the communications from Judge Scoville, Judge Scoville advised XL representatives that he did not believe Pfizer was ever going to reduce its demand on the judgment itself below $17 million because Pfizer had a collectible judgment and Pfizer knew what

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 53

the policy limits were. Pp. 101:23-102:23. According to Judge Scoville, Pfizer believed that it was entitled to collect the entire $17 million on the basis of the interlocutory judgment that was in place in the Federal District Court for the Southern District of New York. *Id.*

On the second day of the settlement conference, January 14, XL offered Pfizer $22 million, which was communicated through Judge Scoville. Pp. 105:8-107:7. Pfizer vehemently rejected it. *Id.* Pfizer's counter was a number in excess of $26 million, which was the initial number Pfizer said that it expected. Pp. 107:8-14. Stryker was not involved in any of these discussions to Mr. Betz' knowledge. Pp. 107:15-108:6. No discussion was held between XL, Pfizer, or Judge Scoville regarding what would happen if XL settled the Pfizer claim with the judgment from Stryker I. Pp. 107:15-108:6. Later in the day, an agreement in principle was reached, however. Pp. 108:7-110:13. There were a number of details that had not been worked out, but at least XL had established a number that it was willing to pay Pfizer and Pfizer was willing accept should the details be worked out. *Id.* That number was $26 million. *Id.* One of the absolute deal breakers that Pfizer put forth was its insistence that Stryker's counterclaim be withdrawn and that Pfizer get a full release from the counterclaim. *Id.* XL indicated that was not going to occur. *Id.* Then, late in the day somebody was able to convince Mr. Barnes that in order to bring the matter to a resolution, some additional money would be offered in exchange for Pfizer's abandonment of the demand for a release of the counterclaim. *Id.* At that point, Mr. Barnes could not reach the person of authority at Pfizer to get permission to agree to that part of the deal. *Id.* Mr. Barnes indicated that he believed he could get that done, but it might take another day. *Id.* Additionally, the timing of the payments had to be resolved, which involved something to do with tax years and releasing of claims, etc. Pp. 110:14-111:2. Any type of allocation had not been worked out on January 14 other than the $17 million being paid as the policy limits. Pp. 11:3-113:25. Before leaving the settlement conference, Stryker was told that the resolution between XL and Pfizer would involve a full and final resolution of all of Pfizer's judgments against Stryker in the Southern District of New York and that it would not in any way compromise Stryker's ability to pursue its counterclaim. Pp. 115:13-117:9. The settlement conference ended with no communication taking place between XL and Stryker about what XL intended with respect to the judgment in Stryker I. *Id.*

Mr. Betz did not inquire of TIG's counsel what impact the Pfizer settlement might have on the TIG excess policy. Pp. 120:4-121:20.

When asked to affirm his affidavit where he indicated that Stryker didn't consent or participate in the settlement process, Mr. Betz testified that one of the conditions placed on the negotiations by Mr. Cartier was that he wanted nothing to do with Pfizer and did not want to speak with them. Pp. 127:5-128:1. Mr. Betz clarified that Stryker did have input into the settlement. Pp. 154:6-18. That input came in the form of Mr. Cartier's indicating that XL should go out and deal with Pfizer, resolve the Pfizer judgment, and then come back to Stryker to pay everything that was owed to Stryker. *Id.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 54

During the settlement conference, XL did not hear from Mr. Cartier, explaining that XL could pay less than the full amount of the Stryker I judgment. Pp. 128:2-129:8. Mr. Cartier expected the insurers, plural, to pay the entire amount of the Stryker I judgment. *Id.* Although it is true that the Stryker I judgment was only against XL, they were at the settlement conference talking about the resolution of three matters, not one. *Id.*

When Mr. Betz stated in his affidavit that Stryker did not consent to the settlement, he testified they did not say "we don't consent to the settlement." Pp. 129:9-130:9. Rather, Stryker was silent on the subject. *Id.* Stryker did request details, most of which were not yet worked out so they could not be provided and therefore Stryker appeared to be relatively dissatisfied. *Id.*

Mr. Betz disagreed with the assertion in Stryker's January 23 letter where Stryker states it did not approve of the negotiations because the negotiations were undertaken at the express direction of Mr. Cartier. Pp. 131:6-133:10.

It was not intentional on the part of XL or the attorneys to not inform Stryker of all the terms of the settlement. Pp. 133:11-23. When Stryker's attorney wrote, "we have asked you to provide us with details about any payment by XLIA to Pfizer, but you have refused to do so," Mr. Betz testified that the attorney was asserting something about an impossibility because XL could not refuse to provide him with details of a payment that wasn't made at that time. Pp. 133:11-23. Mr. Betz testified that Stryker was not cut out of the negotiations between Pfizer and XL. Pp. 134:24-135:6. XL followed Stryker's instructions. *Id.*

## M.    Testimony of Curtis Hall, September 9, 2019

When Mr. Curtis Hall's deposition was taken, he was retired as general counsel of Stryker. He was general counsel when the relevant litigations involved in this case were taking place and during the settlement conference in January 2009 and beyond.

Mr. Hall's testimony establishes the level of sophistication of Stryker regarding insurance matters. As an example, when he was last general counsel, the general counsel's office had 60-70 lawyers assigned to it, as well as a very large staff. Pp. 8:4-11:4. Stryker also had an insurance group which was located within the treasury group of the company. Pp. 14:21-17:23. It was the insurance law group that put the insurance carriers on notice of claims, as well as coordinated with Stryker's outside insurance broker, Marsh, to come up with whatever the coverage was going to be. *Id.*

Mr. Hall notified the insurance group of the potential Uni-Knee poly problem. Pp. 23:25-26:21. He did not recall whether that notification was provided to the insurance group before or after the first knee implant lawsuit. *Id.* He specifically recalls telling the insurance group that he had a concern about the magnitude of the problem and the number of cases that would be coming. *Id.* He told the insurance group that because there was going to be a higher level of exposure, that it was more likely to trigger insurance coverage. *Id.* Unlike the usual type of claims which would not exceed Stryker's SIR on an individual case basis, he reported this was going to

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 55

be a different situation. *Id.* The insurance law group advised him that the insurance that was being purchased was going to have batch coverage going forward. *Id.* He did not like that situation because the presence of batch coverage provisions meant that all product claims related to a single product problem would be batched together so that they would not extend over multiple years. *Id.* The batch coverage would act to consolidate all potential claims into a related single product defect into a single year for occurrence purposes. *Id.* This situation meant that it was more likely to push through some of the policy retentions and that Stryker would not be able to have coverage over multiple years. *Id.*

Mr. Hall hired Michael Cartier and saw him as a litigation associate at Jenner and Block who insurance experience. Pp 32:17-35:6. Mr. Hall knew that Mr. Cartier had knowledge concerning insurance law and insurance coverage-related issues. *Id.* Mr. Hall acknowledged that with respect to the Uni-Knee case/claims and some other cases, he would access Mr. Cartier's knowledge concerning the interpretation of insurance policies and insurance law. *Id.*

## VII.   GENERAL DISCUSSION AND OBSERVATIONS

A.   A review of Michigan bad faith law is helpful. In Michigan, "[i]t is clear that the insurer owes the insured a duty of good faith. Thus, the insured has a direct cause of action against the insurer for a breach of this duty which exposes him to excess liability."[6] *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*[7] is the seminal case on defining the parameters of bad faith in this context. The issue before the Michigan Supreme Court was the definition of bad faith—specifically, whether it requires proof of deceitful conduct, dishonesty, duplicity, or concealment.[8] The Court ruled "bad faith" is not to be used interchangeably with "either 'negligence' or 'fraud.' … [W]e define "bad faith" for instructional use in trial court as arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty."[9] Good-faith denials, offers of compromise, or other honest errors of judgment "are not sufficient to establish bad faith. Further, claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment."[10] There may be bad faith "if the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, even though the insurer's actions were not actually dishonest or fraudulent."[11]

---

[6]   *Commercial Union Ins. Co. v. Med. Protective Co.*, 356 N.W.2d 648, 650 (Mich. Ct. App. 1984).

[7]   *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127, 393 N.W.2d 161 (1986).

[8]   *Id.* at 133.

[9]   *Id.* at 136.

[10]   *Id.* at 136–37.

[11]   *Id.* at 137.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 56

The *Commercial Union* Court also set forth factors which may be considered in determining whether liability exists for bad faith.  The factors are not exclusive, "[n]o single factor shall be decisive," and the factfinder may take into account all other evidence in determining whether the insurer acted in bad faith.[12]  The factors are the following:

1.  failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured,

2.  failure to inform the insured of all settlement offers that do not fall within the policy limits,

3.  failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances,

4.  failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury,

5.  rejection of a reasonable offer of settlement within the policy limits,

6.  undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high,

7.  an attempt by the insurer to coerce or obtain an involuntary contribution from the insured in order to settle within the policy limits,

8.  failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits,

9.  disregarding the advice or recommendations of an adjuster or attorney,

10.  serious and recurrent negligence by the insurer,

11.  refusal to settle a case within the policy limits following an excessive verdict when the chances of reversal on appeal are slight or doubtful, ... and

12.  failure to take an appeal following a verdict in excess of the policy limits where there are reasonable grounds for such an appeal, especially where trial counsel so recommended.,[13]

The *Commercial Union* Court cautioned that in applying the factors:

> [I]t is inappropriate in reviewing the conduct of the insurer to utilize "20–20 hindsight vision." The conduct under scrutiny must be considered in light of the circumstances existing at the time. A microscopic examination, years after the fact, made with the luxury of actually knowing the outcome of the original proceeding is not appropriate. It must be remembered that if bad faith exists in a given situation, it arose upon the occurrence of the acts in question; bad faith does not arise at some later date as a result of an unsuccessful day in court.[14]

---

[12]  *Id.* at 137.

[13]  *Id.* at 138–39 (footnotes omitted).

[14]  *Id.* at 166.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 57

B.   The TIG excess policy unequivocally required Stryker to receive TIG's written consent for the Uni-Knee settlements notwithstanding that they were within the XL primary layer of coverage.[15]   The U.S. Court of Appeals for the 6th Circuit reviewed TIG's policy consent provisions which were set forth in the ultimate net loss language of the policy.   After reviewing the policy, the 6th Circuit held as follows:

> The [TIG] excess-liability policy covers Stryker's "ultimate net loss," defined in relevant part, as the amount paid "in the settlement or satisfaction of claims" for which the insured's liability is established by "adjudication" or "compromise *with the written consent of [TIG].*"   In determining whether a contract is ambiguous a district court must "give the contract language its ordinary and natural meaning." [citations omitted]  **A reasonable person, with an ordinary understanding of the English language, would know what those italicized words mean: the policy requires TIG's "written consent" for any and all settlements.   Nothing within the four corners of the contract suggests some otherwise hidden meaning.**[16]

(emphasis added).   The 6th Circuit's holding is significant for two reasons.   First, Stryker was a sophisticated insured with its own general counsel heading up a legal department.[17]  Stryker used sophisticated insurance intermediaries to purchase its liability insurance.[18]  That level of sophistication would have allowed Stryker to read its own insurance policy and to come to a reasonable conclusion that consent from TIG was required for all settlements.   It was unreasonable to conclude otherwise.   Second, Stryker was represented at the settlement conference by competent policyholder coverage counsel.   Mr. Cartier, deputy general counsel for Stryker, was a former policyholder coverage lawyer employed at Jenner and Block before he joined Stryker.[19]   Mr. Andrew Portinga and Mr. David Gass

---

[15]   Stryker's general counsel recognized that the potential liability for the 171 knee implant claims had a total value which would well exceed $25 million and would likely implicate the TIG layer.   The claims would not be spread over multiple policy years and therefore would implicate TIG's layer and exhaust the SIR.   Hall Dep., pp. 23-26, 41-43, and 48-50.

[16]   *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 842 F.3d 422, 426 (6th Cir. 2016).

[17]   At or about the time of the settlement conference in January 2009, the general counsel department at Stryker was large.   Mr. Hall, Stryker's general counsel, testified that the legal department at the time of his retirement had 60-70 lawyers and a large staff. Hall Dep. Pp. 8:4-11:4.   One of the primary attorneys in the general counsel's office was assistant deputy general counsel Michael Cartier, who had significant insurance coverage experience.   Pp 32:17-35:6.   Mr. Hall would rely upon Mr. Cartier to assist with insurance coverage interpretation and issues. *Id.*

[18]   Stryker had its own insurance group which was responsible for dealing with insurance intermediaries regarding the purchase of insurance coverage.   Pp. 14:21-17:23.   Additionally, Stryker used Marsh as its insurance broker, which is also a very sophisticated international brokerage.   Pp. 14:21-17:23

[19]   Cartier Dep., 5/31/19, pp. 6:24-8:2.   While at Jenner and Block 25% to 50% of Mr. Cartier's practice involved working as a policyholder's coverage lawyer.   The Jenner and Block law firm is currently ranked as one of the best policyholder insurance practices in the United States.   The Jenner and Block website states the following: "We represent policyholders in coverage disputes with their insurers.   Clients seek our advice and representation in difficult matters requiring thorough knowledge and understanding of insurance law, history,

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 58

were partners in the law firm of Miller Johnson and are co-chairs of the firm's "Insurance Policyholder Counseling and Recovery" group. They too are experienced policyholder coverage lawyers.

Although Mr. Cartier was not asked whether he read the TIG excess policy, as deputy general counsel at Stryker and, given his former background as a policyholder coverage attorney, I am assuming that he read the TIG policy at some point prior to engaging in the settlements of the knee implant cases. According to Mr. Portinga, prior to the settlement conference in January 2009, Stryker was fully aware of the TIG policy provisions involving the definition of "ultimate net loss." Portinga Dep., pp. 20:9-21:3. Assuming Mr. Cartier read the TIG excess policy, and given the holding of the 6th Circuit that the ultimate net loss provision of the TIG excess policy requiring consent for all settlements and not just those settlements within the TIG layer of coverage, Mr. Cartier should have come to that same conclusion, in real time, and requested from TIG its consent for the knee implant settlements. He did not. He ignored the TIG policy requirement of consent, erroneously believing that a request for consent was not "practically" required because the knee settlements were within Stryker's SIR and the XL primary limits. Mr. Cartier had two opportunities to preserve coverage for Stryker under the TIG policy. The first opportunity to preserve coverage was to request consent from TIG before settling the knee implant cases. He failed to do that. The second opportunity to preserve TIG coverage was to recognize that he had made a mistake in not seeking consent from TIG for the knee implant settlements. Mr. Cartier should have recognized that there were two pathways to coverage under the TIG policy with one pathway being lost due to his mistake. The other pathway was to preserve TIG coverage regarding the Pfizer judgment, (which represented an adjudication) which allowed TIG excess coverage through the adjudication portal of the ultimate net loss provision. Mr. Cartier could have accomplished this by giving specific instructions to XL regarding how Stryker wanted the XL policy limits utilized so as to preserve the adjudication pathway to TIG coverage.

Once Stryker proceeded with the settlement of the knee implant cases without the consent of TIG, coverage under the TIG policy was lost at that point absent subsequent waiver or estoppel being established.

From the record it appears that the Miller Johnson firm did not become involved with Stryker regarding the knee implant settlements until after most of the settlements had been finalized and completed. Mr. Gass testified that when the Miller Johnson firm became involved, there were still a few straggler knee implant cases that had not been resolved. Those straggler cases were settled after the Miller Johnson firm became involved without seeking consent from TIG to settle those claims. However, Mr. Gass denied that the Miller Johnson firm was involved in Stryker's decision to not seek consent from TIG with respect

---

custom and practice combined with sophisticated strategic thinking, execution and advocacy. Our lawyers have been leaders in the insurance litigation bar for more than 25 years . . ."

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 59

to the post-2003 settlements. Both Mr. Portinga and Mr. Gass were in a slightly different position regarding the need to secure consent from TIG when they entered the case. At that point most of the knee implant settlements had taken place without consent. If Mr. Portinga and Mr. Gass were to seek TIG's consent for the few straggler cases that were settled on their watch, the fact that they sought TIG consent would cut against any argument that Stryker might make (and did make) that consent was unnecessary because the knee implant settlements were within the XL coverage layer.

Both Mr. Portinga and Mr. Gass were experienced policyholder coverage counsel who were retained to represent Stryker regarding the knee implant litigation from a coverage standpoint. As reasonable policyholder coverage counsel, they familiarized themselves with the XL and TIG policies and were conversant on those policies prior to the settlement conference in January 2009.[20]

The determination of the 6th Circuit is applicable to Mr. Cartier/Strykes, as well as Mr. Portinga and Mr. Gass. They were, at a minimum, reasonable persons with an ordinary understanding of the English language (they were actually highly skilled, sophisticated, well-trained and educated insurance policyholder coverage lawyers). They should have recognized that consent was required under TIG's excess policy for coverage to exist and that Stryker had not sought TIG's consent before settling the knee implant cases. As reasonable policyholder coverage counsel they should have recognized that the only remaining pathway to TIG's coverage was through the "adjudication" language of the ultimate net loss clause. Because of this, they should have taken control at the January 2009 settlement conference by giving specific instructions to XL on how Stryker wanted the settlement to be done. They did not.

It is significant to note that even though the 6th Circuit issued the above-quoted language in 2016, the nature of the Court's determination has equal currency, retroactively, to when Stryker was considering settling the knee implant cases. That is to say Mr. Cartier, Mr. Portinga, and Mr. Gass were no less reasonable persons with ordinary understandings of English language (forgetting for a moment that they were experienced, highly trained and educated policyholder coverage lawyers) prior to the 2009 settlement conference, than they were in 2016 when the 6th Circuit ruled on the consent issue.

Sometimes competent coverage counsel make assumptions that are erroneous by not methodically assessing coverage in a step-by-step manner. In this case, Mr. Cartier made

---

[20]  Mr. Portinga testified that he had read the TIG policy, including the section of the policy involving "ultimate net loss" where the consent to settlement language appeared. Portinga Dep., pp. 19:8-20:8. Mr. Portinga testified that he and his law firm (Miller Johnson) were fully aware of the TIG policy provision involving the definition of "ultimate net loss" prior to January 2009. Portinga Dep., pp. 20:9-21:3. Mr. Gass testified that he also read the policy many times. Gass Dep., pp. 29:9-30:6. He believed it was an accurate statement to say that he knew the TIG policy fairly well and had great familiarity with it. *Id.*

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 60

an erroneous coverage assumption which then had to be followed by both Mr. Portinga and
Mr. Gass regarding consent.

In its September 2, 2014 Response to TIG's Motion for Summary Judgment, Stryker
argued TIG's consent to settle defense should fail for a number of reasons.  The core issue
was TIG's interpretation of the consent to settle provision—specifically, that it applied
regardless of whether the claim implicated only the primary layer or TIG's layer.  Stryker
argued this interpretation ran contrary to the understanding and actions of TIG's own
claims adjusters, and thus contravened the parties' practical interpretation of the TIG policy
under *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 459 (Mich. 2003).[21]  In
its ruling on Stryker's Motion for Summary Judgment, the District Court found the word
"claim" was reasonably susceptible to multiple meanings and was therefore ambiguous.[22]
It therefore construed the policy against TIG and looked to extrinsic evidence of the parties'
intent, notably, under *Klapp*, the practical interpretation given to the TIG policy by the
parties.[23]

---

[21]  Stryker Response to TIG's Motion for Summary Judgment, dated September 2, 2014, ECF No. 527, at p. 4.

[22]  *Stryker Corp. v. XL Ins. Co.*, 57 F. Supp. 3d 823, 831 (W.D. Mich. 2014), rev'd and remanded sub nom.
*Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422 (6th Cir. 2016) ("The Court
concludes that the contract language is contradictory under these unique circumstances. On the one hand, the
policy, as interpreted and applied by TIG's own employees, does not require TIG's consent to settlements
entered into below the TIG layer but, on the other hand, the policy does require consent if those settlements
are offered to TIG for payment. The term "claims," as used in the definition of Ultimate Net Loss, is
ambiguous under the circumstances of this case; it is susceptible to more than one interpretation. Because a
latent ambiguity exists, the Court must examine the extrinsic evidence to ascertain the intent of the parties
under the circumstances presented.")

[23]  *Id.*  At no time prior to the consummation of the XL/Pfizer settlement agreement did Stryker seek TIG's
consent for any of the knee implant settlements contained within the Stryker I judgment. Mr. Cartier/Stryker,
as well as Mr. Portinga and Mr. Gass had blatantly assumed that the TIG policy did not require consent for
settlements within the XL layer.  In coming to that questionable conclusion, neither Mr. Cartier, Mr. Portinga,
or Mr. Gass had received the testimony from TIG adjusters and underwriters as support, in real time, for the
failure to secure consent.  The after-acquired testimony of TIG adjusters and underwriters that Stryker
referenced in its briefing and used to support an escape for Stryker's failure to consent was set forth in
Stryker's various motion practice:

> With their company in disarray, TIG's claims adjusters paid little attention to the Uni-Knee
> claims. For each new claim, TIG's claims examiners perfunctorily opened and closed a file
> on the very same day. (Ex. O; Ex. K, Lameka 58:3-20). One of TIG's claims adjusters
> testified that she filled out intake forms during commercials while watching TV at home.
> (Ex. K, Lameka 25:16-26:4). The handwriting on several of the intake forms is exactly the
> same for large portions of the form, suggesting that TIG's claims adjusters completed the
> bulk of the form once, and then photocopied it for later claims. (Compare Ex. O, pg. 22
> through 33).

> Without any investigation, the claims examiners concluded that the claims would not reach
> TIG's coverage layer. (Ex. K, Lameka 64:7-17, 106:5-107:3). TIG therefore closed its files.
> TIG did not assign an adjuster to the claims and did not diary any "follow up." (Ex. K,

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 61

Lameka 88:22-89:6; Ex. L, Couch 58:3-5). When it closed a file, TIG sent a form letter requesting that Stryker update TIG on "pertinent developments that may implicate" TIG's policy. (See e.g. Ex. P). TIG's witnesses testified that TIG's policy is implicated only when TIG had to pay money. (Ex. K, Lameka 69:18-70:23; Ex. J, Mulkey 40:21-41:4; Ex. L, Couch 61:5-23).

TIG did not investigate the Uni-Knee claims, and it did not investigate the underlying policy, either. Even though TIG's policy incorporated the XL policy by reference, TIG's claims examiners did not bother to obtain or review the XL policy before closing the Uni-Knee files. (Ex. K, Lameka 120:15-121 :l)("Where would we get that?"); (Ex. L, Couch 47:22-25; Ex. J, Mulkey 16:5-14). Because they did not review the XL policy, TIG's claims examiners were unaware of the "batch" provisions in the XL policy. None of TIG's claims examiners had any experience with "batch" coverage. (Ex. K, Lameka 52:2-4; Ex. J, Mulkey 27:7-8; Ex. I, Ribble 59:25-60:10,60:17-20; Ex. N, Slavin 58:7-18; Ex. L, Couch, 46:19-25). Even though Stryker had clearly informed TIG that it had declared a "batch" under the XL policy, TIG's claims examiners erroneously treated each Uni-Knee claim as a separate "occurrence" under its policy. (Ex. K, Lameka 84:1-8).

Stryker's Motion for Summary Judgment, ECF No. 498, filed 7/31/14, at p. 4-5.

The word "claims" in the definition of "Ultimate Net Loss" is ambiguous. TIG argues that Stryker was required to obtain TIG's consent to the settlement of any claim—even those claims that were settled below TIG's policy layer. But that is not the only reasonable construction of "claims." Because TIG's policy only "appl[ies] in excess of the UNDERLYING INSURANCE limits," (Doc. #498-2 at PageID #7578), the policy also can be reasonably read to require TIG's consent only to the settlement of claims that are within TIG's policy layer.

That is how TIG's own underwriters and claims adjusters interpreted the policy. As discussed in Stryker's summary judgment brief, every one of TIG's claims adjusters and TIG's underwriter agreed that Stryker was not required to obtain TIG's consent to the settlements of claims that, when made, were beneath TIG's policy layer. (Doc. #498, Page ID #7502). That is, the word "claims" in the definition of "Ultimate Net Loss" means claims within TIG's policy layer, not claims within the lower layers. (Ex. A, Mulkey 122:8-19; Ex. B, Geller 105:16-106:14; Ex. C, Huddleston 85:13-86:17).

The testimony of TIG's witnesses is consistent with TIG's actions. When TIG acted as the primary carrier, TIG's claims adjusters did not seek the consent of any excess carrier when settling a case within the primary limits. (Ex. D, Lameka 132:15-23; Ex. E, Slavin 142:6-143:1). This further shows that TIG did not believe that a primary carrier needs the consent of an excess carrier in order to settle a claim within the primary limits, even when the total claims might later reach the excess layer. And in this case, after TIG received notice of each Uni-Knee claim, TIG opened and closed a file for the claim on the very same day, deciding that the claim would not reach TIG's policy layer. (See Assignment Sheets, Doc. #499-3). TIG's decision to close its files shows that TIG had no interest whatsoever in settlements that, when made, were within the underlying layer.

Stryker's Response to TIG's Motion for Summary Judgment, ECF No. 527, filed 9/2/14, at p. 7–8.

Stryker contends that the term "claims" in the consent provision should be construed to apply only to claims within TIG's policy layer, and not to claims within the underlying insurer's policy layer. Former TIG claims adjusters who worked on the Stryker claims uniformly testified that TIG did not require its consent for settlements of claims that were within the underlying layer of insurance because TIG had no interest in claims that did not

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 62

In *Klapp*, the Michigan Supreme Court ruled that <u>where contracts are ambiguous</u>, the <u>practical</u> interpretation of the policy by the parties may be considered:

> [T]he jury is to consider relevant extrinsic evidence when interpreting a contract whose language is ambiguous. How the drafting party has interpreted ambiguous contractual language in the past is certainly relevant in determining what the parties intended such language to mean. The meaning of a provision in a contract whose language is ambiguous "must be ascertained in the light of all of the relevant circumstances, ... including, ... the meanings accepted by the parties. There is no doubt that evidence of practical interpretation by the parties is admissible as an aid in the determination of the meaning to be given legal effect.[24] Where parties by such a uniform course of conduct for a long time have given a contract a particular construction, that construction will be adopted by the courts.

(emphasis added).  The Sixth Circuit Court of Appeals, however, reversed the District Court's decision and ruled the TIG policy was not ambiguous: "[a] reasonable person, with an ordinary understanding of the English language, would know what those italicized

---

reach its policy layer. They testified that TIG did not have an interest in any settlements that were within either the Stryker's self-insured retention or the XL layer of insurance. (Mulkey Dep. 47, 92, 115, 128-29; Lameka Dep. 65-66; Slavin Dep. 110; Couch Dep. 62.) The only time TIG would want to be involved in settlements was if they involved amounts that TIG might be called upon to pay, i.e., settlements that would be in TIG's layer of coverage. (Lameka Dep. 66.) Claims adjuster Lameka testified that the consent provision means the insured needs TIG's consent for settlements where TIG would have to pay. (*Id.* at 140.) TIG never requested that it be allowed to consent to settlements that, when made, did not require any payment by TIG. (*Id.* at 139.) Claims adjuster Geller testified that "Stryker was free to settle the lawsuits when XL denied coverage, as long as it did not impact the TIG policy." (Geller Dep. 55.) Claims adjuster Slavin agreed that "as long as Stryker was settling those claims within the 15 million [dollar] XL limits, TIG would not be concerned about those settlements." (Slavin Dep. 110.) As long as Stryker was not spending TIG's money, it would not need to have any consent or input into those settlements that were within the XL limits. (*Id.*)

Stryker's insurance expert's testimony was consistent with that of the TIG employees. He testified that he never encountered a circumstance where an excess carrier required consent to settlements of claims which, when made, fell entirely within the underlying carrier's layer of coverage. (Cormack Dep. 54.) Even Schultz, TIG's excess underwriter, agreed that "our TIG policy does not state that it has to give its approval" for settlements within layers below the TIG level. (*Id.* at 72.) "If the suit is never presented to TIG for payment, they don't care." (*Id.* at 149.) TIG agrees that a primary carrier does not need the consent of an excess carrier in order to settle a claim within the primary limits, even if the total claims might later reach the excess layer. As Schultz testified, TIG was not interested in the settlements that were "within and paid by" the underlying insurer. (*Id.* at 129.) She testified that "if a claim were being presented to TIG to pay, then TIG has to agree to settlements." (*Id.* at 128.)

Judge Bell's Order Granting Stryker's Motion for Summary Judgment, ECF no. 546, filed 10/30/14, at p. 10-11.

[24]  *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 478, 663 N.W.2d 447, 458–59 (2003) (citing *Davis v. Kramer Bros. Freight Lines, Inc.*, 361 Mich. 371, 375, 105 N.W.2d 29 (1960)).

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 63

words mean: the policy requires TIG's "written consent" for <u>any and all</u> settlements. Nothing within the four corners of the contract suggests some otherwise hidden meaning." *Klapp*, then, was inapplicable given the unambiguous nature of the TIG policy. Therefore, the practical interpretations of the TIG policy by Stryker and its policyholder coverage counsel were irrelevant to the analysis of the meaning of the TIG policy's consent to settle provision.[25]

A fundamental core principle of insurance policy interpretation is that where an insurance policy's terms are clear, courts will not change or rewrite the language of the policy even though enforcement of the policy may have a harsh result or the court may question the wisdom of the purchase of the policy. Another core principle of insurance policy

---

[25]   It is curious that Stryker, in answering contention interrogatory number 6, is critical of XL as follows:

> XL's conduct in paying claims of this magnitude out of chronological order is almost unprecedented, and is at the very least, highly unusual. Nevertheless, XL appears to have made its decision based on an <u>assumption</u> that there was a 100% certainty that TIG would be required to pay the first-in-time obligations.

Certainly, Stryker's deputy general counsel, and both Mr. Portinga and Mr. Gass, did not have 100% certainly when they concluded that Stryker was not required to request consent from TIG for the settlements within the XL primary layer. Once again, it appears that the contention allegations of Stryker and Stryker's policyholder coverage counsel's are their own indictment for their failing in not recognizing that the TIG policy was clear on its face in requiring consent for settlements with XL's primary layer, that the policy was not ambiguous, and therefore the *Klapp* case would not permit parol evidence to alter the plain requirements of the policy. Given the less than 100% certainty of Stryker's "assumption" that consent was not required, those attorneys should have formulated a specific strategy prior to the January 2009 settlement conference with accompanying instructions to XL to carry out that strategy.

In the contention interrogatory responses of Stryker, Stryker faults XL for relying upon Judge Bell's district court order finding that TIG would be liable for Stryker's liabilities that fell outside the scope of XL's coverage. Stryker alleges the following:

> "Instead, XL seems to have relied wholly upon the District Court Order that held that TIG would be liable for any of Stryker's liabilities that fell outside the scope of XL's coverage. As XL knew, however, that Order was appealable. XL also knew that, even before the settlement conference, TIG was vigorously contesting coverage and argued that it would not pay Stryker anything. Thus, TIG knew that there was risk that TIG could evade coverage, and TIG knowingly exposed Stryker to that risk.

Stryker and its attorneys indict themselves. There was clearly uncertainty, at a minimum, as to whether Stryker was required to acquire TIG's consent before settling the knee implant cases. Certainly, Stryker knew of the same TIG position on coverage that it asserts XL knew of. Despite that knowledge and uncertainty, Stryker and its coverage attorneys did nothing to formulate a strategy for the January 2009 settlement conference, part of which would have involved specific instructions to XL on how to proceed with settlement consistent with that strategy. Certainly, Stryker and its attorneys had the same information regarding the statements made by TIG's coverage counsel regarding no coverage and that Judge Bell's Order was appealable. While I disagree that those factors required a different approach to the January 2009 settlement conference than was actually taken by XL, those contention allegations do indict the pre settlement conduct of Stryker and its coverage counsel. It's like looking into a mirror and the reflection points back to the person looking into the mirror.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 64

interpretation is that the intent of the parties to the policy is derived from the policy language and the policy language will prevail in any coverage dispute where the policy language is clear. I would be surprised if Mr. Cartier, Mr. Portinga, and Mr. Gass would quibble with those fundamental principles. In this case, the 6th Circuit read the TIG policy and found that it was clear in its requirement that consent was required for all settlements, not just those settlements which were into TIG's coverage layer. Simply put, 1+1+1=3. 1 (fair read of the policy) +1 (policy, objectively, plainly and clearly required TIG consent (6th Cir.)) +1 (TIG was not asked to consent) = 3 (obvious coverage problem). Thus, 1+1+1 should have equaled a conclusion that there was a fundamental problem with securing coverage from the TIG excess policy because one of the pathways to coverage (consent) was no longer viable. Mr. Portinga and Mr. Gass needed to ask Stryker if it had secured consent. As to the straggler claims that were settled after 2003 with the participation of Mr. Portinga and Mr. Gass, Mr. Portinga and Mr. Gass would have known that no consent was secured from TIG as to those post-2003 settlements. Armed with the knowledge of the problem, Stryker and its policyholder coverage counsel should have formulated a strategy to move forward at the January 2009 settlement conference which would maximize the opportunity of recovery from the TIG excess policy.

Stryker had competent coverage counsel attending the settlement conference in January 2009. Stryker's deputy general counsel was also a former policyholder coverage counsel in addition to outside policyholder coverage counsel, Mr. Portinga and Mr. Gass.

The role of coverage counsel representing the policyholder in a case like this was to independently review and analyze Stryker's coverage position vis-à-vis XL and TIG. Coverage counsel needed to develop a mediation strategy to optimize the opportunity for insurance recovery from both XL and TIG. Indeed, that is exactly what policyholder coverage counsel does as their specialty practice. Any reasonable policyholder coverage counsel would have reviewed the XL and TIG policies prior to the settlement conference in order to identify possible arguments that the insurance companies might make to avoid paying under those policies. Stryker knew that TIG was looking for a way out of coverage.[26] Once those potential coverage arguments were identified, policyholder

---

[26] Once again, Stryker and its policyholder coverage counsel indict their own conduct when they state in their responses to contention interrogatory number 6 that "XL failed to reasonably investigate the implications of the agreement in principle into which it entered with Pfizer." That agreement in principle was to settle the Pfizer claim and judgment through the payment of XL's policy limits. As policyholder coverage counsel, Mr. Cartier, Mr. Portinga, and Mr. Gass should have anticipated as one possible scenario that would unfold at the settlement conference, the satisfaction of the Pfizer judgment and what the ramifications of that settlement would be. It is Stryker, as well as its policyholder coverage counsel, that should have reasonably investigated the various permutations of settlement to prepare themselves for the settlement conference and to prepare themselves to direct XL to achieve a settlement which maximized Stryker's coverage. This was not a complicated determination. As indicated above, 1+1+1=3, which meant there was a serious coverage problem caused by Stryker's failure to get TIG's consent. That meant there was only one remaining pathway to TIG coverage which was by "adjudication". This should have been obvious to Stryker and its policyholder coverage counsel.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 65

coverage counsel should have formulated a plan to respond to those potential coverage impediments that might be raised by the insurance companies. As the 6th Circuit Court of Appeals made resoundingly clear, any reasonable insured reading the TIG excess policy would come away with an understanding that consent was required for all settlements in order to preserve TIG's excess coverage. Mr. Cartier, Mr. Portinga, and Mr. Gass would have known from a basic reading of the ultimate net loss clause that there were two pathways to recovery under the TIG excess policy. One pathway required consent. Consent had not been secured.[27] It is not the same for XL because XL did not have any actual knowledge that Stryker had blown its coverage with TIG regarding the Stryker I judgment. It was reasonable for XL to assume that Stryker was policy-compliant with the TIG excess policy requirements when the settlement was reached.

Honestly, I stand in amazement at the arguments that are currently being put forth by Stryker's independent policyholder coverage counsel. As Mr. Portinga and Mr. Gass set forth the various arguments and allegations against XL in Stryker's contention interrogatories, they are demonstrating that they knew or should have known about the TIG coverage problem created by their client in settling the knee implant cases without securing the consent of TIG first. Certainly, these capable policyholder coverage counsel

---

Additionally, Stryker and its policyholder coverage counsel indict their own conduct when they allege "TIG was vigorously contesting coverage and argued that it would not pay Stryker anything. Thus, TIG [sic] knew that there was risk that TIG [sic] could evade coverage and TIG [sic] knowingly exposed Stryker to that risk." Obviously, the contention is referring to XL and not TIG. Stryker and its policyholder coverage counsel were well aware of TIG's general no coverage assertions, which should have led them to be cautious in carefully orchestrating the settlement process by giving specific instructions to XL. Stryker and its policyholder coverage counsel suggest that XL should have been on guard because Judge Bell's Order finding TIG had coverage was appealable. Even more so, Stryker and its policyholder coverage counsel should have been on guard of that possibility and therefore needed to take control of the settlement process by specifically directing XL in how to proceed forward. Instead, Stryker and its policyholder coverage counsel did nothing but demand that XL settle with Pfizer without further nuance, restriction, or condition. What Stryker communicated to XL was that it wanted the Pfizer claim and judgment resolved and the carriers needed to figure out how to do that by themselves. When it became obvious to all, including Stryker, that TIG was not going to participate and left the settlement conference, Stryker did nothing to alter or modify its instruction to XL.

[27]   At the time that the January 2009 settlement conference was convened, Judge Bell had entered his August 29, 2008 ruling granting Stryker's Motion for Summary Judgment, finding coverage under both the XL and TIG policies. Because this was a district court opinion, it was subject to reversal on appeal to the 6th Circuit. Because of that vulnerability, competent policyholder coverage counsel would reasonably bolster the policyholder's position at the settlement conference by preparing to overcome with additional argument the insurance company's claim that the district court finding would be overturned on appeal. Therefore, competent policyholder coverage counsel would recognize that any settlement had to overcome the consent failure defect by preserving the adjudication pathway during the settlement negotiations. That is to say, Stryker (Cartier, Portinga, and Gass) should have formulated a settlement strategy which specifically instructed XL to first pay the Stryker I judgment in order to preserve the TIG excess coverage. It is likely that the offer of a partial settlement of the Stryker I judgment by XL's payment of covered benefits would have been acceptable to XL. Mr. Daly testified that XL had come to the conclusion that its policy limits were going to be exhausted no matter what.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 66

demonstrate that they could have thought about all of the potential issues that they now accuse XL of failing to execute on prior to their attendance at the settlement conference in 2009.   EVERY CONCERN that is identified and discussed in Stryker's contention interrogatories are matters and issues that Stryker and its policyholder coverage counsel should have anticipated going into the January 2009 settlement conference because those same lawyers knew that consent had not been secured.

It is unusual for capable, independent policyholder coverage counsel to remain disconnected from the settlement conference activity like these lawyers were.   Had policyholder counsel been more engaged, they could have provided specific guidance to XL as to what Stryker wanted to accomplish and how Stryker wanted to accomplish it. Their carefully worded contention interrogatories are their own indictment.   As will be discussed below in greater depth, XL was not aware that Stryker failed to meet its basic policy obligation to TIG by not seeking consent.   It appears that Stryker and its deputy general counsel, who was himself a policyholder coverage counsel, made a fundamental mistake in not reading correctly the TIG ultimate net loss clause of the policy.   After making that fundamental mistake, which eliminated one coverage pathway to the TIG excess policy, Stryker and its independent outside policyholder coverage counsel (Mr. Portinga and Mr. Gass) now seek to cure their own failings by arguing that XL should have done what Stryker failed to do on its own.

Stryker has responded to XL's contention interrogatories dated August 26, 2019.  I have set forth below a few observations (in addition to those observations already discussed) regarding those contention interrogatory responses.  It is not my intention to respond to all of the contention interrogatories and therefore if I do not have a specific response, it is not to be interpreted in a manner to suggest that I adopt or agree with the contentions being alleged.  Additionally, I have not responded to the contentions in any particular order of importance.

(a)     In responding to contention interrogatory number 7, Stryker asserts that "XL froze Stryker out of the substantive negotiations that occurred between XL and other parties at the settlement conference."   Stryker complains that "XL did not substantively communicate with Stryker at all on January 14, 2009, other than to state at the end of the day that it had reached an agreement in principle with Pfizer." Stryker also acknowledges that it "attended the settlement conference on that date and was willing and able to participate in any negotiations and communications between the parties, but XL declined to allow Stryker to participate in any substantive communications between XL and Pfizer."   These statements need to be unbundled.

First, the record demonstrates that Stryker abdicated any significant participatory role in the settlement discussions with Pfizer.   The testimony of Mr. Bloss, Mr. Daly, Mr. Betz, Mr. Portinga, and Mr. Gass all support the fact that Mr. Cartier

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 67

told XL that he expected XL and TIG to figure out how they were going to resolve the cases. Mr. Cartier had made it clear that Stryker was not going to compromise its demand in excess of $70 million. It was reasonable for XL to conclude that Stryker was directing XL to reach a settlement with Pfizer. Early in the settlement conference, TIG's counsel advised that TIG did not have coverage and left. At that point, Mr. Cartier, Mr. Portinga, and Mr. Gass knew, or should have known, that the only participating insurer in trying to bring about a Pfizer settlement was XL. At a minimum, Stryker should have modified its instructions to XL once TIG left if Stryker had any concern regarding XL's sole participation in attempting to settle the Pfizer claim with XL's policy limits.

There was a profound lack of activity on the part of Stryker's deputy general counsel and his independent policyholder coverage counsel, Mr. Portinga and Mr. Gass, during the settlement conference. The record is clear that those attorneys never engaged in any discussions with any of the other attorneys representing other parties during the course of the mediation unless those other parties went into Stryker's caucus room. Given the fact that the three policyholder coverage lawyers for Stryker knew that consent had not been secured from TIG, it was unreasonable for those same lawyers to abdicate the settlement process through Stryker's instruction to XL to work out a settlement of Pfizer on its own. Stryker's attorneys made no effort to initiate any substantive discussions with the representatives of XL or TIG prior to the settlement in principle being reached between XL and Pfizer. Stryker's counsel have admitted that they made no attempt to seek out Judge Scoville regarding what was taking place as the settlement conference progressed, nor did Stryker's attorneys raise an objection with Judge Scoville as to what was taking place. Contrary to this disconnected lack of participation, it is common for coverage counsel to monitor negotiations at mediations/settlement conferences so as to provide competent advice to coverage counsel's client or clients. When you are a policyholder coverage counsel who knows that there are coverage problems, it is common practice to remain actively engaged in what is taking place at the mediation and/or settlement conference. In that regard, the only freeze-out was the conscious decision of Stryker's representatives to not become actively involved in the settlement conference beyond instructing XL to work out a settlement on its own with Pfizer. Thus, when Stryker alleges that it was "willing and able to participate" in any negotiations at the settlement conference, that statement is only half correct based on this record. Certainly, Stryker's representatives were "able to participate" in the negotiations but they were not "willing" to negotiate based upon the testimony received on this record.

Stryker is critical of XL for not "substantively communicate[ing] with Stryker at all on January 14, 2009 . . ." However, the record indicates that Mr. Cartier gave instructions to XL which could reasonably be interpreted as giving XL discretion to do what was necessary to settle the Pfizer claim and judgment. Certainly, both

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 68

Mr. Portinga and Mr. Gass should have stepped in and clarified what Mr. Cartier instructed XL to do if Stryker did not intend to give XL discretion to proceed as it believed reasonable without further instruction or restriction from Stryker. No such clarification was made. In light of Mr. Cartier's instruction giving XL discretion to resolve the Pfizer claim and judgment, it was not necessary for XL to provide Stryker with a blow-by-blow account of what was taking place on January 14, 2009. Certainly, if Stryker believed it needed that type of accounting, its attorneys would have known that all they had to do was ask.

(b)    In response to contention interrogatory number 6, Mr. Portinga and Mr. Gass state the following:

> XL failed to reasonably investigate the implications of the agreement in principle into which it entered with Pfizer. None of XL's agents or representatives spoke with either Stryker or TIG to determine the Pfizer settlement's potential implications upon Stryker's excess coverage.

This answer was verified by Mr. Cartier. It is a resounding indictment of the prior conduct of Stryker's deputy general counsel and its independent policyholder coverage counsel. As experienced policyholder coverage counsel, Mr. Cartier, Mr. Portinga, and Mr. Gass should have reasonably investigated the implications of Stryker's failure to get TIG's consent to the knee implant settlements. The 6th Circuit Court of Appeals held that any reasonable person with an ordinary understanding of the English language would have understood TIG's consent requirement to mean that it applied to any and all settlements, even those settlements within XL's layer of coverage. Mr. Portinga and Mr. Gass have testified that when they became involved in these cases, they read the TIG policy and were familiar with it. Certainly, Mr. Portinga and Mr. Gass's training and experience as policyholder coverage counsel meant that they knew or should have known that there was a coverage defect in Stryker's ability to satisfy its own claims of reimbursement as well as the Pfizer judgment because the pathways to TIG excess coverage had been narrowed by 50%, i.e., one of the two pathways to TIG's excess coverage, consent, had been lost. The partial answer to the contention interrogatory quoted above suggests that if XL had spoken with Stryker to determine the Pfizer settlement's potential implications on Stryker's excess coverage, that they would have learned about this problem. If that is true as suggested by the contention interrogatory answer, then why didn't Mr. Cartier, Mr. Portinga, and/or Mr. Gass explain that situation to XL prior to the January 2009 settlement conference. There would be no reason to withhold that information and, in my opinion, those attorneys and Stryker were required to give specific instruction to XL regarding how Stryker and its attorneys wanted XL to proceed specifically. That did not occur. Instead, Stryker and its attorneys gave unrestricted discretion to XL to resolve the claim and judgment with Pfizer.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 69

(c)     Stryker contends that "XL's conduct in paying claims of this magnitude out of chronological order is almost unprecedented, and is, at the very least, highly unusual." I do not agree with that observation. Only a few jurisdictions require a specific settlement sequence by regulation, statute, or case law. Absent such controlling state-specific law or regulation, it is well within industry norm, standard, and practice for insurance companies to settle one or more claims in a multiple-claim situation as may be reasonable under the circumstances presented. It was reasonable in this case for XL to look to its insured for guidance on how the insured wanted to sequence settlement. The record demonstrates that XL was advised by its insured to settle first with Pfizer.

It would also be reasonable to look at the nature of the claim presented in making an independent determination of which claim or claims should be resolved. Once again, the record is clear. The Pfizer judgment presented an active exposure to Stryker that was growing at the rate of 9% interest. Both Mr. Cartier and Mr. Portinga believed the Pfizer settlement was a good thing. Cartier Dep., pp. 105:20-106:10; Portinga Dep., pp. 74:2-75:2. Mr. Cartier testified that the removal of the Pfizer judgment removed a serious matter from Stryker's concern. *Id.* The payments made to settle the knee implant cases resolved those exposures and had already been paid by Stryker. It is within industry norm, standard, and practice to look at the nature of the exposure as one factor in determining to settle a claim. On this record it was reasonable for XL to focus on the settlement of the Pfizer judgment because it was an active, unpaid growing exposure to Stryker. A claim for reimbursement could be perceived as a secondary obligation which had become fixed and had already been internalized in Stryker's accounting. Moreover, Stryker's general counsel instructed XL to settle the Pfizer claim and judgment.

Under the circumstances presented, it was not unusual for XL to resolve the Pfizer claim and judgment first. That decision was directed by Stryker and independently represented the resolution of an ongoing active and growing liability which had not yet been funded.

## VIII.   SUMMARY OF OPINIONS

In rendering my opinions below, it is not my intent to offer legal opinions. Questions of law are to be decided by the trial court and not experts. However, in assessing the insurance company's conduct, questions can arise regarding the insurance company's interpretation and belief regarding whether the governing law was reasonable under the circumstances. In the latter type of situation, the focus is not on what the law is, in fact, but on how the insurance company perceived the law to be. With that focus in mind, the interpretation of the law becomes part of the factual context in which the insurance company's conduct is assessed. In that context, the question is not what the law is that governs a particular case, but what the insurance company interpreted

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 70

the law to be and how that interpretation informed the insurance company's decisions and conduct regarding the claim.

### A.   XL ACTED REASONABLY WHEN IT SETTLED THE PFIZER CLAIM AND JUDGMENT ON BEHALF OF STRYKER.

Under Michigan law, bad faith requires "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed the duty." Courts in Michigan have recognized that honest errors of judgment are not sufficient to establish bad faith. Furthermore, claims of bad faith cannot be based on negligence or bad judgment. As indicated throughout this report, generally, and specifically referenced below, XL acted reasonably in its conduct toward Stryker and therefore XL's conduct did not EVER rise to the level of being negligent, let alone to the level of Michigan's bad faith standard.

I.   **Based upon the record, case facts and testimony herein, it is my opinion that XL acted reasonably and well within insurance industry norms, standards, and practices regarding the Pfizer settlement.**

(a)   After Judge Bell ruled that there was coverage under the XL and TIG policies, it was reasonable for XL to reach a decision not to further litigate the coverage ruling and to proceed with settling the pending claims through payment of XL's policy limits.

(b)   It was reasonable for XL to follow the instructions of its policyholder in attempting to first reach a settlement with Pfizer and to bring the Pfizer claim and judgment to a complete resolution.

(c)   After learning that Pfizer would not negotiate a settlement below XL's policy limits, it was reasonable for XL to pay its policy limits to bring about a complete resolution of the Pfizer claims against Stryker.

(d)   XL had no obligation to act as coverage counsel for Stryker in assessing potential coverage defenses TIG might raise and Stryker's responses to those defenses. There is no legal obligation to assume that role and industry norms, standards, and practices are to not assume that type of role. It was not the legal or practical obligation of XL to independently assess coverage defenses that might be raised by TIG in any stage of the proceedings herein. XL was not legally or practically required to assume the role of Stryker's policyholder coverage counsel in creating strategies to maximize Stryker's opportunity to resolve the Pfizer judgment, as well as secure complete reimbursement for the Stryker I judgment. At no time did Pfizer's retained policyholder coverage counsel share with

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 71

XL their coverage analysis and assessment of TIG's potential coverage defenses that were outside of the coverage defenses already raised by XL emanating from XL's primary policy and relevant to TIG as a follow form policy.

(e)     It was reasonable for XL to believe that Stryker was represented by competent policyholder coverage counsel who were capable of advising Stryker regarding its coverages with TIG and any coverage problems with TIG. It was reasonable for XL to assume that Stryker and its policyholder coverage counsel had made sure that Stryker was compliant with all terms and conditions of its TIG excess coverage. At no time did Stryker or its attorneys alert XL to a consent defect to coverage regarding the TIG excess policy.

(f)     It was reasonable for XL to believe that the Pfizer settlement was in the best interest of Stryker because it was an unfunded and unresolved liability that was growing at the rate of 9% interest.

(g)     It was reasonable for XL to pay money to preserve Stryker's counterclaim while settling with Pfizer.

(h)     It was reasonable for Stryker and XL to come to a conclusion that TIG had waived its consent defect defense after TIG alerted the parties to its consent defect defense.

(i)     It was reasonable for XL to assist its policyholder in its effort to secure coverage under the TIG policy after TIG raised the consent defect as a coverage defense.

(j)     In this matter Stryker has identified in its responses to XL's contention interrogatories the various things that Stryker beieves XL failed to do. A fair reading of the contention interrogatory responses only indicts Stryker and its policyholder coverage counsel. The items identified by Stryker in its contention interrogatory responses are items that should have been identified by Stryker and its policyholder coverage counsel prior to their attendance at the January 2009 settlement conference. Unlike XL, Stryker and its policyholder coverage counsel knew and/or should have known that the XL excess policy required consent for all the knee implant settlements. Unlike XL, Stryker and its policyholder coverage counsel knew or should have known that there was a consent defect which would bar coverage under the TIG excess policy unless waiver or estoppel applied. The insurance policy's implied covenant of good faith and fair dealing required Stryker and its

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 72

policyholder coverage counsel to notify XL of the consent defect together with instructions to cure that defect by providing XL with specific instructions on how Stryker wanted XL to settle the Stryker I and Pfizer claims.  That obligation was not delegated to XL.

(k)     It was reasonable for XL to interpret Mr. Cartier's instructions to give XL broad discretion, without restriction, on how to achieve a settlement with Pfizer.  It was also reasonable for XL to interpret Mr. Cartier's instruction as specific directions to XL to settle the Pfizer judgment before even discussing settlement of the Stryker I judgment.

## 2.     No Hindsight Rule

This case involves the culmination of 15 years of litigation in District Court for the Western District of Michigan, Southern District of New York, and multiple appeals to the Sixth Circuit Court of Appeals.  It would be easy to review the actions and statements of the parties with the benefit of the hindsight provided by thousands of pages of evidence, briefing, and judicial decisions.  However, for purposes of determining bad faith, the case must be rewound to January of 2009 in order to examine, as the District Court has framed it, the weight of "all the available evidence and circumstances surrounding XL's decision to determine whether XL acted in bad faith."[28]  It is important not to conflate what was known by XL at the time of the January 2009 settlement conference up through the consummation and execution of the Pfizer settlement agreement in February 2009 with what transpired later in the case when TIG asserted for the first time the additional coverage defense of failure of consent.

Michigan has rejected the hindsight rule in determining insurer conduct.  The Michigan Supreme Court states the following:

> [I]t is inappropriate in reviewing the conduct of the insurer to utilize "20–20 hindsight vision." The conduct under scrutiny must be considered in light of the circumstances existing at the time. A microscopic examination, years after the fact, made with the luxury of actually knowing the outcome of the original proceeding is not appropriate. It must be remembered that if bad faith exists in a given situation, it arose upon the occurrence of the acts in question; bad faith does not arise at some later date as a result of an unsuccessful day in court.[29]

The Court's admonition is appropriate here because the record demonstrates (see below) that neither Stryker nor XL had any reason to believe in January 2009 and thereafter, while the Pfizer settlement agreement was being worked out and then consummated, that TIG would raise a consent defect defense.  Moreover, while Stryker and its attorneys knew that Stryker had violated the TIG

---

[28]     *Stryker Corp. v. XL Ins. Am., Inc.*, No. 1:17-CV-66, 2018 WL 3950899, at *10 (W.D. Mich. Aug. 17, 2018).

[29]     *Commercial Union*, 393 N.W.2d at 166.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 73

policy by failing to get consent for the knee implant settlements, that information was not available to XL at the relevant times herein.

> 3. **At the time of the January 2009 settlement conference, it was reasonable for XL to conclude that TIG owed coverage to Stryker under TIG's excess policy.**

On August 29, 2008, Judge Bell granted Stryker's Motion for Summary Judgment regarding the applicability of the XL and TIG policies to the Pfizer lawsuit.[30]  In so doing, Judge Bell found the following:

> TIG's response concedes that the 2000 TIG Excess Policy follows the form of the 2000 XLIA Policy. TIG joins in XLIA's response to Plaintiffs' motion. As the Court has determined that Plaintiffs are entitled to summary judgment with respect to XLIA and the 2000 TIG Excess Policy follows the form of the 2000 XLIA Policy, it necessarily follows that Plaintiffs are entitled to summary judgment against TIG. ... TIG is obligated under the 2000 TIG Excess Policy to cover any loss in excess of the 2000 XLIA Policy.[31]

Judge Bell's August 29 decision was subsequently amended by a ruling on January 8, 2009—six days before the settlement conference on January 14, 2009.[32]  The January 8, 2009 opinion contains the exact analysis with regard to TIG as set forth above.[33]  Therefore, at the time of the settlement conference on January 12 and 14, 2009, the law of the case was XL's and TIG's policies applied to the Pfizer settlement.[34]

Stryker's settlement conference memorandum recognized this.  It cited Judge Bell's ruling that TIG "is obligated under the 2000 TIG Excess Umbrella Liability Policy to cover any loss in excess of the 2000 XL Insurance America Commercial Umbrella Policy."[35]  In his deposition, Mr. Portinga, Stryker's counsel at the 2009 settlement conference, testified that Stryker was well aware of Judge Bell's rulings which held TIG owed excess coverage to Stryker. Portinga Dep., pp. 23:19–25:1. Mr. Portinga testified that the first ruling, entered on August 29, 2008, held that TIG owed coverage under its excess policy for any amount in excess of XL's layer.  *Id.*

---

[30]   *Stryker Corp. v. Nat'l Union Fire Ins*., No. 1:05-CV-051, 2008 WL 4111271, at *12 (W.D. Mich. Aug. 29, 2008), *opinion amended and superseded sub nom.* Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 1:05-CV-051, 2009 WL 56292 (W.D. Mich. Jan. 8, 2009), *aff'd sub nom. Stryker Corp. v. XL Ins. Am. Inc.*, No. 1:05-CV-51, 2009 WL 3256081 (W.D. Mich. Oct. 7, 2009), *and rev'd*, 681 F.3d 819 (6th Cir. 2012).

[31]   *Id.*

[32]   *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 1:05-CV-051, 2009 WL 56292 (W.D. Mich. Jan. 8, 2009), *aff'd sub nom.* Stryker Corp. v. XL Ins. Am. Inc., No. 1:05-CV-51, 2009 WL 3256081 (W.D. Mich. Oct. 7, 2009), *and rev'd*, 681 F.3d 819 (6th Cir. 2012).

[33]   *Id.* at *12.

[34]   *Id.*

[35]   Stryker Settlement Conference Memorandum, dated January 5, 2009, at p. 4.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 74

Mr. Portinga testified that in the second ruling, entered January 8, 2009, Judge Bell ruled XL and TIG were responsible for the Pfizer judgment, with TIG owing excess coverage upon the exhaustion of XL's limits. *Id.* at p. 25:2-26:2.

Likewise, Stryker's counsel David Gass testified in his deposition that he stood by the following statements in Stryker's briefing: "[b]ecause TIG has no coverage defenses that are unique to its policy, and because it has waived any defenses that it might have had, TIG is liable for the Uni-Knee loss to the extent that the loss exceeds XL's policy limits." Gass Dep., pp. 77:5-15. Mr. Gass admitted the brief also stated "TIG judicially admitted that coverage under its policy turns solely on whether there is coverage under the 2000 XL policy." *Id.* Mr. Gass admitted these statements were true in both 2009 and 2012. *Id.* The foregoing evidence makes clear that XL had a reasonable basis to believe TIG's follow-form policy would be implicated upon exhaustion of the XL policy, as Judge Bell had ruled.[36]

> 4.  **At the time of the January 2009 settlement conference, it was reasonable for XL to assume that Stryker had complied with all policy conditions to preserve coverage under the TIG policy.**

In Stryker's answers to defendant's contention interrogatories, INTERROGATORY NUMBER 6, Stryker makes the following relevant admission: "It is not consistent with industry custom and practice for a primary insurance carrier to provide legal advice about potential coverage under a different insurer's excess policy." I agree with Stryker's admission. In this case, XL had no obligation to evaluate and assess whether coverage was legally available under TIG's excess policy.

It is within industry norms, standards, and customs to expect sophisticated insureds to comply with their coverage obligations with other insurance carriers until and unless it is proven otherwise. In January 2009 through the consummation and execution of the Pfizer settlement agreement, TIG was asserting, generally, that it had no coverage. Both Stryker and XL's interpretation of TIG's assertion involved the "follow-form" nature of TIG's excess policy. As a "follow-form" excess insurer, TIG's coverage was dependent upon the policy conditions, restrictions, and exclusions contained within the XL primary policy. The testimony of Mr. Gass, among others, demonstrates Stryker's understanding and belief that TIG's assertion of no coverage involved those coverage defenses which arose from the XL primary policy to which TIG followed form. Gass Dep., pp. 76:5-78:20 (*see also* Exhibit 118).

---

[36]    Stryker's answers to the contention interrogatories, interrogatory number 6, Stryker states the following:

> XL seems to have relied wholly upon a district court order that held that TIG would be liable for any of Stryker's liabilities that fell outside the scope of XL's coverage. As XL knew, however, that order was appealable.

> Stryker ignores the fact that the adverse coverage determination against XL was also subject to appeal and if that appeal was successful, there would be no XL obligation to indemnify the knee implant settlements.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 75

It was reasonable for XL to assume that Stryker had fulfilled all of the relevant policy conditions to secure coverage under the TIG excess policy. Absent specific knowledge to the contrary, it is within industry norms, standards, and customs to assume that the insured has complied with all relevant conditions to secure coverage for the policies under which coverage is sought. What XL did not know was that Stryker had not sought TIG's consent prior to the knee implant settlements. There is no indication on this record (and it has not been alleged by Stryker) that Stryker advised XL that Stryker had failed to secure the required consent to trigger TIG's excess coverage. Because of this, XL was acting reasonably in assuming that any coverage defense mounted by TIG would involve the same policy defenses that XL was raising in the litigation under its own policy. This is supported by the testimony of Mr. Gass, among others. The testimony of the Stryker witnesses establishes that it was not until long after the Pfizer settlement had been consummated and executed that TIG raised, for the first time, the failure of consent defense to coverage.[37] The 6th Circuit recognized TIG did not raise the consent to settle defense until approximately October 2013 in response to Stryker's Supplemental Complaint.[38]

Stryker and its policyholder coverage counsel knew or should have known that the TIG excess policy required consent for settlements within XL's primary layer. The 6th Circuit's ruling made that absolutely clear. Thus, Stryker and its policyholder coverage counsel knew or should have known that there was a coverage defect in securing coverage under the TIG policy prior to the settlement conference being convened in January 2009. Nevertheless, Stryker is apparently taking the position that Stryker and its policyholder coverage counsel had no way of knowing that a consent defense was going to be raised by TIG, but XL should have an anticipated that to happen even though XL had no knowledge of the consent defect.[39]

---

[37]   *See, e.g.,* Dep. Michael Cartier, May 31, 2019, pp. 24:12-23 : ("At no time prior to the January 2009 settlement conference did TIG inform Stryker that TIG would not cover Stryker's settlements because TIG had not consented to the settlements."); Andrew Portinga Dep., July 17, 2019, pp. 33:9-36:3 (referencing Stryker's reply brief submitted to the court on October 2, 2012 (Exhibit 117) which Mr. Portinga was the primary author on. Mr. Portinga represented to the court the following: "Now, on remand, TIG argues <u>for the first time</u> that it's not liable for Stryker's Uni-Knee settlements because TIG never consented to those settlements.") (emphasis added). It was the testimony of Mr. Portinga that the first time he could recall TIG specifically raising the issue of consent was after the remand in the summer of 2012. Portinga Dep., pp. 36:4-37:12. Mr. Portinga recalled a conversation with Carlos Del Carpio in August 2012 where Mr. Portinga inquired of Mr. Del Carpio whether TIG was going to pay under its policy to which Mr. Del Carpio responded that TIG was taking the position that it had not consented to the knee implant settlements. Portinga Dep., pp. 36:4-37:12.

[38]   *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 842 F.3d 422, 425 (6th Cir. 2016).

[39]   The testimony of both Mr. Portinga and Mr. Gass demonstrates that neither Stryker nor Mr. Portinga and Mr. Gass foresaw that a consent defense was going to be raised by TIG. Certainly, if Stryker and its policyholder coverage lawyers could not foresee that a specific consent defense was going to be raised with full knowledge that there was a basis to raise a consent defense, how could they expect XL to foresee a consent defense being raised without any knowledge of the fundamental predicate fact that Stryker just decided to not request consent based upon an erroneous assumption of law that was wrong.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 76

> **5.    XL had no knowledge or notice in January and February 2009 that Stryker had already breached the TIG excess policy by failing to secure TIG's consent for the knee implant settlements.**

Because XL was unaware of the consent defect, there was no reason for XL to suspect that TIG might possibly raise coverage defenses outside the scope of XL's primary policy which TIG followed-form to.  The XL policy had no consent requirement.  The Sixth Circuit in its 2016 decision recognized TIG did not raise the consent to settle defense until approximately October of 2013 in response to Stryker's supplemental complaint against TIG which sought to recover under TIG's policy.  At no time before October 2013 did TIG raise the consent to settle defense, which was "unique to its policy," arguing the Uni-Knee claims did not constitute "ultimate net loss" because Stryker failed to obtain TIG's written consent at the time the settlement was made.[40]

> **6.    The XL policy's implied covenant of good faith and fair dealing required Stryker to disclose its failure to secure consent under the TIG excess policy.**

Under Michigan law, there generally exists an implied covenant of good faith and fair dealing in all contracts "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[41]  The "neither party" language used by Michigan courts demonstrates that the **covenant** of good faith and fair dealing is a reciprocal obligation under Michigan law.  The reciprocal nature of the obligation of the implied covenant of good faith and fair dealing is almost universal throughout the United States.

As indicated within my report, it is my opinion that Stryker's conduct was not consistent with the policy's implied covenant of good faith and fair dealing vis-à-vis XL.  In order for XL to fulfill its obligation of equal consideration it was important for XL to know whether there were any coverage defenses available to TIG that went beyond the terms of the XL primary policy to which TIG followed form to.  As indicated throughout this report, Stryker and its policyholder coverage counsel knew, or should have known, of the potential for a consent defect challenge to coverage.  Stryker withheld that information from XL.[42]  The withholding of that important information was inconsistent with the implied covenant of good faith.

---

[40]    *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 425 (6th Cir. 2016).

[41]    *Hammond v. United of Oakland, Inc*, 193 Mich.App 146, 151-152, 483 NW2d 652 (1992), quoting *Fortune v. National Cash Register Co.*, 373 Mass 96, 104, 364 N.E.2d 1251 (1977).

[42]    Stryker's inconsistent conduct regarding its obligation of good faith and fair dealing to XL continues into this lawsuit.  One of the arguments asserted by Stryker in support of its claim that XL acted in bad faith is the notion that XL should have done a pay-and-chase with TIG at the time of the settlement conference.  Imagine, Stryker knows that there is a substantial coverage defect which will ultimately preclude TIG coverage that it knows XL is unaware of.  In essence, what Stryker was attempting to do was to demand a pay-and-chase, knowing that XL would be barred from collecting against TIG (aside from the volunteer issue) based upon a coverage defect that Stryker chose not to inform XL of.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 77

> 7.     **XL reasonably followed the instructions of Stryker in pursuing a settlement of the Pfizer claim and judgment.**

Mr. Cartier instructed XL to reach a settlement of the Pfizer claim and judgment before considering resolution of the Stryker reimbursement claim regarding the knee implant settlements that were settled by Stryker.  Stryker was adamant that it was not going to reduce its demand for settlement at the settlement conference.  Mr. Cartier made it clear to the parties that Stryker was not going to compromise their claim.  Cartier Dep., pp. 99:24-101:23.  That meant Mr. Cartier knew that Stryker wanted 100% of what it was entitled to. *Id.* Although he did not tell everybody that Stryker was going to demand 100% of their claim, he did clearly communicate that Stryker was not willing to compromise its position. *Id.* Mr. Cartier testified that Stryker was not going to compromise its claim at the settlement conference. Cartier Dep., pp. 77:21-79:22. The demand to Stryker and TIG was $75 million. Gass Dep., pp. 51:19-53:4. There were no discussions regarding Stryker reducing its $75 million demand. Gass Dep., pp. 59:21-62:2. Mr. Gass did not recall Stryker communicating to Judge Scoville on January 12 that Stryker would take anything less than $75 million. *Id.* In fact, Stryker was still demanding that $75 million throughout the settlement conference. *Id.* Mr. Portinga testified that no one from Stryker indicated in any way to Judge Scoville or any other party (TIG or XL) that it was seeking something less than $75 million for its only demand. Portinga Dep., pp. 120:12-121:13.

According to Mr. Gass, Mr. Cartier made clear Stryker's position that Stryker expected the insurers to settle the claims. Gass Dep., pp. 44:17-45:18. He did not recall Mr. Cartier's precise words. *Id.* Nevertheless, Mr. Gass testified that Stryker made its position clear that it was up to the other parties to figure out how to negotiate the cases. Gas Dep., pp. 47:13-48:6. Additionally, Mr. Cartier expected XL to pay everything if TIG wouldn't participate in the settlement. Gass Dep., pp. 19:21-21:12.

Mr. Portinga testified that Mr. Cartier told Judge Scoville that Stryker wanted the insurers to figure out who was going to pay and what they were going to pay.  Portinga Dep., pp. 49:20-52:3. Mr. Portinga testified that it was always Stryker's position that the court had ruled in favor of coverage and therefore the insurers needed to take care of the judgments and Stryker did not care how they divided it up.  Portinga Dep., pp. 120:12-121:13; pp. 49:20-52:3. Specifically, Michael Cartier testified that he told the insurance companies that they needed to figure it out as to how they would settle the case. Cartier Dep., pp. 82:16-85:16.

The lawyers for XL also recalled that Mr. Cartier instructed XL to first settle the Pfizer claim and judgment. As an example, Mr. David Bloss testified that at one point when Mr. Cartier was asked by Judge Scoville to explain Stryker's position, Mr. Cartier responded in part by gesturing toward the Pfizer people and saying to XL go settle with them and then come back and talk to us and settle with us. Bloss Dep., pp. 47:6-49:7; 85:7-86:25. Mr. Michael Daly recalls that on the first day of the settlement conference when the parties were before Judge Scoville together, Mr. Cartier advised Mr. Daly that he should first resolve the case with Pfizer, which he then did. Daly Dep., pp. 155:16-162:11. What Mr. Daly recalls is that Judge Scoville was escorting Mr.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
September 30, 2019
Page 78

Daly out of the courtroom and that's when Mr. Cartier told him to go and settle with Pfizer. *Id.*
Thus, the record supports XL's reasonable belief that it was advised by Stryker to first focus on
settling the Pfizer claim and judgment before attempting to negotiate a settlement with Stryker.
There was some suggestion that the hope was for a global settlement. However, Stryker came to
know that TIG's counsel left the settlement conference and was no longer participating while XL
continued to negotiate the claim and judgment with Pfizer. Stryker was aware at the settlement
conference that TIG wasn't going to pay anything. Portinga Dep., pp. 22:6-23:18. Stryker did
not, at any time, alter its instructions to XL. Because of this, it was reasonable for XL to proceed
forward in its negotiations with Pfizer as instructed by Stryker, believing it had discretion to model
the settlement.

The conduct of XL in proceeding forward with the negotiations with led to the agreement
in principle with Pfizer was consistent with Stryker's unqualified and simple instruction for XL to
work out a settlement with Pfizer somehow, some way. In that regard, XL acted within industry
norms, standards, and customs.

As indicated throughout this opinion letter, Stryker and its policyholder coverage counsel
had reviewed and were familiar with the TIG excess policy prior to the January 2009 settlement
conference. In fact, Mr. Portinga testified that both Stryker and his law firm (Miller Johnson) were
fully aware of the TIG policy provision involving the definition of "ultimate net loss" prior to
January 2009. Portinga Dep., pp. 20:9-21:3. Mr. Gass testified that he read the policy many times
and was familiar with it. Gass Dep., pp. 29:9-30:6. It is now the law of the case that any reasonable
person who understood English language would have read the consent requirement in the ultimate
net loss definition as pertaining to all settlements, including settlements within the XL primary
layer of coverage. Styrker and its policyholder coverage counsel should have come to that
conclusion when they read and evaluated the TIG excess policy. They also would have known
that the conduct of Mr. Cartier had placed in jeopardy TIG coverage for Stryker's claim for
reimbursement coverage because Stryker intentionally chose not to seek TIG's consent for the
knee implant settlements. These are inescapable core facts. What is also clear is that XL was not
aware of the consent defect. Stryker and its policyholder coverage counsel should have advised
XL of the potential consent defect and then given specific instructions to XL on how to proceed
forward at the settlement conference. Stryker and its policyholder coverage counsel did not do
that. Instead, XL was instructed by Stryker to figure out on its own how to resolve the Pfizer claim
and judgment before discussing settlement of Stryker's reimbursement claims. The instruction
that was given to XL gave XL discretion as to how to resolve the Pfizer settlement.

Mr. Portinga testified that Stryker would not have had any objection to XL's satisfying the
judgment in Pfizer to the extent it did not impair Stryker's coverage. Portinga Dep., pp. 68:4-69:2.
This testimony is significant because, as demonstrated herein, it was the belief of Stryker that there
was no consent issue raised by TIG at that point and the settlement with Pfizer would exhaust the
XL limits, passing the coverage obligation onto the excess layer through TIG. However,
Mr. Cartier in his deposition declared that "[i]f TIG had informed Stryker that TIG would not cover
Stryker's settlements because TIG had not consented to those settlements, then Stryker would have



**CAVANAGH**

STEVEN PLITT
Phone:  (602) 322-4047
Facsimile:  (602) 322-4103

splitt@cavanaghlaw.com
www.cavanaghlaw.com

October 14, 2019

Charles W. Browning, Esq.
Plunkett Cooney
38505 Woodward Ave.
Suite 100
Bloomfield Hills, MI  48304

### REBUTTAL REPORT

Re:   *Stryker Corporation and Howmedica Osteonics Corp. v. XL Insurance America,
Inc., fka Winterthur International America Insurance Company*
USDC, Western District of Michigan, Southern Division
Case No. 1:17-cv-00066-PLM-PJG

Dear Mr. Browning:

I have been provided with expert reports from Mr. Charles Henderson dated September 30,
2019 and Mr. Peter J. Hildebrand dated September 30, 2019.  After reviewing these expert reports
I do hereby reaffirm and incorporate by this reference the opinions and factual discussion set forth
in my expert report dated September 30, 2019.  In rendering my rebuttal opinions, it is not my
intention to offer legal opinions.  In this rebuttal I will not address specific factual inaccuracies in
either expert's report regarding case facts and I will focus my attention only on their opinions.  By
doing so, it is not my intention to agree by silence with either expert's characterization of the case
facts or testimony.

Both Stryker's experts reference the coverage litigation in trying to pull forward what they
believe was improper conduct, irrespective of the statute of limitations, to inseminate the current
case with that alleged bad seed.  The coverage position of XL was fairly debatable and therefore
there is no bad seed to carry forward.  It is improper for Stryker's experts to use this tactic.

### A.   Report of Charles Henderson

1.      (1st bullet point, p. 66).  I disagree with Mr. Henderson's opinion that "XL's initial
coverage denials were unreasonable contrary to custom and practice."  It is my opinion that a fair
debatability existed as to whether there was coverage for the knee implant cases under XL's policy.
XL's challenge of coverage was reasonable and well within industry norms, standards, and
practices.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 2

2.      (2nd bullet point, p. 66).  Mr. Henderson is critical of XL's payment of $500,000 to Pfizer in order to bring about a Pfizer settlement which preserved Stryker's counterclaim. Mr. Henderson apparently takes the position that by XL paying $500,000 to Pfizer, as an adversary of Stryker, somehow XL "help[ed] that adversary [to] continue the fight against Stryker . . ." I disagree with Mr. Henderson.  Any dollars paid to Pfizer in settlement would potentially fund a defense by Pfizer of the Stryker counterclaim.  To suggest that Pfizer did not have the legal and financial resources to defend against the Stryker counterclaim absent the payment of $500,000 is unsupported.  Mr. Henderson goes beyond that fallacious argument by asserting that the payment was made willfully and wantonly, to the disadvantage of Stryker, and contrary to custom and practice in the industry.  I disagree.  The reason why XL paid $500,000 as a miscellaneous amount was to serve the interests of Stryker in two ways: (1) to bring about a settlement of Pfizer's judgment against Stryker as per the instructions of Stryker; and (2) to preserve Stryker's counterclaim while achieving a settlement of the Pfizer claim against Stryker.  As to whether this conduct violates industry norms, standards, and practices, it does not.  Oftentimes insurance companies will settle claims brought against the insured in a business oriented claim without imposing any specific conditions on the payment that the funds not be used to defend against an insured's counterclaim.

3.      (3rd bullet point, p. 66).  Mr. Henderson unbundles his opinion that XL allegedly unreasonably denied coverage (*see* 1 above) to add additional claims of bad faith from that first opinion.  That is to say Mr. Henderson unbundles the fallout from XL's no coverage position to build a "pattern of unreasonable conduct" in not paying knee implant claims that Stryker had settled.  While it is true that XL's no coverage position resulted in XL's determination not to provide a defense for the knee implant cases, whether bad faith exists or not is dependent upon whether XL's belief in no-coverage was "arbitrary, reckless, indifferent, or an intentional disregard of the interests of Stryker."  Here, the issue of coverage was fairly debatable on the facts and the law.  Although the 6th Circuit Court of Appeals ultimately ruled against XL's coverage position, honest errors of judgment are not sufficient to establish bad faith.

4.      (4th bullet point, p. 66). Mr. Henderson attempts to unreasonably limit the general rule throughout the United States that insurance companies can pay claims in any order that they deem appropriate and reasonable.  Mr. Henderson attempts to limit this rule to being only a 6th Circuit rule. He then superimposes upon that rule an obligation of equal consideration.  Finally, he claims that it is industry practice to seek out the insured's consent regarding priority of payments. He is wrong on all counts.  Moreover, as relevant to the facts of this case, XL was given specific instructions regarding settlement priority.  As explained in my original report, Mr. Cartier instructed XL to settle the Pfizer judgment first before coming back to Mr. Cartier to settle the Stryker judgment.  It was reasonable and appropriate for XL to abide by that instruction.  Finally, Mr. Henderson is wrong when he suggests there is some type of accepted custom and practice requiring insurance companies "to seek the insured's consent and cooperation for the priority of payment of outstanding claims when the insurer was in breach of contract by failing to defend in the first place."  There is no such industry custom or practice.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 3

   5.      (1st bullet point, p. 67). Mr. Henderson offers the following opinion:

> Contrary to custom and practice, XL as primary insurer did not consult with Stryker about
> issues relating to the priority of claims for settlement purposes, including: (1) which
> claims present the greatest excess exposure, and (2) to which claims should the available
> policy limits be allocated? While an insurer may not be bound by an insured's wishes, if
> the insurer does not follow them, then, especially here, where XL denied coverage, it is
> duty bound by custom and practice to have a sound, well-documented reason for its
> decisions, and in this case XL had none.

Regarding item number 1, the Pfizer judgment was the greatest excess exposure to Stryker.  As to
item number 2, Mr. Cartier gave specific instructions to XL to settle Pfizer first.  There is no rule
that says when an insurance company denies coverage that industry standards and practice change
in the aftermath of an adverse coverage ruling.  Certainly, XL had a "sound reason" for why it
settled the Pfizer judgment.  Moreover, as explained in my original report, Mr. Cartier, as a former
policyholder coverage lawyer, and the policyholder coverage lawyers at Miller Johnson knew or
should have known of the consent defense of TIG and provided specific instructions to XL in how
to proceed at the settlement conference.  What occurred, instead, was that Stryker gave discretion
to Mr. Daly/XL to bring about a Pfizer judgment without there being any discussion as to how XL
should accomplish that task.

   6.      (2nd bullet point, p. 67) Mr. Henderson opines as follows:

> XL's settlement of the *Pfizer* judgment instead of the original settlements was motivated
> by XL's selfish purpose and was reckless, indifferent to and an intentional disregard of
> Stryker's interests. Additionally, XL voluntarily paid a portion of the *Pfizer* judgment,
> which it continued to maintain it was not obligated to pay, even after seven years of
> litigation, in order to avoid the payment of penalty interest in *Stryker I*. Had XL
> reasonably first paid the *Stryker I* original settlements, it would have had an obligation to
> pay, at most, half of the *Pfizer* judgment.

   I disagree with this opinion.  As indicated in my original report, Stryker and its policyholder
coverage lawyers had an obligation to notify XL of the consent defect and to provide specific
instructions to XL on how Stryker wanted the settlement to proceed.  Mr. Cartier and the
policyholder coverage lawyers at Miller Johnson failed to do that.  In fact, Mr. Cartier gave
contrary instructions to Mr. Daly and XL.  What occurred instead is that Mr. Cartier and the
policyholder coverage lawyers at Miller Johnson themselves were indifferent to and were
intentionally disregarding Stryker's interests by not providing specific instructions to XL on how
to settle the case.  Further, XL was guided during the settlement conference by Judge Scoville.
Mr. Henderson's opinions indict Mr. Cartier and the policyholder coverage lawyers at Miller
Johnson.

   7.      (3rd bullet point, p. 67).  It is hard to follow the logic of Mr. Henderson since he has
strayed so far outside of industry norms, standards, and practices in offering his wishful scenario
of what should have taken place.  It is simpler to acknowledge that the consent requirements of the
TIG policy were obvious, simple, and understandable to an average reasonable person (even more

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 4

so to experienced, trained, and skilled policyholder coverage lawyers like Mr. Cartier, Mr. Portinga, and Mr. Goss) that Stryker knew that it should have gotten consent from TIG. Failing in this caused a forfeiture of coverage through the consent pathway to TIG coverage. Because Stryker knew of the consent defect it created, it should have developed a strategy for handing the settlement conference and then given specific instructions to XL about how Stryker wanted the settlement conference to go down.

8. (4th bullet point, p. 67). Mr. Henderson does not identify specific customs and practices here that he says XL, as a primary insurer, should have followed. I disagree that the Guiding Principles for Insurers of Primary and Excess Coverages apply and do not believe they are relevant to the analysis in this case. Mr. Henderson also ignores the principle (and primary) role that Stryker played in the loss of TIG coverage.

9. (5th bullet point, p. 67). Mr. Henderson takes the position that because the 6th Circuit Court of Appeals ultimately rejected the coverage position of XL that all of Stryker's conduct in this case should be ignored. Clearly, Stryker had the last clear chance to protect its own interests by competently recognizing that it failed to comply with the consent pathway to TIG excess coverage, deliberately, when it chose not to request consent for the knee implant case settlements. As the 6th Circuit has now made clear, Stryker should have known that it needed consent for all settlements, including settlements within the primary layer. Mr. Henderson ignores this. As set forth in my report, XL did not know, and had no reason to know, about the consent defect because an insurer reasonably expects its insured to comply with the requirements of its other policies. This is especially true here, where Stryker was represented by experienced policyholder coverage counsel. Stryker, and its policyholder coverage lawyers from Miller Johnson knew, or should have known, that the consent pathway to TIG coverage had been obliterated by the conscious decision made by Stryker to violate the TIG policy requirement of consent. The coverage was not completely forfeited, however, because the adjudication pathway still existed. What Stryker and its policyholder coverage lawyers failed to do was to cure their known mistake by devising a strategy to cure a circumstance that only they were aware of: the consent defect. Armed with that knowledge, Stryker could have easily given specific and directed instruction to XL to (1) satisfy the Stryker judgment first in terms of the amounts which would have fallen directly under coverage (as opposed to interest penalties and other non-covered amounts), and (2) to then seek a settlement with Pfizer using the remaining XL primary limits. Under this approach, XL would be given a policy credit for the amount of the partial Stryker settlement. If XL did not understand why that type of settlement needed to occur in that sequence, Stryker and its policyholder coverage counsel could then have confidentially revealed to XL that there was a consent defect which eliminated the consent portal to coverage under the TIG policy. The testimony of Mr. Daly demonstrates that XL would have been receptive to that approach. Thus, the only reason for the present litigation is the compounding of errors and mistakes made by Stryker and its policyholder coverage lawyers. This leads to the continuous anomalous situation where the criticisms leveled against XL by Stryker, its policyholder coverage lawyers, and its experts splash backwards and indict the conduct of Stryker and its policyholder coverage lawyers, as opposed to XL.

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 5

10.     (1st bullet point, p. 68).  Mr. Henderson makes a "litigation risk" argument in this section of his report.  However, Mr. Henderson fails to note XL's complete settlement of the *Pfizer* claim eliminated the largest adverse claim against Stryker pursuant to XL's obligations under its Policy.  Mr. Henderson's report also fails to point out that at the time of the settlement conference, Judge Bell had ruled the TIG Policy provided excess coverage after XL's Policy was exhausted.  Mr. Henderson's "litigation risk" argument is also predicated upon XL's knowledge of TIG's consent defense and the resulting ramifications of the *Pfizer* settlement.  However, as discussed in my initial report and in this rebuttal report, XL did not know, and should not have known, about Stryker's failure to obtain consent from TIG.  Stryker, as a sophisticated insured represented by experienced policyholder counsel, knew or should have known, as any reasonable person would, that it needed consent under the TIG Policy.  Therefore, from XL's perspective, settling the *Pfizer* claim did not transfer any "litigation risk" to Stryker because the largest claim was being fully resolved in accordance with XL's obligations under its Policy, because Judge Bell had ruled TIG's excess Policy provided coverage for the remaining claims against Stryker, and because XL did not know, and should not have known, about TIG's consent to settle defense.

11.     (2nd bullet point, p. 68).  I don't dispute the facts set forth by Mr. Henderson except to explain that under Michigan's penalty interest statutes, it is not clear whether penalty interest would, in fact, attach to the facts presented at the relevant times herein.  Irrespective of penalty interest, XL was instructed by Stryker to settle the Pfizer judgment and XL did so by paying its full policy limits.

12.     (3rd bullet point, p. 68).  I agree with Mr. Henderson that Mr. Daly and XL were aware of what amounts were represented by XL's policy limits and what amounts fell outside XL's policy limits and fell into supplemental payments.

13.     (4th bullet point, pp. 68-69).  As indicated in my affirmative report, the testimony from Pfizer is that it was not going to accept less on its judgment in settlement.  An attempt was made to offer less than the full judgment amount and that was rejected.

14.     (1st bullet point, p. 69).  XL was not required to investigate the ramifications of settling the Pfizer judgment ahead of the Stryker judgment.  First, Mr. Cartier gave specific instructions on the sequencing, i.e., that XL was to settle first with Pfizer.  When TIG advised that it was not going to participate in the settlement conference by paying any money, Stryker knew, or should have known, that only XL's money was available to settle the Pfizer judgment.  Knowing that, Stryker did not countervene its prior instruction to XL to settle the Pfizer judgment.  Further, XL was guided during the settlement conference by Judge Scoville.  Thus, XL continued to have Stryker's blessing in pursuing a Pfizer settlement without the imposition of any specific conditions, limitations, or restrictions on those efforts.

15.     (2nd, 3rd, and 4th bullet points, p. 69).  Stryker asked XL to assist Stryker in making arguments against TIG in an attempt to cure the intentional erroneous conduct of Stryker in failing to secure TIG's consent for any of the knee implant settlements.  At that point it was reasonable for XL to believe that an argument of waiver could be made against TIG and so XL assisted Stryker

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 6

in trying to secure for Stryker TIG's coverage. However, Stryker's intentional conduct in not securing consent prior to any of the knee implant settlements obliterated the consent pathway for coverage under the TIG policy. Only Stryker and its policyholder coverage lawyers were aware of that fact. Only Stryker and Stryker's policyholder coverage lawyers could have done something about that problem by devising a strategy to preserve the adjudication pathway to coverage under the TIG policy. Stryker and its policyholder attorneys failed to take basic reasonable steps in that regard.

16.    (5th bullet point, pp. 69-70). I incorporate my original report and the discussion set forth herein in response to this observation of Mr. Henderson. Mr. Henderson ignores the conduct of Stryker and its policyholder coverage lawyers which provided the last clear chance to prevent the current problem that is the focus of this litigation. It is evident that only Stryker and TIG knew of the consent defect. Stryker knew or should have known that it was required to get consent for the knee implant settlements and chose not to do so. When its policyholder coverage lawyers at Miller Johnson came on board, they most likely realized the problem, but could not then request consent to settle the few straggler cases that remained open because that would create an admission and acknowledgment as agents and representatives of Stryker that Stryker knew it needed to get consent from TIG for any of the settlements. At that point, perhaps, Miller Johnson's policyholder coverage lawyers made a tactical decision to not ask for consent for the knee implant settlements and they proceeded to settle the few remaining knee implant cases without TIG's consent so as not to create such a devastating admission by practice.

**B.    Report of Paul J. Hildebrand**

1.    Mr. Hildebrand, in opinion (1)a, believes that XL was obligated to "fully protect Stryker's interests and to negotiate a settlement in good faith as to all outstanding claims." XL was given specific instructions by Stryker to first proceed with an attempt to settle the Pfizer judgment and to then, and only then, come back to discuss settlement of the Stryker judgment. XL complied with those instructions. XL protected Stryker's interests by eliminating a large liability while preserving Stryker's counterclaim.

2.    In opinion (1)b, Mr. Hildebrand concludes that XL "excluded Stryker from participation in the negotiations which led to the payment of limits in Stryker II." Mr. Cartier and Stryker's policyholder coverage counsel showed a profound lack of interest in any negotiations that were taking place during the January 2009 settlement conference. In that type of mediation, the parties are free to shuttle back and forth to individual caucus rooms or to discuss case developments with the magistrate judge. The remainder of Mr. Hildbrand's discussion has been addressed in my affirmative opinion report.

3.    In opinion (1)c, Mr. Hildebrand concludes that the conduct of XL created "a litigation risk for Stryker of losing its excess coverage contrary to industry custom and practice and good faith claims handling." I disagree. Stryker's intentional conduct in not seeking consent to settle the knee implant claims eliminated the consent pathway to TIG excess coverage. Then, without explanation, Stryker never informed XL of the consent defect which Stryker created and

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 7

should have managed.  It was the conduct of Stryker and its policyholder coverage counsel that caused the loss of coverage.

4.      In opinion (2)e and the preceding subparts, Mr. Hildebrand concludes that XL wrongfully denied coverage.  The record demonstrates, in my opinion, that the coverage dispute was fairly debatable.  There is no evidence XL's conduct was arbitrary, reckless, indifferent, or done with intentional disregard of Stryker's interests.  Because there was a fairly debatable reason to believe there was no coverage for the underlying knee implant claims, it is understandable why the case went into litigation.  Contrary to the observations made by Mr. Hildebrand, XL attempted to settle the Pfizer judgment by offering less than its policy limits initially.  Pfizer made it clear that it was not going to discount its judgment.  As an aside, Stryker also had the same intransigent attitude toward discounting its claim.  At the conclusion of the settlement conference, it was announced that an agreement had been reached in principle, meaning that XL was going to pay its policy limits to resolve the case.  It would have been easy for Stryker to connect the dots, knowing that TIG's refusal to participate in the settlement meant that XL's policy limits were going to be exhausted in the Pfizer settlement.

Both of Stryker's experts have concluded that once an insurance company "wrongfully denies coverage" that it is no longer able to rely upon policy provisions.  However, that is an outlier opinion and not supported by the mainstream of insurance law in most jurisdictions.  Michigan has not adopted a requirement by statute or by case law whereby an insurance company that refuses to defend its insured is no longer entitled to act like an insurance company and rely upon its policy provisions.

I disagree with Mr. Hildebrand's opinion that XL acted outside of industry norm, standards, and practices as it litigated the coverage dispute.  I also disagree with Mr. Hildebrand's conclusion that XL "had a clear conflict of interest inconsistent with properly negotiating on Stryker's behalf . . ."  Mr. Hildebrand ignores the fact that XL paid its policy limits in accordance with instructions it received from the insured.  The record indicates that Stryker did not inform XL of the consent defect, nor did Stryker and its policyholder coverage counsel give XL specific instructions to maintain the adjudication pathway to TIG's excess coverage.  To the contrary, instead of receiving specific instructions on how to proceed, XL was told to settle the Pfizer judgment first before coming back to resolve the Stryker judgment.  A reasonable insurer would have interpreted those instructions to authorize the insurer to settle by paying its policy limits in order to protect the insured from the only current exposure.  Stryker's claim was one for reimbursement.

I am astounded by the position taken by both Stryker's experts that XL's payment of its policy limits was somehow inappropriate.  They assume that the claim could have been settled for less than the policy limits.  Testimony from Mr. Barnes establishes that Pfizer was not willing to compromise for less than XL's policy limits.

5.      Responding to Mr. Hildebrand's opinion (2)g, he does not identify what "undisputed amounts" were required to be paid.  If XL's no coverage position was established there would have been no undisputed amounts and it is common for insurance companies to wait

Charles W. Browning, Esq.
Re: *Stryker v. XL*
October 14, 2019
Page 8

for the resolution of the coverage dispute before paying any alleged "undisputed" amounts.  By definition, as long as the insurance coverage dispute is being litigated, it is a disputed amount.  As indicated in response to Mr. Henderson, XL's coverage position was fairly debatable.

6.     In response to Mr. Hildebrand's opinion (2)h, for the reasons set forth in my affirmative opinion report, I disagree with his conclusion that XL's conduct in handling the settlement was inconsistent with good faith claims handling practices.

7.     I find it interesting that Mr. Hildebrand in opinion (2)h.iii sets forth a strategy for bringing about a resolution of the claim which required first payment to Stryker.  Mr. Hildebrand's hypothetical settlement approach does not take into consideration the actual express instructions given by Mr. Cartier to XL on how to move forward with the settlement.  Mr. Hildebrand's discussion does, however, highlight the fact that Stryker should have become involved in giving specific instructions to XL, knowing that Stryker was withholding information from XL regarding the consent defect that arose from Stryker's failure to comply with the TIG policy.

There is no indication, in my opinion, of a violation of equal consideration as Mr. Hildebrand suggests.  The contrary is true.  XL followed the instructions of its insured and paid its full policy limits.  The obligation of equal consideration was fulfilled.

Mr. Hildebrand offers the opinion that "XL failed to investigate the impact of its settlement on the availability of TIG's excess coverage before entering into the settlement . . ."  I disagree that this was an obligation of XL.  However, Mr. Hildebrand indicts the conduct of Stryker and its policyholder coverage counsel.  Stryker and its policyholder coverage counsel knew or should have known of the consent defect and should have formulated a strategy to bring about a settlement to preserve the adjudication pathway to TIG excess coverage and communicated that to XL.  All of the types of conduct that Mr. Hildebrand describes was conduct that should have been engaged in by Stryker and its policyholder coverage counsel.

8.     If I have not addressed any of Mr. Henderson or Mr. Hildebrand's opinions, it is by oversight, or I believe I have already addressed it here or in my affirmative opinion letter.  My failure to mention or address any opinion of these experts is not to be construed as my agreement with those opinions.

Very truly yours,

Steven Plitt
For the Firm

SP/mcw